Nos. 17-2336, 17-2347

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

ARISTA NETWORKS, INC.,

Appellant,

v.

CISCO SYSTEMS, INC.,

Cross-Appellant.

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board No. IPR2016-00303

## APPELLANT ARISTA NETWORKS INC.'S OPENING BRIEF

Michael J. McKeon
Lauren A. Degnan
FISH & RICHARDSON P.C.
901 15th Street, N.W., 7th Floor
Washington, D.C. 20005
Tel: 202-783-5070

Seth M. Sproul
Aleksandr Gelberg
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Tel: 858-678-5070

*Counsel for Appellant Arista Networks, Inc.*

# CERTIFICATE OF INTEREST

Counsel for the Appellant Arista Networks, Inc. certifies the following:

1.      The full name of every party or amicus represented by me is:  Arista Networks, Inc.

2.      The name of the real party in interest:  Arista Networks, Inc.

3.      Parent corporations and any publicly held companies that own 10% or more of the stock of the party are:  None.

4.      The names of all law firms and the partners and associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear for the party in this court and who have not or will not enter an appearance in this case are:

**Fish & Richardson P.C.**: Ruffin B. Cordell; Robert Courtney; W. Karl Renner; Adam R. Shartzer, Jason W. Wolff

**Latham & Watkins LLP**: Douglas E. Lumish; Bert C. Reiser; Patricia Young

**Tensegrity Law Group, LLP:** William P. Nelson; Matthew D. Powers

Date:  September 6, 2017              */s/* Lauren A. Degnan
                                      Lauren A. Degnan

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF RELATED CASES ..................................................v

STATEMENT OF JURISDICTION.......................................................1

INTRODUCTION .................................................................................3

STATEMENT OF THE CASE AND FACTS .......................................4

   I.   The '577 Patent: Network Access Control Using a Content-Addressable Memory.......................................................................................4

  II.   The Prior Art....................................................................................8

      A.   Huey: Access Control in Asynchronous Transfer Mode Networks......8

      B.   ATM UNI Specification: Description of Interfaces Between ATM Network Devices .................................................................10

      C.   The Huey/ATM UNI Specification Combination...............................11

 III.   The *Inter Partes* Review Proceedings .........................................12

      A.   Arista Petitions for *Inter Partes* Review of the '577 Patent ...............12

      B.   Following Institution, the Parties Disputed Whether the Combination of Huey and the ATM UNI Specification Discloses "Access Control" and Other Limitations.........................................................................19

      C.   The Final Written Decision: Claims 1, 7–10, 12–16, 18–22, 25, and 28–31 Are Unpatentable Over the Combination of Huey and the ATM UNI Specification.................................................................21

      D.   The Final Written Decision: Claim 2 .................................................24

SUMMARY OF THE ARGUMENT ...................................................25

ARGUMENT ....................................................................................................26

I.    Standard of Review..................................................................................26

II.   The Phrase "In Parallel Using a Pipelining Technique" Requires
      Pipelined Stages Simultaneously Operating on Different
      Incoming Packets......................................................................................27

      A.    Claim 2 Operates Within the Context of Steps Occurring in a
            Sequential Fashion ............................................................................27

      B.    The Board's Analysis Relies on Limitations Not Present
            in Claim 2 ........................................................................................30

III.  The Board Ignored Huey's Teaching of Parallel Operation Using a
      Pipeline Technique in View of One of Ordinary Skill..................................35

CONCLUSION ..................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*In re Applied Materials, Inc.*,
    692 F.3d 1289 (Fed. Cir. 2012) ..........................................................................26

*Ariosa Diagnostics v. Verinata Health Inc.*,
    805 F.3d 1359 (Fed. Cir. 2015) ..........................................................................38

*Belden Inc. v. Berk-Tek LLC*,
    805 F.3d 1064 (Fed. Cir. 2015) ..........................................................................39

*Consol. Edison Co. of N.Y. v. NLRB*,
    305 U.S. 197 (1938).............................................................................................26

*Homeland Housewares, LLC v. Whirlpool Corp.*,
    865 F.3d 1372 (Fed. Cir. 2017) ..........................................................................39

*Los Angeles Biomedical Research Inst. at Harbor-UCLA Med. Ctr. v.*
    *Eli Lilly & Co.*,
    849 F.3d 1049 (Fed. Cir. 2017) ..........................................................................31

*Randall Mfg. v. Rea*,
    733 F.3d 1355 (Fed. Cir. 2013) ..........................................................................38

**Statutes**

35 U.S.C. § 102 ....................................................................................................10

35 U.S.C. § 103 .............................................................................................*passim*

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel states:

(a) On December 19, 2014, Cisco Systems, Inc. ("Cisco") filed two complaints requesting that the U.S. International Trade Commission commence investigations against Arista under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. §1337. The Commission instituted Investigation Nos. 337-TA-944 and -945 based on these complaints. The Commission's determination in the -944 Investigation is under appeal in Appeal Nos. 16-2539, 16-2563. Oral argument in those appeals was heard on June 6, 2017 before judges Reyna, Schall, and Wallach. The -945 Investigation includes U.S. Patent No. 6,377,577 ("the '577 patent"), which is the subject of the current appeal before the Court. The Commission's determination in the -945 Investigation is under appeal in Appeal Nos. 17-2289, 17-2351. In addition, a patent infringement action Cisco filed against Arista is pending and styled *Cisco Systems, Inc. v. Arista Networks, Inc.*, Case No. 5:14-cv-05343 (N.D. Cal. filed Dec. 5, 2014). The N.D. Cal. action involves the same patent as this appeal, and other patents asserted across the two Commission investigations. The N.D. Cal. action is stayed pending completion of the Commission investigations and any appeals, pursuant to 28 U.S.C § 1659(a).

(b)  On September 28, 2016, the ITC instituted an enforcement proceeding involving U.S. Patent No. 7,162,537, at issue in Appeal No. 16-2563, designated Investigation No. 337-TA-944 (Enforcement Proceeding).

(c) On December 5, 2014, Cisco filed a complaint in N.D. Cal. asserting copyright and patent infringement by Arista.  This action is styled *Cisco Systems, Inc. v. Arista Networks, Inc.,* Case No. 5:14-cv-05344, and involves U.S. Patent Nos. 7,047,526 and 7,953,886.  The final judgment of N.D. Cal. in this action is under appeal before the Court in Appeal No. 17-2145.

(d) The Patent Trial and Appeal Board has instituted six *inter partes* review ("IPR") proceedings involving patents involved in the two ITC investigations: (1) IPR2015-00975 involving U.S. Patent No. 8,051,211; (2) IPR2015-00978 involving U.S. Patent No. 7,340,597; (3) IPR2016-00303 involving the '577 patent, which is the subject of the current appeal before the Court; (4) IPR2016-00306 involving U.S. Patent No. 7,023,853, which is a continuation of the '577 patent; (5) IPR2016-00308 involving U.S. Patent No. 7,162,537; and (6) IPR2016-00309 involving U.S. Patent No. 7,224,668.

(e)  The Final Written Decision in IPR2015-00975 involving U.S. Patent No. 8,051,211 issued on October 5, 2016.  Arista filed a notice of appeal of this Final Written Decision on December 5, 2016.  This appeal was docketed in the U.S. Court of Appeals for the Federal Circuit as *Arista Networks, Inc. v. Cisco Systems,*

*Inc.*, Appeal No. 17-1313, on December 6, 2016.  Cisco's cross-appeal was

docketed as Appeal No. 17-1380, on December 20, 2016, and these appeals were

consolidated that same day.

(f) The Final Written Decision in IPR2015-00978 involving U.S. Patent No.

7,340,597 issued on September 28, 2016.  Arista filed a notice of appeal of this

Final Written Decision on October 11, 2016.  This appeal was docketed in the U.S.

Court of Appeals for the Federal Circuit as *Arista Networks, Inc. v. Cisco Systems,*

*Inc.*, Appeal No. 17-1046, on October 14, 2016.  Cisco's "protective" cross-appeal

was docketed as Appeal No. 17-1281, on November 29, 2016.  On December 20,

2016, Appeal No. 17-1046 was dismissed without prejudice, and on December 22,

2016, Appeal No. 17-1281 was dismissed without prejudice.  On January 13, 2017,

the Board denied Cisco's request for rehearing.  On January 23, 2017, Arista filed

a Notice of Appeal, docketed as Appeal No. 17-1525.  On February 3, 2017, Cisco

filed a Notice of Cross Appeal, docketed as Appeal No. 17-1577.  These appeals

were consolidated on February 6, 2017.

(g) The Final Written Decision in IPR2016-00306 involving U.S. Patent No.

7,023,853 issued on May 25, 2017.  Arista filed a notice of appeal of this Final

Written Decision on July 26, 2017.  This appeal was docketed in the U.S. Court of

Appeals for the Federal Circuit as *Arista Networks, Inc. v. Cisco Systems, Inc.*,

Appeal No. 17-2348, on July 27, 2017.

(h) The Final Written Decision in IPR2016-00308 involving U.S. Patent No. 7,162,537 issued on May 25, 2017.  Arista filed a notice of appeal of this Final Written Decision on July 26, 2017.  This appeal was docketed in the U.S. Court of Appeals for the Federal Circuit as *Arista Networks, Inc. v. Cisco Systems, Inc.*, Appeal No. 17-2349, on July 27, 2017.

(i) The Final Written Decision in IPR2016-00309 involving U.S. Patent No. 7,224,668 issued on June 1, 2017.  Cisco filed a notice of appeal of this Final Written Decision on August 1, 2017.  This appeal was docketed in the U.S. Court of Appeals for the Federal Circuit as *Cisco Systems, Inc.*, *v. Arista Networks*, *Inc.,* Appeal No. 17-2384, on August 3, 2017.

**STATEMENT OF JURISDICTION**

This appeal arises from a final written decision of the Patent Trial and Appeal Board of the United States Patent and Trademark Office in an *inter partes* review proceeding, IPR2016-00303, concerning Cisco's U.S. Patent No. 6,377,577.  The Board issued its final written decision on May 25, 2017. Appx1–38.  On July 21, 2017, Arista filed a Notice of Appeal.  On July 26, 2016, Cisco filed a Notice of Cross Appeal.

Arista's Notice of Appeal was filed within the 63-day time limit set by 35 U.S.C. § 142 and 37 C.F.R. § 90.3(a)(1).  This Court, therefore, has jurisdiction over this appeal under 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.     Whether substantial evidence supports the Board's decision that claim 2 of the '577 patent was not obvious where the Board disregarded the prior art's clear teachings that certain steps are performed "in parallel using a pipeline technique," as required by claim 2.

## INTRODUCTION

Arista appeals the Board's conclusion that the combination of the Huey patent and the ATM UNI Specification does not teach claim 2, which requires performing at least two of the steps recited in claim 1 "in parallel using a pipeline technique."

The Board found that Huey and the ATM UNI Specification combination renders obvious independent claim 1 of U.S. Patent No. 6,377,577 ("the '577 patent") and all challenged dependent claims except claim 2. The Board erred with respect to only claim 2, which contains a unique requirement unrelated to any of the other claims. Claim 2 requires performing at least two steps from claim 1 "in parallel using a pipeline technique," referring to a simultaneous operation of pipeline stages on different packets. The record is undisputed that the combination of Huey and the ATM UNI Specification discloses a set of pipelined stages that operate at the same time on a plurality of incoming packets. The Board misunderstood the "parallel" limitation, however, and this misunderstanding infected its analysis of the prior art, leading it to disregard Huey's most pertinent teachings. When those teachings are considered, the combination of Huey and the ATM UNI Specification clearly renders claim 2 obvious. Because substantial evidence does not support the Board's finding to the contrary, this Court should reverse the Board's decision with respect to claim 2.

## STATEMENT OF THE CASE AND FACTS

I.     **The '577 Patent: Network Access Control Using a Content-Addressable Memory**

The '577 patent, titled "Access Control List Processing in Hardware,"
relates to techniques for enforcing access control for a computer network using a
content-addressable memory (CAM).  Appx39 at (57).  The patent explains that
data packets transmitted between network devices can be restricted using a
technique known as "access control."  Appx45 at 1:6–8.  One such technique
involves using access control lists, or "ACLs," to determine whether to permit or
deny transmission of packets to a particular destination.  *Id.* at 1:13–15 ("[T]he
ACL describes which selected source devices are permitted (and which denied) to
send packets to which selected destination devices.").

The '577 patent specification provides an example of a known ACL format,
where each ACL includes "access control specifiers."  *Id.* at 1:17.  These specifiers
contain information to match with incoming packets and then, based on a match,
specify a particular access result (e.g., whether transmission of packets is
"specifically permitted or specifically denied").  *Id.* at 1:16–27.



*FIG. 1*

Figure 1 of the '577 patent reproduced above, *see* Appx42, illustrates a preferred embodiment for performing access control.  As part of the shown workflow, following packet 130's arrival at one of the system's packet interfaces 101, *see* Appx46 at 3:30–31, routing element 110 selects one or more of the output interfaces to which the packet should be forwarded.  *Id.* at 3:32–36.  Prior to forwarding, access control element 120 determines whether to allow transmission of the packet.  *Id.* at 3:36–40.



**FIG. 2**

Figure 2 reproduced above, *see* Appx43, illustrates a preferred embodiment of access control element 120 shown on Figure 1. When packet 130 arrives at access control element 120, packet label 200 is created based on information derived from packet header 133 of packet 130. Appx46 at 4:1–4. The information in packet label 200 is compared to label match mask 212 and label match pattern 213 of each access control specifier 211. *Id*. at 4:34–47. If a match is found with a particular access control pattern, priority encoder 200 selects the corresponding access control specifier 211 with the highest priority and provides an indicator of

6

that access control specifier 211 to output port 202.  *Id*. at 4:47–56.  The indicator

specifies an access control result, which specifies if the packet should be

transmitted.  *Id*. at 4:57–65.

The '577 patent contains only one independent claim, which is reproduced

below:

> 1. A method, including the steps of maintaining a set of access control patterns in at least one associative memory;
> receiving a packet label responsive to a packet, said packet label being sufficient to perform access control processing for said packet;
> matching matchable information, said matchable information being responsive to said packet label, with said set of access control patterns in parallel, and generating a set of matches in response thereto, each said match having priority information associated therewith;
> selecting at least one of said matches in response to said priority information, and generating an access result in response to said at least one selected match; and
> making a [r]outing-decision in response to said access result.

Appx48 at 7:34–48.  The patent further contains multiple dependent claims,

including claim 2, which describes performing certain of the steps recited in claim

1 "in parallel using a pipeline technique":

> 2. A method as in claim 1, including the step of performing at least two of said steps of receiving, matching, selecting, and making a routing decision, in parallel using a pipeline technique.

*Id*. at 7:49–52.

## II.    The Prior Art

### A.    Huey: Access Control in Asynchronous Transfer Mode Networks

U.S. Patent No. 5,467,349 ("Huey"), titled "Address Handler for an

Asynchronous Transfer Mode Switch," teaches an address handling circuit for an

asynchronous transfer mode (ATM) switch.  Appx407 at (57); Appx420 at 1:8–10.

The disclosed switch contains an address handling circuit that processes a stream

of data consisting of data cells (ATM packets).  Appx421 at 4:58–60.  Each cell

has a header, including a virtual channel identifier (VCI) and a virtual path

identifier (VPI), and a data load.  *Id*. at 4:60–62.



Figure 4 of Huey reproduced above, *see* Appx409, illustrates a functional

block of an ATM switching system described in the specification.  As shown, the

system includes a plurality of input ports, 50(1), 50(2), to 50(N), switch fabric 54,

and a plurality of output ports 58(1), 58(2), to 58(M).  Appx421 at 3:34–38; Appx422 at 5:54–56.  Each input port 50 can include an address handler 62, a cell router 66, and a cell traffic policer 70.  Appx421 at 3:38–40.  Address handler 62 evaluates the header 24 of each arriving cell 22 to validate cells for routing by cell router 66 and to detect invalid cells that are not routed.  *Id.* at 3:40–42.  Cell traffic policer 70 monitors input data streams including a plurality of cells 22 on a VP and/or VC basis at entry points to ATM switching network to ensure that no subscriber exceeds a subscribed peak input data rate.  *Id.* at 3:46–54.  If needed, cell policer 70 can also monitor average input data stream rates.  *Id.* at 3:54–55.



Fig-10a

Figure 10a of Huey reproduced above, *see* Appx415, illustrates a logic diagram of address handling circuit 340.  As part of the operation, CAMs 364 and

9

368 load the VPI/VCI information from compare bus 360 into comparand registers

376 and 378.  Appx424 at 9:13–15.  Then, CAMs 364 and 368 compare the

VPI/VCI information against all VP/VC addresses stored in arrays 386 and 388

simultaneously to determine if there is a match.  *Id.* at 9:17–20.  A match by CAM

364 or 368 is signaled to match address circuit 392, which enables the highest

priority CAM that has the match.  *Id.* at 9:20–23.  The circuit then outputs the

match address register of the highest priority CAM onto match address bus 404.

*Id.* at 9:23–25.

### B.    ATM UNI Specification: Description of Interfaces Between ATM Network Devices

ATM User-Network Interface Specification version 3.0 ("ATM UNI

Specification") defines the interfaces used between ATM user devices and

switches.  Appx457–458.  ATM is a telecommunications concept defined by the

American National Standards Institute (ANSI) and International

Telecommunications Union (ITU) standards for carriage of a complete range of

user traffic, including voice, data, and video signals, on any User-to-Network

Interface (UNI).[1]  Appx456.  Among other things, the ATM UNI Specification

---

[1] The ATM User Specification is prior art under 35 U.S.C. § 102(b), because it was published in 1993, several years before the critical date of the '577 patent, by Prentice Hall.  Appx432–433.  Arista submitted a declaration by an employee of Person (parent of Prentice Hall) certifying the publication of the ATM User Specification in 1993.  Appx3126 at §§ 3–4.  Arista also submitted a declaration of

describes a Usage Parameter Control ("UPC") which validates the ATM

connections and measures and restricts the transmission rate of those ATM

connections.  Appx549; Appx552–553.  The UPC's main purpose is to protect

network resources from malicious or unintentional misbehavior that can affect the

integrity of other already established connections and impact their negotiated

bandwidth allocation or Quality of Service (QoS).  *Id*.  Each Virtual Connection

negotiates a Traffic Contract during setup, and the UPC ensures conformance with

the contract by enforcing data cell rate limiting, including discarding cells that

exceed allowed rate limits for a particular VPI or VCI.  *Id.*

### C.    The Huey/ATM UNI Specification Combination

One of ordinary skill would be motivated to combine Huey with the ATM

UNI Specification.  Huey describes an address handling circuit for an ATM switch

that processes a network data stream.  Appx407 at (57); Appx420 at 1:8–10.  Huey

specifically describes that the ATM switch "can also interface with an end device

or customer premises equipment (CPE) via user to network interfaces (UNI)."

---

a librarian who analyzed the ATM User Specification's library record at the
Arizona State University and concluded that the book was cataloged and available
through the university library by at least June 15, 1994, also years before the
critical date of the '577 patent.  Appx3118 at § 8.  Finally, Arista submitted prior
art documents authored by Cisco that cite to and confirm public availability the
ATM User Specification. *See, e.g.,* Appx3179–3180 ("The UNI 3.0 specification
is published by Prentice Hall and should be available at most technical
bookstores."); Appx3205 at (45), (73); Appx3213 at 6:15–17.

Appx420 at 2:26–32.  The ATM UNI Specification describes the operation of the specific interfaces disclosed in Huey.  Appx457–58; Appx549; Appx552–53.  In essence, the ATM UNI Specification explains how the hardware of Huey's ATM system operates.  Therefore, a person of ordinary skill would have been motivated to combine the teachings of Huey with the teachings of the ATM UNI Specification.  Appx155–156 (Chao Declaration) at § 92.

## III.   The *Inter Partes* Review Proceedings

### A.   Arista Petitions for *Inter Partes* Review of the '577 Patent

Arista petitioned for *inter partes* review of the '577 patent, and sought cancellation of independent claim 1 and dependent claims 2, 7–10, 12–16, 18–22, 25, and 28–31 on the ground of their being obvious over Huey in view of the ATM UNI Specification under 35 U.S.C. § 103.  Appx61–123.

Arista argued that the broadest reasonable interpretation of "access control" "encompass[es] restrictions or modifications of the transmission of a packet." Appx70.

For independent claim 1, Arista contended that "Huey in combination with the ATM UNI Specification teaches a method, including the steps of maintaining a set of access control patterns—e.g., VP and VC addresses stored in CAM arrays—in at least one associative memory—CAMs 364 and 368." Appx78.  In particular, Arista focused on Huey's disclosure of address handler 62 and cell traffic policer

70 of Input Port 50. Appx78–79. Huey Figure 4 illustrates the interconnection of these modules.



Fig-4
PRIOR ART

Appx79. As part of the workflow, address handler 62 validates the headers of each incoming cell for routing by cell router 66. *Id.* Then, cell traffic policer 70 monitors cell traffic for compliance on a VP and/or VC basis. *Id.* Huey's address handling circuit includes content addressable memory units (CAMs 364 and 368) that store VP/VC addresses (representing virtual paths and virtual channels within a virtual path) used to filter data cell traffic in the cell policer. Appx79–80.

Arista showed that Huey in combination with the ATM UNI Specification discloses using address handler 62 and cell traffic policer 70 to enforce access control. Arista explained that the ATM cell policer functionality is described in the ATM UNI Specification, under the section on the Usage Parameter Control (UPC). Appx80. The UPC's main purpose is to protect the network from

13

malicious or unintentional misbehavior by detecting violations of negotiated traffic parameters and taking appropriate actions. *Id.* The UPC monitors traffic, i.e., cells or packets, entering the network from both active Virtual Channel Connections (VCCs) and Virtual Path Connections (VPCs) and may pass cells if they conform to the negotiated Traffic Contract, or discard cells if they do not. Appx81.

Next, Arista argued that "Huey in combination with the ATM UNI Specification teaches receiving a cell header—i.e. a 'packet label'—that is derived from a cell, the cell header being sufficient to perform access control processing for the cell." Appx82–83. Huey teaches that headers of incoming non-idle cells are loaded into header register 352. *Id.* Those cell headers include VPI/VCI addresses and are compared with VP/VC addresses stored in CAMs 364 and 368.

Further, Arista explained that "Huey in combination with the ATM UNI Specification teaches matching matchable information—VPI/VCI header entries— from the cell header with a set of access control patterns—VP/VC addresses stored in CAM arrays—in parallel, and generating a set of matches in response thereto, each said match having priority information associated therewith." Appx84. In particular, Huey teaches parallel searching in CAMs 364 and 368 for entries that match information from the cell header. Appx84–85. Annotated Figure 10a of Huey reproduced below illustrates CAMs 364 and 368:



Fig-10a

Appx85 (annotations added). VPI/VCI addresses, i.e. "matchable information," stored in comparand registers 376 and 378 are compared against VP/VC addresses stored in arrays 386 and 388 of CAMs 364 and 368. *Id*. Arista also explained that Huey teaches CAM priority (for example, CAM 368 corresponding to a VC filter could have priority over CAM 364 of a VP filter) and an array location for the matched VP/VC address are used to extract the cell identifier (or routing data) for the matching entry. Appx86.

Arista showed that "Huey teaches that—upon the identification of all matching data—any match by any of the CAMs is signaled to a match address circuit 392, which then enables the highest priority CAM that has one or more matches." Appx87. In Huey, contents of the match register of the highest priority

15

CAM are transferred to highest priority match address register 406, which in turn transmits the match data to configuration and control circuit 408.  Appx87–88. The latter then queries the highest priority CAM using the match address to obtain the cell identifier, i.e. "routing data," stored in the VP/VC hearing in the CAM array (386 or 388) of the highest priority CAM.  *Id.*  Following that, data for cells that have matched a VP/VC address stored in the CAM arrays is passed to the cell traffic policer, while other cells are discarded.  Appx88.

Arista explained that "Huey in combination with the ATM UNI Specification teaches that the cell traffic policer implements the UPC functionality [that generates an access result] in response to said at least one selected match." *Id.*  The ATM UNI Specification discloses that "[u]sage parameter control is performed on VCCs or VPCs," and that the UPC enforces the negotiated Traffic Contract including the allotted bandwidth and other traffic restrictions for data cells in a given VPI or VCI.  Appx88–89.  This enforcement involves monitoring the traffic entering the network from active VPIs and VCIs to determine whether the agreed traffic parameters are violated, and may result, among other things, in cell passing or cell discarding.  Appx89–90.  The latter action is reserved for cells that do not conform with to the negotiated Traffic Contract, such as for example a cell exceeding an established rate.  Appx90–91.

16

Finally, addressing the last element of claim 1, Arista argued that "Huey in combination with the ATM UNI Specification teaches making a routing decision in response to said access result." Appx91–92. Huey in combination with the ATM UNI Specification, which discloses the UPC functionality, teaches that the cell traffic policer 70, among other things, passes or discards cells based on its determination whether a given cell conforms to Traffic Contract. *Id.*

With regard to dependent claim 2, Arista explained that "Huey teaches that several steps involved in cell handling may be accomplished in parallel using a pipeline technique." Appx93. In Huey, the steps of receiving a stream of cells each including a cell header, matching the VPI/VCI fields, selecting a match, and making a routing decision based on the match are all performed in real time, i.e. fast enough that each stage must operate concurrently on different packets. *Id.* Huey's pipeline first processes cells by the address handler—including receiving, matching, and selecting—and then by the cell policer—including selecting and making a routing decision. Appx93–94. Because this pipeline architecture operates on a stream of cells in real time, it meets the requirements of claim 2.

For other dependent claims, Arista likewise relied on the combination of Huey and the ATM UNI Specification and argued that those claims are rendered obvious. Appx95–122.

17

In its Patent Owner's Preliminary Response, Cisco argued that "access control," which involves "restriction of transmission of a packet to its intended destination," should be different from "simple forwarding" that determines "where a packet should go based on its address."  Appx879–881.  Cisco then contended that "[n]either Huey nor ATM UNI discloses 'access control.'"  Appx887. According to Cisco, Huey "discloses address lookup and filtering on ATM cells, that Arista's 'access control' argument involving Huey's address handler and policer is flawed, and that the ATM UNI Specification never mention the term "access control" and related terms.  Appx887–893.  Cisco further argued that the Board should deny institution on the ground that the doctrine of assignor estoppel bars Arista from challenging the validity of the '577 patent.  Appx897–912.

The Board subsequently instituted *inter partes* review on the '577 patent. The Board declined to deviate from its continued policy of rejecting assignor estoppel as a doctrine applicable to *inter partes* review.  Appx1509–1511.  Turning to claim construction, the Board construed "access control" as "restriction on the transmission of a packet or alteration of a selected output interface for the packet." Appx1512–1514.  Using this construction, the Board found that Arista met its burden of showing a reasonable likelihood that all challenged claims are unpatentable.  Appx1524.  The Board rejected Cisco's argument that Huey does not disclose "access control."  Appx1520–1523.  It stressed that Arista relies on

Huey's scenario "where the VP/VC information from a cell header ***does*** match . . .
[and] the cell is . . . subsequently discarded by cell traffic policer 70 for not
confirming with the Traffic Contract," in view of the UPC disclosure of the ATM
UNI Specification.  Appx1521 (emphasis added).  The Board concluded that
Huey's traffic cell policer 70 imposes "a restriction on transmission of a packet,"
and thus performs "access control" under the Board's construction.  Appx1522.

> **B.     Following Institution, the Parties Disputed Whether the
> Combination of Huey and the ATM UNI Specification Discloses
> "Access Control" and Other Limitations**

Following the institution decision, Cisco continued arguing that Huey in
view of the ATM User Specification fails to disclose "access control."  Cisco
contended that the Board erred in its construction of "access control," *see*
Appx1548–1553, that Huey fails to perform "denying access when a match is
found," *see* Appx1561–1562, that Huey's address handler only performs "ordinary
forwarding," *see* Appx1578, and that neither Huey's traffic policer, nor UPC
disclosed in the ATM UNI Specification is shown to be implemented in hardware,
as required by the '577 patent's claims.  *See* Appx1567–1568.  Cisco further
contended that Huey does not disclose a "packet label," because the claims
specifically refer to Internet Protocol (IP) packets, not ATM cells, *see* Appx1571,
and that Huey's cell policer in combination with ATM UNI Specification's UPC is
not "sufficient to perform access control processing."  Appx1577.

Turning to dependent claim 2, Cisco attempted to make a distinction between performing the requisite steps "in parallel" versus performing them "in real time." Appx1582. Cisco did not address, however, Arista's reference to the pipeline processing circuit disclosed in Huey and illustrated in Figure 4 where each stage of the pipeline simultaneously operates on a different one of a stream of cells, one after the other as they work their way through the pipeline. Finally, Cisco argued that Arista did not show that other challenged claims are unpatentable in view of Huey and the ATM UNI Specification. Appx1585–1588.

In its reply, Arista refuted Cisco's arguments on "access control" and explained that that Cisco relies on structural limitations that are not part of the claim. *See* Appx2388–2396, Appx2401–2403. Addressing the "packet label" limitation, Arista stressed that Cisco improperly attempts to limit the claim to a preferred embodiment from the specification and that Huey in view of the ATM UNI Specification explicitly discloses performing traffic control processing for each cell, thus meeting the claim language. Appx2397–2401.

With respect to dependent claim 2, Arista explained that performing interdependent stages recited in claim 1 "in parallel using a pipeline technique" translates, under the broadest reasonable interpretation, into operating "on *different packets*, but at the same time." Appx2404 (emphasis in original). Arista stressed that one of ordinary skill would understand that Huey teaches the recited pipelined

operation since "the address handler, cell router, and cell policer are connected in a pipelined fashion" and because "operating the address handler and cell policer at the same time" on multiple packets would be fast and efficient. Appx2404–2405.

Finally, Arista's reply traversed Cisco's argument on claims 9 and 10, which were the only other claims that Cisco chose to dispute in its response. Appx2405.

## C. The Final Written Decision: Claims 1, 7–10, 12–16, 18–22, 25, and 28–31 Are Unpatentable Over the Combination of Huey and the ATM UNI Specification

The Board correctly found that Arista showed claims 1, 7–10, 12–16, 18–22, 25, and 28–31 are obvious over the combination of Huey and the ATM UNI Specification.

As an initial matter, the Board declined to apply the doctrine of assignor estoppel to the instant proceeding. Appx7–8. The Board was not persuaded by Cisco's arguments that it should deviate from its continued policy of rejecting assignor estoppel as doctrine applicable to *inter partes* review. *Id.* The Board also denied Cisco's motion to exclude the ATM UNI Specification, on the ground that the ATM UNI Specification was a printed publication that was publicly accessible before the invention date of the '577 patent. *Id.*

Next, the Board ruled on claim construction. Because Arista did not rely on the "alteration" portion of the construction of "access control," the Board rejected Cisco's objections and declined to determine whether that portion of the

construction was correct.  Appx11–12.  Instead, the Board held that, for purposes of this decision, "access control" shall mean "restriction on the transmission of a packet."  *Id.*

The Board then found that Huey in view of the ATM UNI Specification renders claims 1, 7–10, 12–16, 18–22, 25, and 28–31 obvious.  Appx22–31; Appx34–36.  With regard to independent claim 1, the Board methodically rejected Cisco's argument that the prior art combination does not disclose "access control."  The Board explained that Arista is not relying on a scenario where the CAM search produces no matches, but rather refers to the operation "where the VP/VC information from a cell header ***does match*** and the cell is then ***discarded*** by cell traffic policer 70 for not confirming with the Traffic Contract."  Appx23–24 (emphasis added).  The Board observed that "no cell is ever discarded by cell traffic policer 70 unless that cell has first been matched by address handler 62" and that "the VC/VP addresses that are used to make a match are not required by the claims to also generate the access result."  Appx26–27; *see also* Appx30.  The Board likewise rejected Cisco's arguments on "access control" that entirely ignored cell traffic policer 70, inappropriately conflated the steps of "maintaining access control patterns" and "making a routing-decision," and erroneously attempted to limit the claim to performing access control in hardware memory or CAM.  Appx24–27.

The Board was also unpersuaded by Cisco's arguments with regard to "packet label . . . sufficient to perform access control processing."  The Board refused to draw a distinction between Huey's ATM cells and IP packets, which Cisco argued was the field of the '577 patent invention.  Appx27–28.  Next, addressing a related contention that Huey's ATM cell header does not meet the limitation of a "packet label . . . sufficient to perform access control processing" because Huey's address handler performed only an "ordinary forwarding operation," the Board stressed that its construction does not distinguish between "ordinary forwarding" and "access control," and it does not require specific source and destination information to be present in the packet label.  Appx28–29.

Finally, the Board rejected Cisco's argument about the lack of a "routing decision" in the prior art.  Cisco contended that "changing the output interface is a routing decision" and that the ATM switch in Huey is incapable of doing that.  Appx30.  The Board held that Cisco's point is irrelevant because the construction of "access control" includes "restriction on the transmission of a packet, i.e. dropping the packet," which is a routing decision that [the Board has] found that Huey does make."  Appx30–31.

For dependent claims 9 and 10, the Board held that Huey's "determination of priority based on in which physical CAM the match occurred" is sufficient to meet the claims' limitation.  Appx34–35.  Lastly, because Cisco did not raise any

additional arguments for claims 7–8, 12–16, 18–22, 25, and 28–31, except that they were supposedly unpatentable for the same reason as claim 1, the Board adopted Arista's contentions and found those claims unpatentable. Appx36.

### D.   The Final Written Decision: Claim 2

The Board found that Arista failed to show that claim 2 is obvious over the combination of Huey and the ATM UNI Specification.

The Board started its analysis of claim 2 by interpreting the term "in parallel using a pipeline technique." Appx31. The Board stated that the '577 patent's specification "describes that the step of selecting an output interface and the step of determining the output permission for a packet, which includes matching a packet label against the access control memory, determining all of the successful matches, determining the highest priority match, and providing an output result, are performed in parallel." *Id.* The Board did not explain, however, why it referred to the steps of "selecting an output interface" and "determining the output permission for a packet," neither of which appears in claim 2. The Board also did not explain its finding that this disclosure does not teach a "pipeline technique," as expressly required by the claim. The Board further held that "the Specification does support the fact that when discussing parallel operations, it is discussing two steps of processing a packet occurring at the same time." *Id.* Thus, the Board appeared to

misunderstand the phrase "in parallel using a pipeline technique" to mean a concurrent operation on a single packet.

The Board did not directly address Arista's argument that Huey discloses pipelined stages in Figure 4 that operate on a stream of cells at the same time.  The Board further declined to take into account Arista's additional evidence—the Kogge book on pipelining technique—that confirms that one of ordinary skill would necessarily recognize that the address handler and the cell policer in parallel using a pipeline technique.  Appx33–34.  The Board held that Arista failed to combine Kogge with Huey and the ATM UNI Specification and to explain how Kogge's pipelining operates in parallel.  *Id.*

This appeal followed.

## SUMMARY OF THE ARGUMENT

The Board erred in holding that the combination of Huey and the ATM UNI Specification does not render claim 2 unpatentable.  The Board first misinterpreted claim 2 when it relied on claim language from a different claim of a different, albeit related, patent into claim 2.  This language does not appear in claim 2 and carries with it different requirements and meaning than the actual language of claim 2.

This error led the Board to disregard the unrebutted teachings of Huey and the ATM UNI Specification.  Huey discloses pipelined stages that process packets

simultaneously.  Arista's expert testified that one of ordinary skill would understand the stages in Huey to operate at the same time on different packets. The Kogge reference, on which Arista relied to show the general understanding of one of ordinary skill, also shows that it was well-known before Huey that pipelined stages operate concurrently, or simultaneously.  This reference thus confirms that one of ordinary skill would understand Huey in light of the ATM UNI Specification to satisfy claim 2's requirement that two steps be performed "in parallel in a pipeline technique."

Therefore, substantial evidence does not support the Board's finding that the combination of Huey and ATM UNI Specification does not render claim 2 obvious and this Court should reverse the Board's decision.

## ARGUMENT

## I.     Standard of Review

This Court reviews the Board's factual findings underlying its obviousness conclusion for substantial evidence.  *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 217 (1938).

**II.    The Phrase "In Parallel Using a Pipelining Technique" Requires Pipelined Stages Simultaneously Operating on Different Incoming Packets**

Although Cisco did not identify "in parallel using a pipeline technique" as a term for construction, its arguments against claim 2 suggested that it viewed this limitation as requiring the steps to be performed in parallel for the same packet. Appx1582 (describing certain operations "for a packet . . . are all performed in parallel"). The Board stated that it did not consider Cisco to be advancing this view as a construction, but ultimately appeared to agree with the principle: "the Specification does support the fact that when discussing parallel operations it is discussing two steps of processing a packet occurring at the same time." Appx31. This view is contrary to the language of claim 2 and would exclude the preferred embodiment.

Importantly, the Board's incorrect view of the "in parallel in a pipelined technique" limitation led it to disregard Huey's disclosure of pipelining and the record evidence showing the ordinary meaning of pipelining. As discussed below, in the context of the '577 patent, "in parallel using a pipeline technique" refers to performing the relevant operations on different packets, but at the same time.

**A.    Claim 2 Operates Within the Context of Steps Occurring in a Sequential Fashion**

The language of claims 1 and 2 indicates that the term "in parallel using a pipelining technique" refers to a set of stages arranged in a pipeline that operate on

a stream of packets.  Claim 1 recites steps to be performed in a sequential fashion, one after another.[2]  Claim 2, which depends on claim 1, involves performing certain of those steps "in parallel using a pipeline."  Thus, claim 2's "parallel" limitation refers to simultaneous operation, while the "pipeline technique" refers to sequential staging of the recited steps.

Specifically, claim 1 recites a series of steps by which an incoming packet is processed.  By its express language, claim 1 requires that commencement of each step (after the first step) depend on an input from the prior step:

> 1. A method, including the steps of maintaining a set of access control patterns in at least one associative memory;
> *receiving a packet label* responsive to a packet, said packet label being sufficient to perform access control processing for said packet;
> *matching* matchable information, said matchable information being *responsive to said packet label*, with said set of access control patterns in parallel, and
> *generating* a set of matches *in response thereto*, each said match having *priority information* associated therewith;
> *selecting* at least one of said *matches in response to said priority information*, and
> *generating an access result in response to said* at least one selected *match*; and
> *making* a [r]outing-decision *in response to said access result*.

---

[2] One of these sequential steps—"matching matchable information, said matchable information being responsive to said packet label, with said set of access control patterns in parallel"—itself involves an operation that occurs in parallel for a single packet.  However, as discussed below, the structure of the claim as a whole demonstrates that the steps by which an incoming packet is processed—the receiving, matching, generating, selecting, generating, and making steps—all occur sequentially.

Appx48 at 7:34–48 (emphasis added).  For example, in order to commence the "matching" step that uses the "said packet label," the step of "receiving a packet label" needs to have been performed first.  Likewise, starting the "selecting" step that is performed in "response to said priority information" is contingent upon finishing the step of "generating a set of matches . . . having priority information" in response to the "matching" step.  Finally, the last step of "making a [r]outing decision" is performed "in response to said access result," which means that the "generating an access result" step must finish first.  *Id.*  This temporal dependence is the hallmark of a pipeline process, and precludes overlapping or simultaneous operation of any stage for any single packet.

Dependent claim 2 requires that at least two of the "receiving, matching, selecting, and making a routing decision" steps recited in claim 1 be performed "in parallel":

> 2. A method as in claim 1, including the step of performing **at least two** of said **steps** of **receiving, matching, selecting, and making** a routing decision, **in parallel using a pipeline technique**.

Appx48 at 7:49–52 (emphasis added).  Because claim 1 describes performing its steps in a sequential fashion for a particular packet, those steps cannot be performed "in parallel" for that given packet, in the sense that sequential, inter-dependent steps cannot operate on the same packet at the same time.  This is similar to an auto assembly line where a car goes through various stages

sequentially, for example applying paint and attaching wheels. The same car cannot be in two stages at once, but different cars can be processed at different stages simultaneously. In this context, claim 2 recites performing certain steps of claim 1 at the same time but on different packets.

Claim 2's reference to a "pipeline technique" further bolsters this understanding. A pipeline technique, as understood by one of ordinary skill, involves taking a "function and partition[ing] it into many autonomous but interconnected subfunctions [or stages]." Appx3293 (Kogge discussing design approaches used in the world of high-speed computers). This setup allows a "concurrent use of many different stages by different items." Appx3298. In the context of claim 2, operating a pipeline technique means performing the recited steps simultaneously, i.e. in parallel, for different packets that enter the pipeline at different times. Thus, the term "in parallel using a pipeline technique" involves operating the steps of claim 1 on multiple packets at the same time.

## B. The Board's Analysis Relies on Limitations Not Present in Claim 2

The Board misinterpreted claim 2. The Board commenced its analysis of claim 2 with a discussion of the term "parallel" in view of the specification:

> The Specification describes that *the step of selecting an output interface* and *the step of determining the output permission* for a packet, which includes matching a packet label against the access control memory, determining all of the successful matches, determining the highest priority match, and providing an output result, are

30

*performed in parallel*. *Id.* at 6:40–53. It is less clear whether the individual steps within *the step of determining the output permission for a packet*, i.e., matching a packet label against the access control memory, determining all of the successful matches, determining the highest priority match, and providing an output result, are performed in parallel.   Nevertheless, *the Specification* does support the fact that when discussing *parallel* operations it is *discussing two steps of processing a packet occurring at the same time*.

Appx31 (emphasis added).  Here, instead of analyzing the steps and their

operation, as recited in claim 2, the Board, for some unknown reason, chose to

discuss limitations of claim 63 of related U.S. Patent No. 7,023,853.[3]

---

[3] U.S. Patent No. 7,023,853 ("the '853 patent") is a continuation of the '577 patent.  Arista challenged claim 63 of the '853 patent in *inter partes* review Case No. IPR2016-00306.  The cases proceeded on parallel tracks and the Board (the same panel) heard oral argument on both the '577 and '853 patents' proceedings on the same day.  Appx3628.  Arista's appeal of the Board's decision in the '853 patent's case is docketed as Appeal No. 17-2348.

Claim 63 of the '853 patent recites the following:

> 63. A method of processing a packet comprising:
> *selecting an output interface* to which to forward the packet;
> *determining forwarding permission* for the packet,
>> wherein
>> the determining comprises
>> matching one or more characteristics of said packet with one or more access control specifiers in at least one access control element;
> processing said packet based on said forwarding permission;
> wherein,
>> *the selecting step is performed in parallel with the determining step.*

Appx3800 at 12:20–33 (emphasis added).  Although the '853 patent was not submitted as an exhibit in the '577 patent's IPR proceeding, this Court may take judicial notice of it.  *See Los Angeles Biomedical Research Inst. at Harbor-UCLA*

The steps of claim 63 are distinctly different from those of claim 2 of the '577 patent, as they are not performed serially for a particular packet, and do not operate in a pipeline fashion.  In particular, claim 2 does not recite a "step of selecting an output interface" that is performed "in parallel" with the step of "determining the output permission."[4]  These two steps cannot be performed using a "pipeline technique" as required by claim 2 since they are not part of the recited steps of claim 1.

Significantly, the steps that claim 2 does recite—receiving, matching, selecting, and making a routing decision—do not operate on the same packet at the same time in the preferred embodiment of the '577 patent.[5]  Appx46 at 4:34–67.  Rather, the specification teaches that the steps of matching, generating, selecting, and making a routing decision occur sequentially, one after the other.  *Id.*  For instance, the Abstract states that the CAM matches "information from the packet header" to "access control specifiers" stored in the CAM, and those "successful

---

*Med. Ctr. v. Eli Lilly & Co.*, 849 F.3d 1049, 1062 (Fed. Cir. 2017) (The Federal Circuit "can properly take judicial notice of the records of related court proceedings.").

[4] The Board used the phrase "determining the output permission" as proxy to refer to the collective steps of claim 1.  Appx31.

[5] As discussed above, claim 1's step of "matching matchable information . . . with said set of access control patterns in parallel" involves an operation that occurs in parallel for the same packet.  This operation has nothing to do with performing multiple steps of claim 1 "in parallel using a pipeline technique," as required by claim 2.

matches are input to a priority selector" that selects the match with the highest

priority.  Appx39 at (57).  The "specified result of the selected match is used to

permit or deny access for the packet."  *Id.*  Each of these steps requires the output

of the prior step, and thus two or more of these steps cannot be operated in parallel

for a single packet.  Indeed, the specification nowhere discloses that any of these

steps are performed in parallel, in the sense that they occur simultaneously, for a

single packet.  Given the dependence of one step on the completion of the prior

step, there is no way these steps could occur at the same time for the same packet.

The Board's error in analyzing how the steps of claim 1 can be done in

parallel stems from its reliance on the disclosure of the parallel operation of the

claim 63 elements, where the steps "selecting an output interface" and

"determining forwarding permission" are performed at the same time.  The step of

"determining forwarding permission" in claim 63 (used as proxy by the Board to

represent the steps of claim 1) is decoupled from the "selecting an output interface"

step of claim 63, which allows those steps to be done in parallel.  In contrast to the

steps of claim 63, the steps of claim 1 are sequential and cannot be done in parallel

with each other for the same packet.  The Board acknowledged as much:

> It is less clear whether the individual steps within the step of
> determining the output permission for a packet, i.e., matching a packet
> label against the access control memory, determining all of the
> successful matches, determining the highest priority match, and
> providing an output result, are performed in parallel.

Appx31.  However, without answering the very question it raised—"whether the individual steps of claim 1 are performed in parallel"—the Board sidestepped the issue and relied on the disclosed "parallel" operation of claim 63 to justify its view that the patent broadly contemplates "two steps of processing a packet occurring at the same time," and by extension so does claim 2.  *Id.*

Based on its analysis of limitations that do not even appear in claim 2, the Board disregarded the significance of "pipeline technique" in claim 2.  Appx32 ("[T]his 'pipeline' argument by Petitioner is irrelevant.").  The Board likewise overlooked critical disclosure in Huey that demonstrates that Huey's technique operates in a pipeline fashion that meets the requirements of claim 2.  Adopting Cisco's distinction, the Board concluded that:  "performing steps in real time is not the same as performing those steps in parallel as Arista alleges."  *Id.* (internal quotations omitted).  Contrary to the Board's dismissal of "real time" operation, and its conclusion that the "pipeline" argument was irrelevant, Arista's evidence demonstrates that "real time" operation in the context of the pipelined stages of Huey means they operate simultaneously on a stream of packets, i.e., in parallel. App2404–2405; Appx93–94.  The Board's misunderstanding of claim scope thus led it to reject Arista's obviousness argument and uphold the claim.

### III.   The Board Ignored Huey's Teaching of Parallel Operation Using a Pipeline Technique in View of One of Ordinary Skill

Substantial evidence does not support the Board's refusal to hold claim 2 unpatentable over Huey in view of the ATM UNI Specification.  Given the Board's finding that Huey/ATM UNI Specification combination includes all the elements of claim 1, the sole dispute for claim 2 revolves around the disclosure of performing certain of those steps in "parallel in a pipeline technique."

Arista showed that Huey discloses a series of pipelined stages that operate simultaneously and perform the matching, generating, selecting, and routing steps "in parallel using a pipeline technique" as cells pass through the pipeline.  Figure 4 of Huey shows the pipelined stages that process incoming cells in input port 50 (2):



Appx409 (annotated).  *See also* Appx421 at 3:34–57 ("Referring to FIG. 4, a switching system for packets, for example fixed-length ATM cells, is shown . . .").

Input port 50 (2) will process an incoming cell by passing it to address handler 62, then cell router 66, then finally cell policer 70.  After the first cell is passed from address handler 62 to cell router 66, another incoming cell would be processed by address handler 62, following behind the first cell, and so on, such that each stage is always operating on a cell.

Arista offered two pieces of evidence to show that one of ordinary skill would understand Figure 4 and the related disclosure in the ATM UNI Specification to teach the sequential, yet simultaneous operation of each stage on different packets as they pass through input port 50 (2).  Appx2404–2405.  The Board failed to consider this evidence properly.  First, Arista's expert Dr. Chao offered unrebutted testimony at his deposition explaining the parallel, pipeline operation in Huey:

> A. But ***the person of ordinary skill will understand that this structure will allow you to do parallel and pipeline***.  So let me explain that.
>
> So if we look at one cell perspective here, ***cell comes in, it will be handled by address handler and then the result***, you know, ***passed to the cell router and then passed to the cell policer***.  So from that perspective, it's ***pipeline here***.  Once they -- ***one followed by the other***.
>
> But ***before*** the next stage could ***finish***, then the next cell could come in here.  ***So, in other words, you could have two cells in operation or process in parallel***.  So from that perspective, you could consider it is in parallel.

Appx1788:17–1789:8 (emphasis added).  This operation was not addressed by the Board, nor disputed by Cisco.

Second, Arista cited a book titled "The Architecture of Pipelined Computers" by Kogge, published in 1981, that confirms that a person of ordinary skill would recognize Huey to teach a pipeline technique as a fundamental aspect of computer technology.  Appx2404–2405.  Kogge describes the pipelining technique as "well-recognized" by computer architects (more than 15 years before the '577 patent) for achieving higher performance:

> As a particular **item** flows through [a] pipeline, it **occupies only one stage at a time**.  **Simultaneously, an item that enters the pipeline before this item occupies a stage farther down the pipeline, and an item that enters after the referenced item occupies a previous stage.**  As time goes on, the stage vacated by one item is occupied by the one immediately following it.  **This concurrent use of many different stages by different items is often called overlap.**  The net result is that the maximum rate at which new items may enter the pipeline depends strictly on the longest time required to traverse any single stage and not the number of stages.

Appx3298 (emphasis added).  Kogge's description of pipelining expressly describes the inherent parallel, or concurrent, behavior of a pipelined system.  One of ordinary skill would understand the pipelined stages of Huey to disclose a "concurrent use of many different stages," precisely as Dr. Chao explained, and Arista argued.

The Board refused to consider Kogge because Arista did not offer it as part of a combination with Huey and the ATM UNI Specification.  Appx33–34.  The Board's decision was an error, as Kogge informs how one of ordinary skill would interpret Huey and the ATM UNI Specification without needing to be combined in

a formal obviousness combination with them. *See Ariosa Diagnostics v. Verinata Health Inc.,* 805 F.3d 1359, 1365–67 (Fed. Cir. 2015) (vacating and remanding the decision to hold patent claims nonobvious where the Board failed to consider evidence of one of ordinary skill because it was not identified as part of obviousness combination). *See also Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) ("[T]he [*KSR*] Court required an analysis that reads the prior art in context, taking account of 'demands known to the design community,' 'the background knowledge possessed by a person having ordinary skill in the art,' and 'the inferences and creative steps that a person of ordinary skill in the art would employ.'" (quoting *KSR Int'l. Co. v. Teleflex, Inc.*, 550 U.S. 398, 418 (2007))). Properly considered, Kogge teaches that one of ordinary skill would understand the sequential, pipelined stages of Huey, and the specific processing steps in the ATM UNI Specification, to operate concurrently but on different packets, that is "in parallel using a pipeline technique."

The Board then dismissed Kogge by contending that it distinguishes the pipelining technique from a parallel operation. Appx33–34. Although Kogge mentions a so-called ***parallel*** technique, it makes clear that such technique refers to "achiev[ing] high speed by ***replicating some basic function many times*** and providing each replication with one piece of the input data." Appx3293 (emphasis added). The description of a "parallel technique" on which the Board relied is thus

not the "parallel" recited in claim 2, which refers to a feature implemented by the "pipeline technique."  That is, the "parallel" recited in claim 2 is a function, or description, of the pipelining itself—the natural, inherent consequence of operating sequential stages at the same time.

The Board's distinction thus does not address the unrebutted disclosure in Huey of pipelined stages that operate simultaneously.  Under the Board's view, one of ordinary skill would understand Huey to teach sending one packet at a time through the pipeline of input port 50 (2) of Huey, until it is finally processed by the cell policer, and only then sending the next packet through the processing stages. This is not plausible, or supported by the evidence.  Dr. Chao's testimony and the disclosure of Kogge conclusively show that one of ordinary skill would understand Huey to stream packets through the pipeline such that each stage would be processing packets at all times.

The Board's refusal to find claim 2 obvious over Huey in view of ATM UNI Specification is thus not supported by substantial evidence and warrants reversal. *See, e.g.*, *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1075–77, 1082 (Fed. Cir. 2015) (reversing the PTAB's determination that claims are nonobvious where the PTAB erred in rejecting the motivation to combine prior art references and where there was no meaningful dispute that the combination of references taught the claims at issue); *see also Homeland Housewares, LLC v. Whirlpool Corp.*, 865

F.3d 1372, 1374-79 (Fed. Cir. 2017) (reversing the PTAB's determination that

claims are nonobvious where the PTAB declined to construe the term that the

Court construed and where the Patent Owner's testimony was plainly inconsistent

with the record).

## CONCLUSION

For the reasons above, the Court should reverse the Board's finding that

claim 2 was not shown to be unpatentable.

Dated: September 6, 2017                Respectfully submitted,

                                        */s/ Lauren A. Degnan*
                                        Michael J. McKeon
                                        Lauren A. Degnan
                                        FISH & RICHARDSON P.C.
                                        901 15th Street, N.W., 7th Floor
                                        Washington, D.C. 20005
                                        Tel: 202-783-5070

                                        Seth M. Sproul
                                        Aleksandr Gelberg
                                        FISH & RICHARDSON P.C.
                                        12390 El Camino Real
                                        San Diego, CA 92130
                                        Tel: 858-678-5070

                                        *Counsel for Appellant Arista Networks, Inc.*

Addendum

Trials@uspto.gov                                        Paper 53
Tel: 571-272-7822                              Entered: May 25, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

ARISTA NETWORKS, INC.,
Petitioner,

v.

CISCO SYSTEMS, INC.,
Patent Owner.

————————————

Case IPR2016-00303
Patent 6,377,577 B1

————————————

Before BRYAN F. MOORE, MIRIAM L. QUINN, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

MOORE, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. 318(a)*

## I.    INTRODUCTION

Arista Networks, Inc. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1, 2, 7–10, 12–16, 18–22, 25, and 28–31 of U.S. Patent No. 6,377,577 B1 (Ex. 1001, "the '577 patent").  Paper 1 ("Pet.").  Cisco Systems, Inc. ("Patent Owner") filed a Preliminary Response.  Paper 7 ("Prelim. Resp.").  On June 11, 2016, we instituted an *inter partes* review of claims 1, 2, 7–10, 12–16, 18–22, 25, and 28–31. Paper 8 ("Dec. on Inst.").

After institution, Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp."), and Petitioner filed a Reply (Paper 24, "Pet. Reply").  A consolidated oral hearing for this case and related Cases IPR2016-00306, IPR2016-00308, and IPR2016-00309 was held on March 7, 2017, and a transcript of the hearing has been entered into the record of the proceeding as Paper 51 ("Tr.").  Patent Owner filed a Motion to Exclude Evidence (Paper 44, "PO Mot.").  Petitioner filed an Opposition to Petitioner's Motion to Exclude Evidence (Paper 46, "Pet. Opp."); and Petitioner filed a Reply to Patent Owner's Opposition to the Motion to Exclude Evidence (Paper 48, "PO Reply to Opp.").

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a).  For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 7–10, 12–16, 18–22, 25, and 28–31 are unpatentable, but has not shown that claim 2 is unpatentable.

### A.    Related Proceedings

The '577 patent is involved in *Cisco Systems, Inc. v. Arista Networks, Inc.*, Case No. 4:14-cv-05343 (N.D. Cal.) and *Cisco Systems, Inc. v. Arista*

IPR2016-00303
Patent 6,377,577 B1

*Networks, Inc., Network Devices, Related Software and Components Thereof (II)*, ITC Inv. No. 337-TA-945.  Pet. 1; Paper 5, 1.  Petitioner has also filed other petitions requesting *inter partes* review of the '577 patent:  IPR2015-00973, IPR2015-01049, and IPR2016-00301.  Paper 5, 1.  Petitioner also has filed numerous petitions requesting *inter partes* review of other patents owned by Patent Owner.

### B.    The '577 Patent

The '577 patent is titled, "Access Control List Processing in Hardware," and relates generally to a method for performing access control list processing in hardware using an associative memory.  Ex. 1001, Abstract.  Data packets transmitted between network devices can be restricted using a technique known as "access control."  *Id.* at 1:6–8.  One access control technique is to use access control lists, or "ACLs," to determine whether to permit or deny transmission of a packet to a particular destination.  *Id.* at 1:13–15 ("[T]he ACL describes which selected source devices are permitted (and which denied) to send packets to which selected destination devices.").

The Specification provides an example of a known ACL format, where each ACL includes "access control specifiers."  *Id.* at 1:17.  These specifiers contain information to match with incoming packets, and then based on a match, specify a particular access result (e.g., whether transmission of a packet is "specifically permitted or specifically denied").  *Id.* at 1:16–27.  Figure 1 of the '577 patent is reproduced below.

IPR2016-00303
Patent 6,377,577 B1



FIG. 1

Figure 1 is a block diagram of a system for performing access control in accordance with the '577 patent.  As shown in Figure 1, packet 130 arrives at one of the system's packet interfaces 101.  *Id.* at 3:30–31.  Routing element 110 then selects one or more of the output interfaces to which the packet should be forwarded.  *Id.* at 3:32–36.  Prior to forwarding, access control element 120 determines whether to allow transmission of the packet.  *Id.* at 3:36–40.  Figure 2 of the '577 patent is reproduced below.

IPR2016-00303
Patent 6,377,577 B1



**FIG. 2**

Figure 2 is a block diagram of an access control element that contains access control patterns. When packet 130 arrives at access control element 120, packet label 200 is created based on information derived from packet header 133 of packet 130. *Id.* at 4:1–4. The information in packet label 200 is compared to label match mask 212 and label match pattern 213 of each access control specifier 211. *Id.* at 4:34–47. If a match is found with a particular access control pattern, priority encoder 200 selects the corresponding access control specifier 211 with the highest priority and provides an indicator of that access control specifier 211 to output port 202.

IPR2016-00303
Patent 6,377,577 B1

*Id.* at 4:47–56. The indicator specifies an access control result, which specifies if the packet should be transmitted. *Id.* at 4:57–65.

### C.    Illustrative Claim

Petitioner challenges claims 1, 2, 7–10, 12–16, 18–22, 25, and 28–31 of the '577 patent. Claim 1 is the only independent claim, and is reproduced below:

> 1.    A method, including the steps of
>
> maintaining a set of access control patterns in at least one associative memory;
>
> receiving a packet label responsive to a packet, said packet label being sufficient to perform access control processing for said packet;
>
> matching matchable information, said matchable information being responsive to said packet label, with said set of access control patterns in parallel, and generating a set of matches in response thereto, each said match having priority information associated therewith;
>
> selecting at least one of said matches in response to said priority information, and generating an access result in response to said at least one selected match; and
>
> making a [r]outing-decision in response to said access result.

Ex. 1001, 7:34–48.

### D.    Instituted Ground of Unpatentability

| References | Basis | Challenged Claims |
|---|---|---|
| Huey[1] and ATM UNI Specification.[2] | § 103 | 1, 2, 7–10, 12–16, 18–22, 25, and 28–31 |

---

[1] U.S. Patent No. 5,467,349, issued Nov. 14, 1995 (Ex. 1020).
[2] ATM User-Network Interface Specification, Version 3.0, Sept. 10, 1993 (Ex. 1021).

IPR2016-00303
Patent 6,377,577 B1

## II.    ANALYSIS

### A.    *Assignor Estoppel*

Patent Owner urges that the Board should have denied institution under an application of assignor estoppel, which Patent Owner admits the Board does not recognize as a defense in *inter partes* review proceedings. PO Resp. 57–64.  None of the arguments presented persuaded us to deviate from our continued policy of rejecting assignor estoppel as doctrine applicable to *inter partes* review.  As we have explained in other decisions where a patent owner has argued this issue:

> Under the AIA, "a person *who is not the owner of a patent* may file with the Office a petition to institute an *inter partes* review of the patent."  35 U.S.C. § 311(a) (emphasis added).  Consequently, under the statute, an assignor of a patent, who is no longer an owner of the patent at the time of filing, may file a petition requesting *inter partes* review.  This statute presents a clear expression of Congress's broad grant of the ability to challenge the patentability of patents through *inter partes* review.

*Athena Automation Ltd. v. Husky Injection Molding Sys. Ltd.*, Case IPR2013-00290, slip op. at 12–13 (PTAB Oct. 25, 2013) (Paper 18); *see also Esselte Corp. v. DYMO B.V.B.A.*, Case IPR2015-00779 (PTAB Aug. 28, 2015) (Paper 13); *B/E Aerospace, Inc. v. MAG Aerospace Indus., LLC*, Case IPR2014-01510, slip op. at 14–15 (PTAB March 26, 2015) (Paper 24); *Redline Detection, LLC, v. StarEnvirotech, Inc.*, Case IPR2013-00106, slip op. at 12-13 (PTAB June 30, 2014) (Paper 66); *Synopsys, Inc. v. Mentor Graphics Corp.*, Case IPR2012-00042, slip op. 16–17 (PTAB Feb. 19, 2014) (Paper 60).  Regarding these cases, Patent Owner asserts that,

> Although the Board has been reluctant to apply assignor estoppel in the context of *inter partes* review . . . , Cisco

IPR2016-00303
Patent 6,377,577 B1

> respectfully submits that the Board should have applied the
> doctrine of assignor estoppel to deny the institution of this
> Petition.  The Board's continual rejection of the assignor
> estoppel defense is contrary to the rules governing this
> proceeding and works a substantial injustice on Cisco by
> allowing Cheriton and Bechtolsheim, through their company
> Arista, to disavow [their] prior assignment and use these
> proceedings as an end run around the assignor estoppel
> doctrine.

PO Resp. 58.  We have reviewed and considered Patent Owner's arguments
for application of assignor estoppel, as quoted above and otherwise
explicated throughout its Patent Owner Response.  We are cognizant of the
specter of forum shopping, but we agree with the Board's prior statement
that, "Congress has demonstrated that it will provide expressly for the
application of equitable defenses when it so desires."  *Redline*, Paper 40, slip
op. at 4 (PTAB Oct. 1, 2013) (citing *Intel Corp. v. Int'l Trade Comm'n*, 946
F.2d 821, 836–38 (Fed. Cir. 1991)).  Accordingly, we decline to apply
assignor estoppel to this *inter partes* review proceeding.

### A.    Patent Owner's Motion to Exclude Evidence

Patent Owner moves to exclude several of Petitioner's exhibits,
including Exhibit 1021 and Exhibit 1028.  PO Mot. 1.

#### 1. Ex. 1028 will not be excluded

Exhibit 1028 is a declaration from Ms. Sandra Schroeder, who works
for Pearson, the parent company of Prentice Hall, Inc., which published
ATM UNI Specification. *See* Ex. 1028 ¶ 1.  Patent Owner asserts the
declaration should be excluded because Ms. Schroeder has not presented any
actual records corroborating her testimony and she has no personal
knowledge of the publication of the ATM UNI Specification.  PO Mot. 12.
We disagree.  The declaration from Ms. Schroeder may be used as evidence

IPR2016-00303
Patent 6,377,577 B1

of Prentice Hall's routine business practice supporting the publication of the
ATM UNI Specification. *See Swindell Dressler Int'l Co. v. Travelers Cas.
& Sur. Co.*, 827 F. Supp. 2d 498, 502 (W.D. Pa. 2011); *see* Fed. R. Evid.
406, 803, and 902; *see also, e.g. Envirex, Inc. v. Ecological Recovery
Assocs., Inc., et al.*, 454 F.Supp. 1329, 1333 (M.D. Pa. 1978) ("[E]vidence
of the routine practice of an organization, *whether corroborated or not*, is
relevant to prove that the conduct of the organization in a particular occasion
was in conformity with the routine practice") (emphasis added); American
Jurisprudence Proof of Facts; Second Series, 35 POF 2d 589 ¶¶ 1–11 (1983).
Also, as Petitioner points out, Patent Owner did not request the underlying
corroborating records during these proceedings.

> Patent Owner also asserts that,

> > For purposes of public availability of the ATM UNI
> > reference, the relevant date is not the date Prentice Hall may
> > have given the ATM UNI reference as the publication date.
> > The relevant date is the date the ATM UNI reference was
> > available and indexed in a library or available for download
> > from the Internet.

PO Mot. 13–14. A motion to exclude is the wrong vehicle to challenge
public availability, which is a substantive issue that goes to the sufficiency
of the evidence, not to admissibility at issue here. *FLIR Sys., Inc. v. Leak
Surveys, Inc.*, IPR2014-00411, slip. op., Paper 113 at 4 (PTAB September 3,
2015) ("A motion to exclude is not a vehicle for addressing the weight to be
given evidence."); *see also* 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012) ("A
motion to exclude . . . may not be used to challenge the sufficiency of the
evidence to prove a particular fact.").

> For the reasons above, we do not exclude Exhibit 1028.

9

IPR2016-00303
Patent 6,377,577 B1

### 2. *Ex. 1021 will not be excluded*

Exhibit 1021 is the ATM UNI Specification. Patent Owner argues the ATM UNI Specification should be excluded as irrelevant because "Arista has not provided any competent evidence showing that the ATM UNI reference was publicly available before the critical date of the '577 patent." PO Mot. 3–6. Again, a motion to exclude is the wrong vehicle to challenge public availability, which is a substantive issue that goes to the sufficiency of the evidence, not to admissibility at issue here. *FLIR Sys., Inc.*, Paper 113 at 4. Thus, Patent Owner's arguments regarding Exhibit 1021 will not be considered and we do not exclude Exhibit 1021.

### 3. *Exs. 1027, 1029, 1030, 1031*

We do not rely on Exhibits 1027, 1029, 1030, or 1031 in this decision. Thus, Patent Owner's motion to exclude regarding these Exhibits is dismissed as moot.

### B. *Claim Construction*

In an *inter partes* review, a claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears. 37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278 (Fed. Cir. 2015) ("We conclude that Congress implicitly approved the broadest reasonable interpretation standard in enacting the AIA."), *cert. granted sub nom. Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 890 (mem.) (2016). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set

IPR2016-00303
Patent 6,377,577 B1

forth in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). We must be careful not to read a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993). Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Petitioner proposes constructions for the terms "access control," "associative memory," "packet label," "responsive," and "access control specifier." Pet. 5–9. Patent Owner objects to the Board's modified construction of "access control," agrees with Petitioner's proposed construction of "access control specifier," and proposes a clarification of the term "access result." PO Resp. 15–22. For the purposes of this Decision, only the following terms require construction.

### 1.    *"access control"*

In the Decision to Institute we construed "access control" consistent with the construction reached in connection with determining whether to institute *inter partes* review of the '973 IPR. We construed "access control" as "restriction[] on the transmission of a packet or alteration of a selected output interface for the packet." *See* '973 IPR, Paper 11, 4–5 (Decision on Request for Rehearing).

Patent Owner asserts "Arista never relies on or points to any example in Huey or ATM UNI (the only alleged prior art of record) where there is an alteration of a selected output interface in response to access control processing." PO Resp. 22. Petitioner agrees, stating "Arista does not rely

IPR2016-00303
Patent 6,377,577 B1

on the portion of the definition requiring an "alteration of an output interface." Pet. Reply 20. Because the parties neither rely on the "alteration" portion of the construction nor dispute the "restriction" portion of the construction, we construe, for purposes of this decision, "access control" to mean "restriction on the transmission of a packet" and need not determine whether the "alteration" portion of the construction from the Decision on Institution is correct.

## 2. *"access control specifier"*

In the Decision on Institution, we construed "access control specifier" to mean "a specifier that includes information for matching with a packet and that may indicate, or aid in indicating, an access result." The parties do not dispute the interpretation of "access control specifier" set forth in our Decision on Institution, and we discern no reason based on the record before us to change that interpretation for purposes of the Final Decision. PO Resp. 22; *See generally*, Pet. Reply. Accordingly, we adopt our claim construction for "access control specifier" from the Decision on Institution.

## 3. *"access result"*

In the Decision on Institution, we declined to limit "access result" to a permit/deny decision for the same reasons stated above with respect to "access control." Dec. on Inst. 13–14. However, we did not explicitly define "access result." We stated that Patent Owner's proposed construction is unduly narrow because it ignores "altering" or "modifying" the output interface. *Id.* Nevertheless, as explained above, the parties in this *inter partes* review do not rely on the "altering" or modifying" of the output interface.

IPR2016-00303
Patent 6,377,577 B1

Patent Owner asserts "the Board has, in other related proceedings for the '577 patent, consistently required that an 'access result' be premised on a successful match, which is described by the '577 patent. Put differently, the Board has distinguished, for example, discarding packets (e.g., defective packets) when there is no match with an access control specifier." PO Resp. 22 (citations omitted). Petitioner does not respond to this assertion. However, Petitioner's analysis of the references acknowledges that a successful match is required. *See* Pet. Reply 8 ("The Board's understanding at institution was correct—the input port of Huey/ATM UNI generates access results 'in response to' successful matches . . . ."); *see also* Tr. 33:9–20 (Petitioner states "Of course, the Board found that there must be a successful match."). In the analysis below, consistent with the claim language and the Specification, we require the prior art and evidence presented to show a successful match with an "access control specifier."

### C.    *The Challenged Claims – Obviousness over Huey and ATM UNI Specification*

Petitioner contends that claims 1, 2, 7–10, 12–16, 18–22, 25, and 28–31 are unpatentable under 35 U.S.C. § 103 as obvious over Huey and ATM UNI Specification. Pet. 12–57. Petitioner relies on the testimony of Dr. H. Johnathan Chao. Ex. 1002. Patent Owner disagrees with Petitioner's contentions. PO Resp. 23–57.

### 1.    *Huey*

Huey, titled "Address Handler for an Asynchronous Transfer Mode Switch," teaches an address handling circuit for an asynchronous transfer mode ("ATM") switch. Ex. 1020, Abstract, 1:8–10. The address handling circuit processes a cell data stream including a plurality of cells. *Id.* at 4:58–

13

IPR2016-00303
Patent 6,377,577 B1

60. Each cell has a header portion with a virtual channel identifier (VCI) and a virtual path identifier (VPI) and a data payload portion. *Id.* at 4:60–62.

Figure 4 of Huey depicts a functional block of an ATM switching system.



Fig-4
PRIOR ART

As shown in Figure 4, ATM switching system includes a plurality of input ports, 50(1), 50(2), to 50(N), switch fabric 54, and a plurality of output ports 58(1), 58(2), to 58(M). *Id.* at 3:34–38, 5:54–56. Each input port 50 can include an address handler 62, a cell router 66, and a cell traffic policer 70. *Id.* at 3:38–40. Address handler 62 evaluates header 24 of each cell 22 input thereto to validate cells for routing by cell router 66 and to detect invalid cells that are not routed. *Id.* at 3:40–42. Cell traffic policer 70 monitors input data streams including a plurality of cells 22 on a VP and/or VC basis at entry points to ATM switching network 10. *Id.* at 3:46–48. Cell policer 70 monitors ATM cell input rates to ensure one subscriber does not exceed a subscribed peak input data rate. *Id.* at 3:52–54. Cell policer 70 can also monitor average input data stream rates if needed. *Id.* at 3:54–55.

IPR2016-00303
Patent 6,377,577 B1

Figure 10A of Huey is reproduced below.



Fig-10a

Figure 10A is a detailed logic diagram of address handling circuit 340 which parallels operation of address handling circuit 200 of Figure 8. *Id.* at 8:45–48. Content addressable memory circuits ("CAMs") 364 and 368 load the VPI/VCI addresses from compare bus 360 into comparand registers 376 and 378. *Id.* at 9:13–15. CAMs 364 and 368 compare the VP/VC address against VC/VP addresses stored in arrays 386 and 388 to determine if there is a match. *Id.* at 9:17–20. A match by CAM 364 or 368 is signaled to match address circuit 392, which enables the highest priority CAM that has the match. *Id.* at 9:20–23. The contents of the match address register of the highest priority CAM is output onto match address bus 404. *Id.* at 9:23–25.

### 2.    *ATM UNI Specification*

ATM UNI Specification defines the interfaces used between ATM user devices and switches. Ex. 1021, 30–31. It teaches that "[a] traffic contract is comprised of a [Quality of Service ("QoS")] class, a vector of

IPR2016-00303
Patent 6,377,577 B1

traffic parameters, a conformance definition and other items as specified in section 3.6." *Id.* at 76. It also teaches a Usage Parameter Control ("UPC"), which "is defined as the set of actions taken by the network to monitor and control traffic in terms of traffic offered and validity of the ATM connection." *Id.* at 96, 122. "The UPC is intended to control the traffic offered by an ATM connection to ensure conformance with the negotiated Traffic Contract." *Id.* at 125.

### 3.    *ATM UNI Specification is a Printed Publication*

Patent Owner asserts "Arista's evidence supporting ATM UNI's alleged publication date is legally insufficient. Arista therefore has not met its burden to establish ATM UNI as prior art." PO Resp. 4. Petitioner submits the ATM UNI Specification as Exhibit 1021, which on page 5 provides a copyright notice dated 1993 by Prentice Hall. Ex. 1021, 5. Petitioner alleges in the Petition that the ATM UNI Specification's publication date is December 1993. Pet. 3. In response to Patent Owner's argument that the ATM UNI Specification's publication date of 1993 is insufficient evidence of its public accessibility (PO Resp. 4), Petitioner provides a declaration of an employee of Pearson (parent of Prentice Hall) (Ex. 1028). Pet. Reply. 2, 22.

The determination of whether a given reference qualifies as a prior art "printed publication" involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public. *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under

IPR2016-00303
Patent 6,377,577 B1

35 U.S.C. § 102(b)." *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986).  To qualify as a prior art printed publication, the reference must have been disseminated or otherwise made accessible to persons interested and ordinarily skilled in the subject matter to which the document relates prior to the critical date.  *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008).

Although Patent Owner challenges whether the ATM UNI Specification is a printed publication, the burden remains on Petitioner to demonstrate unpatentability.  *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.,* 800 F.3d 1375, 1378 (Fed. Cir. 2015*) (*citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in an *inter partes* review).  Petitioner must demonstrate by a preponderance of the evidence that the challenged claims are obvious, and one aspect of such a showing is that the references relied upon are patents or printed publications.

Having reviewed the parties' arguments and supporting evidence, we determine that Petitioner has demonstrated sufficiently that the ATM UNI Specification is a printed publication based on the following reasons and factual findings.  First, we find that the ATM UNI Specification was published by Prentice Hall in 1993.  We base our findings on the testimony of Ms. Schroeder, an employee of Pearson, parent of Prentice Hall, filed as Exhibit 1028.  We also support our findings based on the indicia of publication found on the ATM UNI Specification, Exhibit 1021, and the totality of the facts including that the ATM UNI Specification is a book published by a well-known publisher several years before the critical date of June 30, 1998.

IPR2016-00303
Patent 6,377,577 B1

Patent Owner asserts "the only evidence of record that Arista can rely on for proving public availability are: (i) ATM UNI' s copyright date of 1993; and (ii) ATM UNI's two instances of library cataloguing markings . . . ." PO Resp. 6. Patent Owner asserts that "ATM UNI's copyright of 1993, standing alone, is legally insufficient to establish that ATM UNI was publicly available in 1993, or at any point prior to the critical date of June 30, 1998."[3] *Id.* at 7 (citing *iONROAD Ltd. v. Mobileye Tech. Ltd.*, IPR2013-00227, slip op., at 3 and 15–16 (PTAB Aug. 27, 2013) (Paper 18) ("*iONROAD*").

Patent Owner cites to *Hilgraeve* for the proposition that a copyright notice is "insufficient to establish that a product was known or used by others on that date." *Hilgraeve, Inc. v. Symantec Corp.*, 271 F. Supp. 2d 964, 976 (E.D. Mich. 2003). However, panels have relied on such a notice as probative evidence of publication. *See, e.g., Ford Motor Co. v. Cruise Control Techs. LLC*, Case IPR2014-00291, slip op. at 7–8 (PTAB June 29, 2015) (Paper 44); *FLIR Systems, Inc. v. Leak Surveys, Inc.*, IPR2014–00411, slip op. at 18–19 (PTAB Sept. 5, 2014) (Paper 9) (copyright notice establishes prima facie prior art date). Additionally, in this case, unlike *Hilgraeve*, ATM UNI Specification is not a user manual shipped with a product but is a book published by a well-known publisher, i.e., Prentice Hall.

---

[3] Patent Owner does not assert that the copyright date is hearsay. Nevertheless, at the time of issuing this Decision, the ATM UNI Specification qualifies as an ancient document under Fed. R. Evid. 803(16) because it is now more than 20 years old.

IPR2016-00303
Patent 6,377,577 B1

Patent Owner also relies on *iONROAD*.  In *iONROAD*, however, the exact month of publication was at issue and the copyright notice did not indicate the month.  *iONROAD*, Paper 18 at 15–16.  Here, the copyright notice shows a publication date of 1993, well before the critical date of 1998 regardless of which month in 1993 it was published.  *See Fujitsu Semiconductor Ltd. v. Zond, LLC*, IPR2014-00802, 2015 WL 5834202, at *19 (PTAB Oct. 2, 2015) (Considering the length of time between the alleged publication date and the critical date in assessing whether a reference qualified as a printed publication); *Ford*, Paper 44 at 7–8 (June 29, 2015) ("the date of the copyright notice is well before the filing date of the patent application that became the '463 patent").

The declaration of Ms. Schroeder, who works for Pearson, the parent company of Prentice Hall, Inc. supports Petitioner's contentions regarding the publication date of the ATM UNI Specification.  Ex. 1028.  Ms. Schroeder testifies that the ATM UNI Specification was published in 1993.  Ex. 1028 ¶ 4.  Ms. Schroeder testifies that "[a]s a part of its ordinary course of business, Pearson [parent company of Prentice Hall] publishes educational, technical, and professional literature."  *Id.* at ¶ 3.  To the extent Patent Owner asserts that the declaration is insufficiently corroborated to show an actual publication date, the declaration nevertheless supports the conclusion that a book, with indicia reciting publication by Prentice Hall, was published.

The probative value of routine business practice to show the performance of a specific act has long been recognized.  *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986) (citations omitted).  "Evidence of routine business practice can be sufficient to prove that a reference was made accessible

IPR2016-00303
Patent 6,377,577 B1

before a critical date." *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988). We credit Ms. Schroeder's testimony as showing the routine general business practice of Prentice Hall and supporting the copyright date on the ATM UNI Specification.

Patent Owner relies on *L-3 Communications Holdings, Inc. v. Power Survey, LLC*, IPR2014-00832, slip op. at 16–17 (PTAB Nov. 14, 2014) (Paper 9) and *TRW Automotive US LLC v. Magna Electronics Inc.*, IPR2015-00960, slip op. at 18–19 (PTAB Oct. 5, 2015) (Paper 9) for the proposition that a date on a document does not establish that an accompanying document was available to, or disseminated to, the public. PO Resp. 6–7. However, *TRW* involved symposium papers, which are not necessarily disseminated to the public, and *L-3 Communications* involved a corporate report that was "circulated to select employees of Sarnoff Corporation." *L-3 Comm'ns*, Paper 9 at 16–17; *TRW Auto.*, Paper 9 at 18–19. Patent Owner has not presented evidence that the ATM UNI Specification is similarly limited in distribution or not generally disseminated to the public.

As noted above, the ATM UNI Specification is a technical reference published by a well-known, commercial publisher. Mere distribution to commercial publishers without restrictions on use has been held to constitute publication. *See Garrett Corp. v. United States*, 422 F.2d 874, 878 (Cl. Ct. 1970) ("While distribution to government agencies and personnel alone may not constitute publication, distribution to commercial companies without restriction on use clearly does." (internal citation omitted)) (discussed in *Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985) and *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 936–37 (Fed. Cir.

IPR2016-00303
Patent 6,377,577 B1

1990)).  Here, we have more than just distribution to a commercial publisher; we have work published by the commercial publisher.

In this case, the ATM UNI Specification was distributed to Prentice Hall, which is in the business of publishing and selling such papers to interested persons.  *See* Ex. 1028 ¶¶ 1–4.  Therefore, the facts and circumstances surrounding the reference's disclosure to members of the public suggest public dissemination.  *See In re Klopfenstein*, 380 F.3d at 1350.  Additionally, because *inter partes* review is designed and intended to afford expedited and efficient relief, it serves the interest of justice to allow the Petitioners to rely on the copyright date of technical references published by a well-known publisher in this case.

Patent Owner also asserts "Arista provides no explanation as to the meaning of the Arizona State University (ASU) Catalog Card Number included in ATM UNI ('Catalog Card Number')."  PO Resp. 7.  This assertion is moot.  We do not rely on the card catalog number.  As noted above, the ATM UNI Specification is not a University thesis paper, which may or may not be made available to the public in the regular course of business of the University.  Rather, the ATM UNI Specification is a technical reference distributed by a commercial publisher of educational, technical, and professional literature.

Accordingly, based on the facts and circumstances of this case, we conclude that the ATM UNI Specification was a printed publication that was publicly accessible before the invention date of the '577 patent (i.e., June 30, 1998), and is, therefore, prior art to the challenged claims.

IPR2016-00303
Patent 6,377,577 B1

*4.    Analysis*

Petitioner asserts that a combination of Huey and the ATM UNI
Specification renders obvious claims 1, 2, 7–10, 12–16, 18–22, 25, and 28–
31.  Pet. 12–57.  We have reviewed the Petition, Patent Owner's Response,
Petitioner's Reply, as well as the relevant evidence discussed in those papers
and other record papers.  As described in further detail below, we determine
that the record sufficiently establishes Petitioner's contentions for claims 1,
7–10, 12–16, 18–22, 25, and 28–31, but not for claim 2, and we adopt
Petitioner's contentions discussed below as our own.

*5.    Claim 1*

Independent claim 1 recites "maintaining a set of access control
patterns in at least one associative memory."  Petitioner cites Huey's VP and
VC addresses stored in CAM arrays (at least one associative memory),
CAMs 364 and 368.  Pet. 13 (citing Ex. 1002 ¶¶ 93–107), as the recited
"access control patterns" and cites the ATM UNI Specification's Usage
Parameter Control (UPC) for performing "access control" (citing Ex. 2021
§§ 3.6.3.2.3.1, 3.6.3.2.3.5).  Pet. 13–17.  Independent claim 1 recites
"receiving a packet label responsive to a packet, said packet label being
sufficient to perform access control processing for said packet."  Petitioner
cites Huey's cell header, which includes VPI/VCI addresses, as the recited
"packet label."  Pet. 17–18.  Independent claim 1 also recites "matching
matchable information, said matchable information being responsive to said
packet label, with said set of access control patterns in parallel, and
generating a set of matches in response thereto, each said match having
priority information associated therewith."  Petitioner cites Huey's teaching
of matching VPI/VCI addresses with VP/VC addresses stored in CAMs 364

IPR2016-00303
Patent 6,377,577 B1

and 368 in parallel, and generating matches associated with priority information.  Pet. 19–21.

Independent claim 1 also recites "selecting at least one of said matches in response to said priority information, and generating an access result in response to said at least one selected match."  Petitioner cites Huey's teaching to select the contents of the match register of the highest priority CAM, cites the ATM UNI Specification's teachings regarding Usage Parameter Control, and argues that Huey's cell traffic policer 70 "necessarily generates a discard instruction, i.e., an access result, for cell[s] that violate, or fail to conform to, the Traffic Contract."  Pet. 25; *see id.* at 22–26.  Finally, independent claim 1 recites "making a routing decision in response to said access result."  Petitioner argues that the combination of Huey and the ATM UNI Specification teaches that Huey's cell traffic policer 70 makes a routing decision in response to said access result by discarding cells that do not conform with the Traffic Contract.  Pet. 26–27. Petitioner sets forth reasons to combine Huey and the ATM UNI Specification on pages 12–13 of the Petition.

Patent Owner argues that Huey does not disclose "access control" because "[n]owhere does Huey disclose any discarding of cells when there is a match . . . [a]nd Huey's discarding of cells when there is no match in the CAM results in the cell being dropped prior to the cell being passed on to the cell router or cell policer."  PO Resp. 31 (citing Ex. 2015); *id.* at 27–33. Specifically, Patent Owner argues that Huey does not have the ability to restrict transmission of a packet or alter a selected output interface for a packet, as our construction of "access control" requires.  Petitioner is not relying, however, upon Huey's operation when the VP/VC information from

23

IPR2016-00303
Patent 6,377,577 B1

a cell header cannot be matched. To the contrary, Petitioner is relying upon a scenario where the VP/VC information from a cell header *does* match, but the cell is nevertheless subsequently discarded by cell traffic policer 70 for not conforming with the Traffic Contract. Pet. 22–26. As a result, this argument by Patent Owner is not persuasive.

Patent Owner also argues that Huey's address handling circuit does not perform "access control." PO Resp. 27–33. This argument also is not persuasive because Petitioner relies upon the *combination* of Huey's address handling circuit and cell traffic policer 70 for performing the claimed method, not upon Huey's address handling circuit alone. *See, e.g.*, Pet. 13 ("Combined, the address handler and policer perform the claimed method.").

Patent Owner also argues that "[n]either Huey's cell policer or the ATM UNI Specification's UPC are implemented in an associated memory, as required by the '577 patent's claims." PO Resp. 34. Specifically, Patent Owner argues that the claims are limited to performing "access control" in hardware rather than software. *Id*. at 34. For support, Patent Owner states "[a] key aspect of the '577 patent's invention is the implementation of access control in hardware memory." *Id.* (citing Ex. 1001, Abstract). Patent Owner does not assert, and we do not determine, that the cited text from the Abstract is a clear and unmistakable disavowal of implementations using software. Thus, despite the language in the Abstract, we determine that the claims do not require that "access control" occur in hardware memory.

Claim 1 contains several limitations, of which only "maintaining access control patterns in at least one associative memory" is arguably limited to a hardware implementation by its recitation of "associative memory." As Petitioner point out, however, "[t]he claim is otherwise silent

24

IPR2016-00303
Patent 6,377,577 B1

as to what structure—whether software or hardware—generates the "access result" or performs any of its other steps." Pet. Reply 9. Therefore, we do not agree with Patent Owner's argument.

Patent Owner also argues that the ATM UNI Specification's UPC and Huey's cell policer do not disclose "access control" because the traffic control data and cell policer are not stored or implemented in a CAM. PO Resp. 33–37. As noted above, the only limitation that arguably requires a CAM is "maintaining access control patterns in at least one associative memory." Patent Owner is not specific in its argument, however, about which step or steps must occur in the CAM. *Id.* Patent Owner appears to be referring to the "matching," "selecting," and/or "access result" steps. The claim, however, does not explicitly require those limitations to be performed in a CAM. Thus, we do not agree with Patent Owner's argument.

Patent Owner also argues that the combination of Huey and the ATM UNI Specification does not disclose "access control patterns." PO Resp. 37–39. Specifically, Patent Owner asserts "Huey's VP/VC addresses are not used by the cell policer / UPC to enforce Traffic Contract, which Arista contends is the element that performs the access control, thus cannot be the 'access control patterns' described and claimed in the '577 patent." *Id.* at 39. We disagree.

As discussed above, we are persuaded that Huey teaches that its cell policer performs "access control." Huey also teaches that "[c]ell [traffic] policer 70 monitors ATM cell input rates to ensure one subscriber does not exceed a subscribed peak input data rate. Cell policer 70 can also monitor average input data stream rates if needed." Ex. 1020, 3:52–55. The ATM UNI Specification provides further details about Huey's user to network

25

IPR2016-00303
Patent 6,377,577 B1

interfaces ("UNI") 18, such as a Usage Parameter Control that ensures conformance with a Traffic Contract by, *inter alia*, discarding cells that exceed allowed rate limits. *See, e.g.*, Ex. 1021, 76, 122, 125–126. Thus, Huey's cell traffic policer 70 is imposing "a restriction on transmission of a packet," as our construction requires, at least when it discards a non-conforming cell.

Patent Owner also suggests the fact that VC/VP addresses are not used by the cell policer/UPC to enforce the Traffic Contract is a failure by Petitioner to show step of "maintaining access control patterns in at least one associative memory." PO Resp. 39. Patent Owner's argument on this point refers to "access control" generally, thereby conflating two limitations of the claim. When the limitations and Petitioner's contentions are examined individually in addition to as a whole, however, it is clear the cell policer is related to claim 1's recitation of "making a routing-decision in response to said access result" and the VC/VP addresses are related to the "maintaining" and "matching" limitations.

Huey's discard instruction, which Petitioner contends is the recited "access result," is based on whether a cell passed to the policer exceeds the Traffic Contract. Pet. 25. Claim 1 requires only that the access result be generated "in response to" the match so the VC/VP addresses used to match do not need to also be used by the cell policer. Huey's discard instruction is generated "in response to" a match by the address handling circuit because a match necessarily precedes the determination by cell traffic policer 70 to discard a non-conforming cell. *See, e.g.*, Pet. 23 (citing Ex. 1020, 9:39–41, Fig. 10b). Put another way, no cell is ever discarded by cell traffic policer 70 unless that cell has first been matched by address handler 62. There is no

IPR2016-00303
Patent 6,377,577 B1

requirement that the "access control specifiers" are directly used in ultimately making the routing decision. Thus, the VC/VP addresses that are used to make a match are not required by the claims to also generate the access result.

Patent Owner also asserts that Huey's ATM cell header, relied on by Petitioner, cannot meet the limitation of "receiving a packet label responsive to a packet, said packet label being sufficient to perform access control processing for said packet." PO Resp. 39–46. Although Patent Owner asserts the limitation is not met, Patent Owner first argues that "Huey's ATM cell header is not analogous to the claimed packet label." Specifically, Patent Owner argues that there are "fundamental differences" between the ATM protocol in Huey and the IP protocol described in the Specification. *Id.* at 40–41. Patent Owner then argues that an ATM cell header is not analogous to the claimed packet header. PO Resp. 41–45. To the extent Patent Owner is making an analogous art argument, Patent Owner fails to set forth the proper standard for assessing analogous art and fails to present a coherent corresponding analysis.

"References within the statutory terms of 35 U.S.C. § 102 qualify as prior art for an obviousness determination only when analogous to the claimed invention." *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004) (finding both hair brush art and toothbrush art to be analogous to a claim to a hair brush) (citing *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992)). "Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with

27

IPR2016-00303
Patent 6,377,577 B1

which the inventor is involved." *Id.* (citations omitted). The scope of the field of endeavor is a factual determination based on the scope of the application's written description and claims. *Bigio*, 381 F.3d at 1326.

Patent Owner makes two arguments in regard to whether ATM cells are "analogous" to IP packets. First, Patent Owner argues that ATM cells are not relevant to IP packets because IP packets have variable length rather than fixed length packets. PO Resp. 42. Patent Owner has not established that the field of the inventor's endeavor is variable length IP packets, nor does Patent Owner present evidence or argument on that point. Patent Owner also argues that ATM networks are "sharply" different than IP networks because ATM cells do not contain specific source and destination information. *Id.* at 42–43. Again, Patent Owner has not established that the field of the inventor's endeavor is IP networks, nor does Patent Owner present evidence or argument on that point. Ultimately Patent Owner argues, "[w]hile the claimed packet label is responsive to a packet that would include IP specific information, for example, identifying the specific source and destination of the packet—i.e., information also necessary to perform access control for the packet—Huey's cell header does not include and does not need similar identifying information." *Id.* at 45. We are not persuaded by Patent Owner's argument because, as noted above, Patent Owner has not performed a proper analogous art analysis.

Patent Owner also argues that Huey does not meet the limitation to a "packet label . . . sufficient to perform access control processing." *Id.* at 46. Patent Owner incorporates its "analogous" arguments discussed above into this argument, thus our analysis below applies to the arguments made on pages 39 to 46 of the Patent Owner Response. *See Id.* at 39–46.

IPR2016-00303
Patent 6,377,577 B1

Specifically, Patent Owner argues that "Huey's ATM cell header is not
sufficient to perform access control processing for the ATM cell and
therefore does not meet claim 1's requirement that the received packet
header be 'sufficient to perform access control processing' for the packet."
*Id.* at 46.  Patent Owner argues that Huey's address handler performs only
"ordinary forwarding operations."  *Id.*  In particular, Patent Owner argues
that "identifying the specific source and destination of the packet [is]
information [] necessary to perform access control for the packet."  *Id.* at 45.

    We have construed "access control" to mean "restriction on the
transmission of a packet."  Our construction does not distinguish between
"ordinary forwarding" and "access control" generally, nor does it require
specific source and destination information.  Pet. Reply 13.  Patent Owner
also argues "there is no indication that Huey's ATM cell header (the alleged
packet label) is sufficient to perform access control based solely on the
operations of Huey's address handler."  *Id.* at 46.  However, the claim does
not recite that the determination of whether a packet label is "sufficient to
perform access control" rests solely on the operation of an address handler
on the packet header.  As discussed above, Petitioner is relying upon the
combination of Huey's address handler and cell policer.  With respect to the
cell policer, Patent Owner contends that its operations "do ***not*** rely on any
information in Huey's ATM cell header" (*id.*), but, as Petitioner correctly
points out, "the VPI and VCI information in the cell header is used by the
input port to apply traffic control to each cell" (Pet. Reply 14–15).
Therefore, Patent Owner's arguments are not commensurate with the scope
of the claims and are not persuasive.

IPR2016-00303
Patent 6,377,577 B1

Patent Owner asserts that neither Huey nor the ATM UNI
Specification renders obvious "matching matchable information, said
matchable information being responsive to said packet label, with said set of
access control patterns in parallel, and generating a set of matches in
response thereto, each said match having priority information associated
therewith" and/or "generating an access result in response to said at least one
selected match." PO Resp. 47–48. Specifically, Patent Owner asserts that
Huey discards cells based on a lack of a match. *Id.* We disagree. As noted
above, Huey's discard instruction, which Petitioner contends is the recited
"access result," is based on whether a cell passed to the policer exceeds the
Traffic Contract. *Id.* at 35. Claim 1 requires only that the access result be
generated "in response to" the match. Huey's discard instruction is
generated "in response to" a match by the address handling circuit because a
match necessarily precedes the determination by cell traffic policer 70 to
discard a non-conforming cell. *See, e.g.*, Pet. 23 (citing Ex. 1020, 9:39–41,
Fig. 10b).

Patent Owner also argues that "Huey does not disclose 'access result'
and therefore also does not disclose making a routing decision 'in response
to said access result.'" PO Resp. 48. Specifically, Patent Owner argues that
"Huey does not disclose this claim element because Huey's ATM switching
system determines the entire transmission path for a cell the moment that the
cell enters the ATM network, and not in response to an access result." PO
Resp. 48 (citing Ex. 2015 ¶ 160). Patent Owner suggests that changing the
output interface is a routing decision that Huey fails to make. *Id.* at 49. This
is irrelevant because we construed "access control" to include "restriction on
the transmission of a packet," i.e., dropping the packet—which is a routing

IPR2016-00303
Patent 6,377,577 B1

decision that we have found that Huey does make.  Thus, we are not persuaded by this argument.

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable because the claimed subject matter would have been obvious over the combination of Huey and the ATM UNI Specification to a person of ordinary skill in the art.

*6.    Claim 2*

Claim 2 recites that the method also includes "the step of performing at least two of said steps of receiving, matching, selecting, and making a routing decision, in parallel using a pipeline technique."  Ex. 1001, 7:48–52.  The Specification describes that the step of selecting an output interface and the step of determining the output permission for a packet, which includes matching a packet label against the access control memory, determining all of the successful matches, determining the highest priority match, and providing an output result, are performed in parallel.  *Id.* at 6:40–53.  It is less clear whether the individual steps within the step of determining the output permission for a packet, i.e., matching a packet label against the access control memory, determining all of the successful matches, determining the highest priority match, and providing an output result, are performed in parallel.  Nevertheless, the Specification does support the fact that when discussing parallel operations it is discussing two steps of processing a packet occurring at the same time.

Petitioner states that "[u]nder the BRI standard, therefore, claim 2 must cover a pipelined process where the relevant steps occur at the same time, but for different packets."  Pet. Reply 18.  However, Patent Owner

IPR2016-00303
Patent 6,377,577 B1

does not appear to suggest that the relevant steps must occur on the same packet at the same time.  PO Resp. 50–54.  Thus, this "pipeline" argument by Petitioner is irrelevant.

Petitioner asserts that "[Huey's] pipeline architecture is performed on a stream of cells in real time, thus the steps of receiving, matching, selecting, and making a routing decision, in parallel."  Pet. 29 (citing Ex. 1020, 8:67–9:9).  Patent Owner responds that "performing steps 'in real time' is not the same as performing those steps 'in parallel' as Arista alleges."  PO Resp. 51.  We agree with Patent Owner in this regard.

Patent Owner points out that the passage relied on by Petitioner discusses three things:  1) "Huey describes that the contents of the ATM cell header can be simultaneously loaded into a register"; 2) "Huey generally discusses that the comparison of the VPI/VCI subfields take place 'in real time'"; and 3) "the [parallel] connection of Huey's CAMs."  PO Resp. 50–52.

> Petitioner cites to the following passage from Huey:
>
> The ATM cell header 24, minus the HEC byte, is simultaneously loaded into a header register 352.  The entire ATM cell header 24 can be used for comparison or selected fields or bits of the header can be used. For the purposes of discussion, the VPI/VCI subfields will be loaded into header register 352 and used for comparison.  One skilled in the art will appreciate that the invention can apply to all combinations of the ATM cell header fields and/or bits.  In addition, comparison of the VPI/VCI subfields takes place in real time.  If many VCI/VPI subfields are simultaneously loaded, an address field for locating cells within temporary cell 10 buffer 348 could also be used.

Ex. 1020, 8:67–9:9; Pet. 28–29 (citing Ex. 1020, 8:67–9:9).  The cited section states only that the comparison of the VPI/VCI subfields occurs in "real time,"

IPR2016-00303
Patent 6,377,577 B1

not that the entire process is performed in "real time."  As to the simultaneous loading of the ATM header, Petitioner does not explain how this means that any two of the listed steps occurs in parallel.  PO Resp. 52.  Additionally, the comparison of the VPI/VCI subfields in "real time" may suggest that the step of matching is performed efficiently on subfields for a particular header, but it does not suggest that matching occurs in parallel with another step in the process.

> Petitioner also cites to the following from Huey:
>
> > While address handling circuit 340 of FIGS. 10A and 10B is implemented with CAMS 364 and 368 connected in parallel and with a priority circuit or system, CAMs 364 and 368 could also be connected in series as shown in FIG. 8 if desired.

*Id.* at 29 (quoting Ex. 1020, 10:46–50).  Petitioner asserts, based on this passage, that "Huey discloses that the CAMs are performing their respective functions in parallel." *Id.*  We disagree.  The quoted section does not address whether any separate ones of the relevant steps of the claim occur "in parallel," but only that the CAMs are physically connected in parallel, not that they operate in parallel to each another.  PO Resp. 52.

Finally, in its Reply, Petitioner asserts that one of ordinary skill in the art would "understand the speed benefits and efficiency from operating the address handler and cell policer at the same time, rather than waiting for one packet to finish the entire pipeline before starting the next."  Pet. Reply 18–19 (citing Ex. 1033 at xi, 1–2).  Petitioner cites to another reference, Exhibit 1033 (Kogge, *The Architechure of Pipelined Computers*, 1981) ("Kogge"), to show the efficiency of operating the steps in parallel.

There are two problems with Petitioner's assertion.  First, Petitioner has not shown a reason to combine Kogge with Huey and the ATM UNI

IPR2016-00303
Patent 6,377,577 B1

Specification.  Second, to the extent this reference is used to show the scope and content of the art at the time of the invention, Kogge makes it clear that parallelism and pipelining are different concepts that are "generally discernably different in their general approach." Ex. 1033, 1.  Petitioner has not explained how Kogge shows that putting packets through the pipeline without waiting for the previous packet to finish would be considered operating in parallel given that this reference distinguishes parallel operation from pipeline operation.  Petitioner argued at the oral hearing that Patent Owner was advocating "a particular flavor of parallelism, as opposed to what's understood by normal parallel pipelining." Tr. 41:6–14.  However, neither Petitioner nor its declarant has explained what "normal parallel pipelining" is or what the basis is for us to define "normal parallel pipelining."  Thus, we are not persuaded by Petitioner's contention that one of ordinary skill in the art would modify Huey to meet the limitation of performing at least two of said steps "in parallel using a pipeline."

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has not demonstrated by a preponderance of the evidence that claim 2 is unpatentable because it would have been obvious over the combination of Huey and the ATM UNI Specification.

### 7.    *Claims 9 and 10*

Claims 9 and 10 both recite "said priority information for each said access control pattern is responsive to a position of said access control pattern in a memory."  Petitioner cites Huey's selection of the match that occurs in the highest priority CAM, i.e., CAM 364 or 368.  Pet. 32–37 (citing Ex. 1002 at ¶¶ 137–144), as the recited "position of said access

IPR2016-00303
Patent 6,377,577 B1

control pattern in a memory." Pet. 32–37. We adopt these contentions as
our own findings. Patent Owner asserts that "merely giving priority to one
CAM over another CAM is not analogous to the claimed 'priority
information' being 'responsive to a position of said access control pattern in
a memory.'" PO Resp. 54. Patent Owner relies on the Specification's
statement that "[t]he priority encoder [] [then] selects the single access
control specifier [] with the highest priority (in a preferred embodiment, the
one with the lowest address in the access control memory 210)." *Id*. at 55
(quoting Ex. 1001, 4:48–56). Based on this quotation, Patent Owner asserts
that because Huey prioritizes based on in which one of two CAMs the match
occurs rather than an address within one CAM, Huey cannot meet the
limitation of claim 9. PO Resp. 56.

Petitioner responds that the claimed "a memory" can be read broadly
to include both CAMs of Huey. Pet. Reply (citing Ex. 1002 ¶¶ 141–142).
We agree. A "position" in "memory" reasonably can be read more broadly
than a physical address in one physical memory. *Id.* Thus, under the
broadest reasonable construction, the claimed a memory is not limited to a
single physical memory. Thus, Huey's determination of priority based on in
which physical CAM the match occurred meets the limitation of claims 9
and 10.

Upon consideration of the parties' contentions and supporting
evidence, we determine that Petitioner has demonstrated by a preponderance
of the evidence that claims 9 and 10 are unpatentable because their subject
matter would have been obvious over the combination of Huey and the
ATM UNI Specification to a person of ordinary skill in the art.

IPR2016-00303
Patent 6,377,577 B1

8.     *Claims 7, 8, 12–16, 18–22, 25, and 28–31*

Patent Owner argues that dependent claims 7, 8, 12–16, 18–22, 25, and 28–31, which depend ultimately from claim 1, are patentable for the same reasons as claim 1 discussed above. PO Resp. 38, 50. Patent Owner does not raise any additional arguments with respect to those claims.

Petitioner contends that claims 7, 8, 12–16, 18–22, 25, and 28–31 are unpatentable under 35 U.S.C. § 103 as obvious over Huey and ATM UNI Specification. Pet. 12. To support its contentions, Petitioner provides detailed explanations as to how this proffered combination meets each claim limitation. *Id.* at 30–32, 37–57. Petitioner also relies upon a Declaration of Dr. Chao, who has been retained as a declarant by Petitioner for the instant proceeding. Ex. 1002 ¶¶ 132–136, 145–192. We adopt these contentions as our own.

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 7, 8, 12–16, 18–22, 25, and 28–31 are unpatentable because they would have been obvious over the combination of Huey and the ATM UNI Specification.

## III.    CONCLUSION

Petitioner has met its burden of proof by a preponderance of the evidence in showing that claims 1, 7–10, 12–16, 18–22, 25, and 28–31 of the '577 patent are unpatentable based upon the following grounds of unpatentability:

| References | Basis | Challenged Claims |
|---|---|---|
| Huey and the ATM UNI Specification. | § 103 | 1, 7–10, 12–16, 18–22, 25, and 28–31 |

36

IPR2016-00303
Patent 6,377,577 B1

Petitioner has not met its burden of proof by a preponderance of the evidence in showing that claim 2 of the '577 patent is unpatentable.

## IV.   ORDER

After due consideration of the record before us, and for the foregoing reasons, it is:

ORDERED that the Motion to Exclude is *denied* as to Exhibits 1021 and 1028, and *dismissed as moot* as to Exhibits 1027 and 1029–1031;

FURTHER ORDERED that claims 1, 7–10, 12–16, 18–22, 25, and 28–31 of the '577 patent are held unpatentable;

FURTHER ORDERED that claim 2 of the '577 patent has not been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2016-00303
Patent 6,377,577 B1

PETITIONER:

W. Karl Renner
Kevin Greene
Alex Gelberg
Adam Shartzer
Michael McKeon
Jason Wolff
FISH & RICHARDSON P.C.
IPR40963-0003IP1@fr.com
PTABInbound@fr.com
gelberg@fr.com
shartzer@fr.com
mckeon@fr.com
wolff@fr.com


PATENT OWNER:

Jon E. Wright
Robert Greene Sterne
Lori A. Gordon
Lestin L. Kenton, Jr
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
jwright-PTAB@skgf.com
rsterne-PTAB@skgf.com
lgordon-PTAB@skgf.com
lkenton-PTAB@skgf.com



US006377577B1

(12) **United States Patent**
Bechtolsheim et al.

(10) Patent No.: **US 6,377,577 B1**
(45) Date of Patent: **Apr. 23, 2002**

(54) **ACCESS CONTROL LIST PROCESSING IN HARDWARE**

(75) Inventors: **Andreas V. Bechtolsheim**, Stanford; **David R. Cheriton**, Palo Alto, both of CA (US)

(73) Assignee: **Cisco Technology, Inc.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/108,071**

(22) Filed: **Jun. 30, 1998**

(51) Int. Cl.⁷ ................................................. G06F 9/34
(52) U.S. Cl. .................. 370/392; 370/395.32; 370/389
(58) Field of Search ................................. 370/392, 393, 370/394, 396, 397, 398, 399, 400, 389, 395.32; 709/220, 221, 222, 227, 228, 229

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,131,767 A | 12/1978 | Weinstein |
| 4,161,719 A | 7/1979 | Parikh et al. |
| 4,316,284 A | 2/1982 | Howson |
| 4,397,020 A | 8/1983 | Howson |
| 4,419,728 A | 12/1983 | Larson |
| 4,424,565 A | 1/1984 | Larson |
| 4,437,087 A | 3/1984 | Petr |
| 4,438,511 A | 3/1984 | Baran |
| 4,439,763 A | 3/1984 | Limb |
| 4,445,213 A | 4/1984 | Baugh et al. |
| 4,446,555 A | 5/1984 | Devault et al. |
| 4,456,957 A | 6/1984 | Schieltz |
| 4,464,658 A | 8/1984 | Thelen |
| 4,499,576 A | 2/1985 | Fraser |
| 4,506,358 A | 3/1985 | Montgomery |
| 4,507,760 A | 3/1985 | Fraser |
| 4,532,626 A | 7/1985 | Flores et al. |
| 4,644,532 A | 2/1987 | George et al. |
| 4,646,287 A | 2/1987 | Larson et al. |
| 4,677,423 A | 6/1987 | Benvenuto et al. |

| | | |
|---|---|---|
| 4,679,189 A | 7/1987 | Olson et al. |
| 4,679,227 A | 7/1987 | Hughes-Hartogs |
| 4,723,267 A | 2/1988 | Jones et al. |
| 4,731,816 A | 3/1988 | Hughes-Hartogs |

(List continued on next page.)

OTHER PUBLICATIONS

Alessandri, Access Control List Processing in Hardware, Diploma Thesis, ETH, pp. 1–85, Oct. 1997.*

*Primary Examiner*—Wellington Chin
*Assistant Examiner*—Frank Duong
(74) *Attorney, Agent, or Firm*—Skjerven Morrill MacPherson LLP

(57) **ABSTRACT**

The invention provides for hardware processing of ACLs and thus hardware enforcement of access control. A sequence of access control specifiers from an ACL are recorded in a CAM, and information from the packet header is used to attempt to match selected source and destination IP addresses or subnets, ports, and protocols, against all the ACL specifiers at once. Successful matches are input to a priority selector, which selects the match with the highest priority (that is, the match that is first in the sequence of access control specifiers). The specified result of the selected match is used to permit or deny access for the packet without need for software processing, preferably at a rate comparable to wirespeed. The CAM includes an ordered sequence of entries, each of which has an array of ternary elements for matching "0", "1", or any value, and each of which generates a match signal. The ACL entered for recording in the CAM can be optimized to reduce the number of separate entries in the CAM, such as by combining entries which are each special cases of a more general access control specifier. A router including the CAM can also include preprocessing circuits for certain range comparisons which have been found both to be particularly common and to be otherwise inefficiently represented by the ternary nature of the CAM, such as comparisons of the port number against known special cases such as "greater than 1023" or "within the range 6000 to 6500".

**31 Claims, 3 Drawing Sheets**



ARISTA-1001

**US 6,377,577 B1**

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,750,136 A | 6/1988 | Arpin et al. |
| 4,757,495 A | 7/1988 | Decker et al. |
| 4,763,191 A | 8/1988 | Gordon et al. |
| 4,769,810 A | 9/1988 | Eckberg, Jr. et al. |
| 4,769,811 A | 9/1988 | Eckberg, Jr. et al. |
| 4,771,425 A | 9/1988 | Baran et al. |
| 4,819,228 A | 4/1989 | Baran et al. |
| 4,827,411 A | 5/1989 | Arrowood et al. |
| 4,833,706 A | 5/1989 | Hughes-Hartogs |
| 4,835,737 A | 5/1989 | Herrig et al. |
| 4,879,551 A | 11/1989 | Georgiou et al. |
| 4,893,306 A | 1/1990 | Chao et al. |
| 4,903,261 A | 2/1990 | Baran et al. |
| 4,922,486 A | 5/1990 | Lidinsky et al. |
| 4,933,937 A | 6/1990 | Konishi |
| 4,960,310 A | 10/1990 | Cushing |
| 4,962,497 A | 10/1990 | Ferenc et al. |
| 4,962,532 A | 10/1990 | Kasirai et al. |
| 4,965,772 A | 10/1990 | Daniel et al. |
| 4,970,678 A | 11/1990 | Sladowski et al. |
| 4,979,118 A | 12/1990 | Kheradpir .................... 364/436 |
| 4,980,897 A | 12/1990 | Decker et al. |
| 4,991,169 A | 2/1991 | Davis et al. |
| 5,003,595 A | 3/1991 | Collins et al. |
| 5,014,265 A | 5/1991 | Hahne et al. |
| 5,020,058 A | 5/1991 | Holden et al. |
| 5,033,076 A | 7/1991 | Jones et al. |
| 5,054,034 A | 10/1991 | Hughes-Hartogs |
| 5,059,925 A | 10/1991 | Weisbloom |
| 5,072,449 A | 12/1991 | Enns et al. |
| 5,088,032 A | 2/1992 | Bosack |
| 5,095,480 A | 3/1992 | Fenner |
| RE33,900 E | 4/1992 | Howson |
| 5,115,431 A | 5/1992 | Williams et al. |
| 5,128,945 A | 7/1992 | Enns et al. |
| 5,136,580 A | 8/1992 | Videlock et al. |
| 5,166,930 A | 11/1992 | Braff et al. |
| 5,199,049 A | 3/1993 | Wilson |
| 5,206,886 A | 4/1993 | Bingham |
| 5,208,811 A | 5/1993 | Kashio et al. |
| 5,212,686 A | 5/1993 | Joy et al. |
| 5,224,099 A | 6/1993 | Corbalis et al. |
| 5,226,120 A | 7/1993 | Brown et al. |
| 5,228,062 A | 7/1993 | Bingham |
| 5,229,994 A | 7/1993 | Balzano et al. |
| 5,237,564 A | 8/1993 | Lespagnol et al. |
| 5,241,682 A | 8/1993 | Bryant et al. |
| 5,243,342 A | 9/1993 | Kattemalalavadi et al. |
| 5,243,596 A | 9/1993 | Port et al. |
| 5,247,516 A | 9/1993 | Bernstein et al. |
| 5,249,178 A | 9/1993 | Kurano et al. |
| 5,253,251 A | 10/1993 | Aramaki |
| 5,255,291 A | 10/1993 | Holden et al. |
| 5,260,933 A | 11/1993 | Rouse |
| 5,260,978 A | 11/1993 | Fleischer et al. |
| 5,268,592 A | 12/1993 | Bellamy et al. |
| 5,268,900 A | 12/1993 | Hluchyj et al. |
| 5,271,004 A | 12/1993 | Proctor et al. |
| 5,274,631 A | 12/1993 | Bhardwaj |
| 5,274,635 A | 12/1993 | Rahman et al. |
| 5,274,643 A | 12/1993 | Fisk |
| 5,280,470 A | 1/1994 | Buhrke et al. |
| 5,280,480 A | 1/1994 | Pitt et al. |
| 5,280,500 A | 1/1994 | Mazzola et al. |
| 5,283,783 A | 2/1994 | Nguyen et al. |
| 5,287,103 A | 2/1994 | Kasprzyk et al. |
| 5,287,453 A | 2/1994 | Roberts |
| 5,291,482 A | 3/1994 | McHarg et al. |
| 5,305,311 A | 4/1994 | Lyles |
| 5,307,343 A | 4/1994 | Bostica et al. |
| 5,309,437 A | 5/1994 | Perlman et al. .......... 730/85.13 |
| 5,311,509 A | 5/1994 | Heddes et al. |
| 5,313,454 A | 5/1994 | Bustini et al. |
| 5,313,582 A | 5/1994 | Hendel et al. |
| 5,317,562 A | 5/1994 | Nardin et al. |
| 5,319,644 A | 6/1994 | Liang |
| 5,327,421 A | 7/1994 | Hiller et al. |
| 5,331,637 A | 7/1994 | Francis et al. |
| 5,345,445 A | 9/1994 | Hiller et al. |
| 5,345,446 A | 9/1994 | Hiller et al. |
| 5,359,591 A | 10/1994 | Corbalis et al. |
| 5,361,250 A | 11/1994 | Nguyen et al. |
| 5,361,256 A | 11/1994 | Doeringer et al. |
| 5,361,259 A | 11/1994 | Hunt et al. |
| 5,365,524 A | 11/1994 | Hiller et al. |
| 5,367,517 A | 11/1994 | Cidon et al. |
| 5,371,852 A | 12/1994 | Attanasio et al. |
| 5,386,567 A | 1/1995 | Lien et al. |
| 5,390,170 A | 2/1995 | Sawant et al. |
| 5,390,175 A | 2/1995 | Hiller et al. |
| 5,394,394 A | 2/1995 | Crowther et al. |
| 5,394,402 A | 2/1995 | Ross |
| 5,400,325 A | 3/1995 | Chatwani et al. |
| 5,408,469 A | 4/1995 | Opher et al. |
| 5,416,842 A | 5/1995 | Aziz |
| 5,422,880 A | 6/1995 | Heitkamp et al. |
| 5,422,882 A | 6/1995 | Hiller et al. |
| 5,423,002 A | 6/1995 | Hart |
| 5,426,636 A | 6/1995 | Hiller et al. |
| 5,428,607 A | 6/1995 | Hiller et al. |
| 5,430,715 A | 7/1995 | Corbalis et al. |
| 5,430,729 A | 7/1995 | Rahnema |
| 5,442,457 A | 8/1995 | Najafi |
| 5,442,630 A | 8/1995 | Gagliardi et al. |
| 5,452,297 A | 9/1995 | Hiller et al. |
| 5,473,599 A | 12/1995 | Li et al. |
| 5,473,607 A | 12/1995 | Hausman et al. |
| 5,477,541 A | 12/1995 | White et al. |
| 5,485,455 A | 1/1996 | Dobbins et al. |
| 5,490,140 A | 2/1996 | Abensour et al. |
| 5,490,257 A | 2/1996 | Fenner |
| 5,491,687 A | 2/1996 | Christensen et al. |
| 5,491,804 A | 2/1996 | Heath et al. |
| 5,497,368 A | 3/1996 | Reijnierse et al. |
| 5,504,747 A | 4/1996 | Sweasey |
| 5,509,006 A | 4/1996 | Wilford et al. |
| 5,517,494 A | 5/1996 | Green |
| 5,519,704 A | 5/1996 | Farinacci et al. |
| 5,519,858 A | 5/1996 | Walton et al. .............. 395/600 |
| 5,526,489 A | 6/1996 | Nilakantan et al. |
| 5,530,963 A | 6/1996 | Moore et al. |
| 5,535,195 A | 7/1996 | Lee |
| 5,539,734 A | 7/1996 | Burwell et al. |
| 5,541,911 A | 7/1996 | Nilakantan et al. |
| 5,546,370 A | 8/1996 | Ishikawa |
| 5,555,244 A | 9/1996 | Gupta et al. |
| 5,561,669 A | 10/1996 | Lenney et al. |
| 5,583,862 A | 12/1996 | Callon |
| 5,592,470 A | 1/1997 | Rudrapatna et al. |
| 5,598,581 A | 1/1997 | Daines et al. |
| 5,600,798 A | 2/1997 | Chenrukuri et al. |
| 5,604,868 A | 2/1997 | Komine et al. |
| 5,608,726 A | 3/1997 | Virgile |
| 5,617,417 A | 4/1997 | Sathe et al. |
| 5,617,421 A | 4/1997 | Chin et al. |
| 5,630,125 A | 5/1997 | Zellweger |
| 5,631,908 A | 5/1997 | Saxe |
| 5,632,021 A | 5/1997 | Jennings et al. |
| 5,634,010 A | 5/1997 | Ciscon et al. |
| 5,638,359 A | 6/1997 | Peltola et al. |
| 5,644,718 A | 7/1997 | Belove et al. |

2

**US 6,377,577 B1**

Page 3

| | | | | | | |
|---|---|---|---|---|---|---|
| 5,659,684 A | 8/1997 | Giovannoni et al. | 5,748,617 A | 5/1998 | McLain, Jr. | |
| 5,666,353 A | 9/1997 | Klausmeier et al. | 5,754,547 A | 5/1998 | Nakazawa | |
| 5,673,265 A | 9/1997 | Gupta et al. | 5,802,054 A | 9/1998 | Bellenger | |
| 5,678,006 A | 10/1997 | Valizadeh et al. | 5,835,710 A | 11/1998 | Nagami et al. | |
| 5,680,116 A | 10/1997 | Hashimoto et al. | 5,854,903 A | 12/1998 | Morrison et al. | |
| 5,684,797 A | 11/1997 | Aznar et al. | 5,856,981 A | 1/1999 | Voelker | |
| 5,687,324 A | 11/1997 | Green et al. | 5,892,924 A | 4/1999 | Lyon et al. ........... 395/200.75 |
| 5,689,506 A | 11/1997 | Chiussi et al. | 5,898,686 A | 4/1999 | Virgile | |
| 5,694,390 A | 12/1997 | Yamato et al. | 5,903,559 A | 5/1999 | Acharya et al. | |
| 5,724,351 A | 3/1998 | chao et al. | | | | |
| 5,748,186 A | 5/1998 | Raman | * cited by examiner | | | |

U.S. Patent    Apr. 23, 2002    Sheet 1 of 3    US 6,377,577 B1



**FIG. 1**



**FIG. 2**



*300*

*FIG. 3*

6

US 6,377,577 B1

**1**

## ACCESS CONTROL LIST PROCESSING IN HARDWARE

In a computer network for transmitting information, messages can be restricted from being transmitted from selected source devices to selected destination devices. In known computer networks, this form of restriction is known as "access control" and is performed by routers, which route messages (in the form of individual packets of information) from source devices to destination devices. One known technique for access control is for each router to perform access control by reference to one or more ACLs (access control lists); the ACL describes which selected source devices are permitted (and which denied) to send packets to which selected destination devices.

In a known standard for ACL format, each ACL includes a plurality of access control specifiers, each of which selects a range of sender and destination IP address prefix or subnet, and port, and provides that packet transmission from that selected set of senders to that selected set of destinations is either specifically permitted or specifically denied. ACLs are associated with input interfaces and independently with output interfaces for each router. In known routers such as those manufactured by Cisco Systems, Inc., of San Jose, Calif., the router is provided with an ACL using an ACL command language, interpreted by the operating system software for the router, such as the IOS operating system.

One problem in the known art is that processing of packets to enforce access control according to the ACL is processor-intensive and can therefore be relatively slow, particularly in comparison with desired rates of speed for routing packets. This problem is exacerbated when access control is enforced for packets using software in the router, because software processing of the ACL can be quite slow relative to hardware processing of the packet for routing.

One known solution is to reduce the number of packets for which access control requires actual access to the ACL. In a technique known as "netflow switching," packets are identified as belonging to selected "flows," and each packet in a flow is expected to have identical routing and access control characteristics. Therefore, access control only requires reference to the ACL for the first packet in a flow; subsequent packets in the same flow can have access control enforced identically to the first packet, by reference to a routing result cached by the router and used for the entire flow.

Netflow switching is further described in detail in the following patent applications:

U.S. application Ser. No. 08/581,134, titled "Method For Traffic Management, Traffic Prioritization, Access Control, and Packet Forwarding in a Datagram Computer Network", filed Dec. 29, 1995, in the name of inventors David R.

Cheriton and Andreas V. Bechtolsheim, assigned to Cisco Technology, Inc., attorney docket number CIS-019;

U.S. application Ser. No. 08/655,429, titled "Network Flow Switching and Flow Data Export", filed May 28, 1996, in the name of inventors Darren Kerr and Barry Bruins, and assigned to Cisco Technology, Inc., attorney docket number CIS-016; and

U.S. application Ser. No. 08/771,438, titled "Network Flow Switching and Flow Data Export", filed Dec. 20, 1996, in the name of inventors Darren Kerr and Barry Bruins, assigned to Cisco Technology, Inc., attorney docket number CIS-017.

These patent applications are collectively referred to herein as the "Netflow Switching Disclosures". Each of

**2**

these applications is hereby incorporated by reference as if fully set forth herein.

While netflow switching achieves the goal of improving the speed of enforcing access control by the router, it still has the drawback that comparing at least some incoming packets against the ACL must be performed using software. Thus, the relative slowness required by software processing of the ACL is not completely avoided.

A second problem in the known art is that software processing of the ACL takes increased time when the ACL has numerous entries, such as when the requirements for access control are complex. The more entries in the ACL, the more time is expected to be required for software processing of the ACL, and thus the more time is expected to be required for software enforcement of access control. Since known routers require at least some software enforcement of access control, this reduces the routing speed at which the router can operate.

For example, for some large ACLs, routing speed can be reduced to as low as about 10,000 packets per second. However, the wirespeed rate of incoming packets is presently (for relatively short packets) about 1.5 million packets per gigabit per second transmission capacity, or in the range of about tens to hundreds of millions of packets per second for gigabit networks. Since it would be desirable for routers to operate at speeds comparable to the wirespeed, the present limitation on router speed is unacceptably low.

Accordingly, it would be desirable to provide a method and system for hardware processing of ACLs and thus hardware enforcement of access control. This advantage is achieved in an embodiment of the invention in which a sequence of access control specifiers from an ACL are recorded in a CAM (content-addressable memory), and in which matching (or lack of matching) of information from the packet header to specifiers recorded in the CAM are used to enforce access control.

## SUMMARY OF THE INVENTION

The invention provides a method and system for hardware processing of ACLs and thus hardware enforcement of access control. A sequence of access control specifiers from an ACL are recorded in a CAM, and information from the packet header is used to attempt to match selected source and destination IP addresses or subnets, ports, and protocols, against all the ACL specifiers at once. Successful matches are input to a priority selector, which selects the match with the highest priority (that is, the match that is first in the sequence of access control specifiers). The specified result of the selected match is used to permit or deny access for the packet without need for software processing, preferably at a rate comparable to wirespeed.

In a preferred embodiment, the CAM includes an ordered sequence of entries, each of which has an array of ternary elements for matching on logical "0", logical "1", or on any value, and each of which generates a match signal. The ACL entered for recording in the CAM can be optimized to reduce the number of separate entries in the CAM, such as by combining entries which are each special cases of a more general access control specifier.

A router including the CAM can also include preprocessing circuits for certain range comparisons which have been found both to be particularly common and to be otherwise inefficiently represented by the ternary nature of the CAM. For example, comparisons of the port number against known special cases, such as "greater than 1023" and "within the range 6000 to 6500", can be treated by circuitry for performing range comparisons or by reference to one or more auxiliary CAMs.

7

US 6,377,577 B1

**3**

The invention can also be used to augment or override routing decisions otherwise made by the router, so as to implement QOS (quality of service), and other administrative policies, using the CAM.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a block diagram of a system for access control list processing.

FIG. **2** shows a block diagram of an access control element.

FIG. **3** shows a flow diagram of a method for access control list processing in hardware.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In the following description, a preferred embodiment of the invention is described with regard to preferred process steps and data structures. Those skilled in the art would recognize after perusal of this application that embodiments of the invention can be implemented using circuits adapted to particular process steps and data structures described herein, and that implementation of the process steps and data structures described herein would not require undue experimentation or further invention.

System Elements

FIG. **1** shows a block diagram of a system for access control list processing.

A system **100** includes a set of packet input interfaces **101**, a routing element **10**, an access control element **120**, and a set of packet output interfaces **102**. The system **100** receives packets **130** at the input interfaces **101**; each packet **130** indicates a source device **131**, from which it was sent, and a destination device **132**, to which it is intended to go. The routing element **110** processes each packet **130** to select one or more of the output interfaces **102** to which the packet **130** should be forwarded. The access control element **120** determines if the packet **130** has permission to be forwarded from its source device **131** to its destination device **132**. Each packet **130** that has permission to be forwarded is output to its selected output interface **102**.

In a first set of alternative embodiments, the system **100** may include a plurality of access control elements **120** operating in parallel in place of the single access control element **120**.

In a second set of alternative embodiments, the system **100** may include one or more access control elements **120** coupled to the input interfaces **101** and operating to determine if packets **130** have permission to be forwarded from their source devices **131** at all. The access control element **120** is shown coupled to the routing element **110** to perform access control after a routing decision has been made. However, the access control element **120** is still capable of denying access to packets **130** responsive to whether they have permission to be forwarded from their source devices **131** at all.

In a third set of alternative embodiments, the system **100** may include one or more access control elements **120** coupled to individual input interfaces **101** and operating to make access control determinations for packets **130** arriving at particular input interfaces **101**. Similarly, the system **100** may include one or more access control elements **120** coupled to individual output interfaces **102** and operating to make access control determinations for packets **130** forwarded to particular output interfaces **102**.

Access Control Element

FIG. **2** shows a block diagram of an access control element.

**4**

In a preferred embodiment, the access control element **120** operates on a set of selected elements of a packet header **133** for each packet **130**. The system **100** collects the selected elements into a packet label **200**.

In a preferred embodiment using netflow switching, the packet label **200** used for access control at the input interfaces **101** includes a source device **131**, the destination device **132**, a port identifier for a port at the source device **131**, a port identifier for a port at the destination device **132**, and a protocol type. In alternative embodiments, the packet label **200** may be any collection of information derived from the packet **130** (preferably from the packet header **133**) used for access control.

The concept of preprocessing the packet label has wide applicability, including determining other routing information in response to data in the packet header. For example, in addition to or instead of comparing data in the packet header against known special cases, such as "greater than 1023" and "within the range 6000 to 6500," preprocessing can include performing logical or arithmetic operations on data in the packet header. Preprocessing can also include data lookup, or substituting new data, in response to data in the packet header.

The access control element **120** includes an input port **201** coupled to the packet label **200**, an access control memory **210**, a priority encoder **220**, and an output port **202** coupled to the priority encoder **220**.

When the access control element **120** is disposed for controlling access for packets responsive to their input interfaces **101**, the packet label **200** includes an identifier for the input interface **101**. When the access control element **120** is disposed for controlling access for packets responsive to their output interfaces **102**, the packet label **200** includes an identifier for the output interface **102**.

The access control memory **210** includes a CAM (content-addressable memory) having a sequence of access control specifiers **211**. Each access control specifier **211** includes a label match mask **212** and a label match pattern **213**. For each access control specifier **211**, each bit of the label match mask **212** determines whether or not a corresponding bit of the packet label **200** is tested. If so, the corresponding bit of the label match pattern **213** is compared for equality with the corresponding bit of the packet label **200**. If all compared bits are equal, the access control specifier **211** matches the packet label **200**. Bits that are not compared have no effect on whether the access control specifier **211** is considered to match the packet label **200** or not.

The priority encoder **220** is coupled to all of the access control specifiers **211**, and receives an indicator from each one whether or not that access control specifier **211** matched the packet label **200**. The priority encoder **220** selects the single access control specifier **211** with the highest priority (in a preferred embodiment, the one with the lowest address in the access control memory **210**) and provides an indicator of that single access control specifier **211** to the output port **202**.

The indicator provided to the output port **202** specifies whether or not the packet **130** has permission to be forwarded from its specified source device **131** to its specified destination device **132**. In a preferred embodiment, the indicator specifies one of three possibilities: (a) the packet **130** is forwarded to its calculated output interface and on to its specified destination device **132**; (b) the packet **130** is dropped; or (c) the packet **130** is forwarded to a "higher-level" processor for further treatment. When a packet **130** is dropped it is effectively denied access from its specified source device **131** to its specified destination device **132**.

8

US 6,377,577 B1

5

The higher-level processor includes a general-purpose processor, program and data memory, and mass storage, executing operating system and application software for software (rather than hardware) examination of the packet **130**. The packet **130** is compared, possibly to the access control specifiers **211** and possibly to other administrative policies or restrictions, by the higher-level processor. The higher-level processor specifies whether the packet **130**, after processing by the higher-level processor, is forwarded to a selected output interface or is dropped.

Access Control Lists

A Cisco access control list includes a sequence of access control entries, which are mapped to a set of access control specifiers **211**. Each access control entry has a structure according to the following syntax:

access-list access-list-number [dynamic dynamic-name [timeout minutes]] {deny|permit} protocol source source-wildcard [operator port [port]] destination destination-wildcard [operator port [port]] [established] [precedence precedence] [tos tos] [log]

This syntax, its meaning, and access control entries in general, are further described in documentation for Cisco IOS software, available from Cisco Systems, Inc., in San Jose, Calif., and hereby incorporated by reference as if fully set forth herein.

Access control entries can specify that particular actions are permitted, denied, or that they will be recorded in a log. Access control entries are interpreted sequentially. Thus, an earlier more specific access control entry can prohibit particular actions (such as receiving messages from a particular sending device), while a later more general access control entry can permit the same actions for other devices (such as other sending devices in the same network).

When an access control list is translated for entry into the access control memory, it is optimized to reduce the number of separate entries that are used. Thus, an access control list with N separate access control entries is translated into a set of access control specifiers **211** that can be smaller or larger than N, depending on the effect of optimization.

A first optimization detects separate access control entries that each refer to a special case of a more general access control specifier **211**, such as in one of the following cases:

A first access control entry provides a selected permission for a selected source device **131 2S**, and a second access control entry provides the same permission for a selected source device **131 2S+1**. The first and second access control entries can be translated into a single more general access control specifier **211** with an unmatched bit in the $2^0$ position.

A set of access control entries each provides the same selected permission for a range of selected source devices **131 S** through T, and the range S through T can be represented as a smaller number of bit strings with unmatched bits.

A set of access control entries provides a selected permission for a comparison of source device **131** addresses with a test value V.

A second optimization detects range comparisons that have been found to be particularly common. For example, it is common to compare the source or destination port number for being greater than 1023, or for being within the range 6000 to 6500. To compare the source or destination port number for being greater than 1023 with matched and unmatched bits would use about six entries for each such comparison (to test each one of the six high-order bits of the port number for being logical "1").

In a preferred embodiment, a comparison circuit **230** compares the source port number and the destination port

6

number with these known ranges and provides a set of comparison bits **231** indicating whether or not the source port number and the destination port number are within each specified range. The comparison circuit **230** includes a finite state machine **232** (or other element) for storing lower and upper bounds for each specified range. The comparison bits **231** are coupled to the input port **201** of the access control element **120** for treatment as matchable input bits supplemental to the header of the packet **130**.

In various embodiments, the invention can be used to augment or override routing decisions otherwise made by the router, using the access control element **120**. In addition to specifying that the packet **130** is to be dropped or forwarded to the higher-level processor, the access control element **120** can alter the output interface, which was selected by the routing element **110**, to another selected output interface. The invention can thus be used to implement QOS (quality of service) policies and other administrative policies.

Method of Operation

FIG. **3** shows a flow diagram of a method for access control list processing in hardware.

A method **300** includes a set of flow points to be noted, and steps to be executed, cooperatively by the elements of the system **100**.

At a flow point **310**, a packet is received at one of the packet input inter-faces **101**.

At a step **321**, the routing element **110** receives an input packet **130**.

At a step **322**, the routing element **110** identifies the header for the packet **130**.

At a step **323**, the routing element **110** selects portions of the header for use as the packet label **200** for access control. In a preferred embodiment, the packet label **200** used for access control at the input interfaces **101** includes the source device **131**, the destination device **132**, the port identifier at the source device **131**, the port identifier at the destination device **132**, and a protocol type.

At a step **324**, the routing element **110** couples the packet label **200** and an input interface specifier to the input access control element **120**.

At a step **325**, the routing element **10** determines a selected output inter-face for the packet **130**.

At a step **326**, preferably performed in parallel with the step **325**, the input access control element **120** determines the input permission for the packet **130**, that is, whether the routing element **110** permits forwarding the packet **130** from the source device **131** for the packet **130**.

The step **326** includes matching the packet label **200** against the access control memory **210** for the input access control element **120**, determining all of the successful matches, coupling the successful matches to the priority encoder **220** for the input access control element **120**, determining the highest-priority match, and providing an output result from the input access control element **120**.

If at the step **326**, the input access control element **120** determines that the higher-level processor should process the packet **130**, the higher-level processor processes the packet **130**. A result from the higher-level processor is substituted for the result from the input access control element **120**.

If at the step **326**, the input access control element **120** (or the higher-level processor) determines that the packet **130** should be dropped, the packet **130** is dropped, and the routing element **110** takes no further action with regard to the packet **130**.

At a step **327**, the routing element **110** couples the packet label **200** and the output interface specifier to the output access control element **120**.

9

US 6,377,577 B1

7

At a step **328**, the output access control element **120** determines the output permission for the packet **130**, that is, whether the routing element **110** permits forwarding the packet **130** to the destination device **132** for the packet **130**.

The step **326** includes the following actions:

matching the packet label **200** against the access control memory **210** for the out-put access control element **120**;

determining all of the successful matches;

coupling the successful matches to the priority encoder **220** for the output access control element **120**;

determining the highest-priority match; and

providing an output result from the output access control element **120**.

If at the step **328**, the output access control element **120** determines that the higher-level processor should process the packet **130**, the higher-level processor processes the packet **130**. A result from the higher-level processor is substituted for the result from the output access control element **120**.

If at the step **328**, the output access control element **120** (or the higher-level processor) determines that the packet **130** should be dropped, the packet **130** is dropped, and the routing element **110** takes no further action with regard to the packet **130**.

At a flow point **330**, the packet is ready for transmission to one of the packet output interfaces **102**.

Alternative Embodiments

Although preferred embodiments are disclosed herein, many variations are possible which remain within the concept, scope, and spirit of the invention, and these variations would become clear to those skilled in the art after perusal of this application.

What is claimed is:

**1**. A method, including the steps of maintaining a set of access control patterns in at least one associative memory;

receiving a packet label responsive to a packet, said packet label being sufficient to perform access control processing for said packet;

matching matchable information, said matchable information being responsive to said packet label, with said set of access control patterns in parallel, and generating a set of matches in response thereto, each said match having priority information associated therewith;

selecting at least one of said matches in response to said priority information, and generating an access result in response to said at least one selected match; and

making a routing-decision in response to said access result.

**2**. A method as in claim **1**, including the step of performing at least two of said steps of receiving, matching, selecting, and making a routing decision, in parallel using a pipeline technique.

**3**. A method as in claim **1**, wherein said access control patterns each include a bit pattern for matching and a mask pattern of bits not for matching.

**4**. A method as in claim **1**, wherein said access control patterns each include a set of ternary elements, each representative of a logical "0," logical "1", or "don't care" value.

**5**. A method as in claim **1**, wherein said associative memory includes a hardware content-associative memory having a plurality of rows, each row including one of said access control patterns and one of said access results.

**6**. A method as in claim **1**, wherein said associative memory includes a hardware content-associative memory having a plurality of rows,

each row including a bit pattern for matching and one of said access results, and

8

each row being associated with a pattern of bits not for matching, said set of patterns of bits not for matching being fewer than a number of said rows.

**7**. A method as in claim **1**, wherein said associative memory includes a ternary content-associative memory.

**8**. A method as in claim **1**, wherein said packet label includes a source IP address or subnet, a destination IP address or subnet, a source port, a destination port, a protocol specifier, or an input interface.

**9**. A method as in claim **1**, wherein said priority information for each said access control pattern is responsive to a position of said access control pattern in a memory.

**10**. A method as in claim **1**, wherein said priority information includes a position in said associative memory, and said step of selecting includes choosing a first one of said matches.

**11**. A method as in claim **1**, wherein said routing decision includes a committed access rate decision.

**12**. A method as in claim **1**, wherein said routing decision includes an administrative policy decision regarding treatment of said packet.

**13**. A method as in claim **1**, wherein said routing decision includes determining an output interface for said packet.

**14**. A method as in claim **1**, wherein said routing decision includes implementing a quality of service policy.

**15**. A method as in claim **1**, wherein said routing decision includes permitting or denying access for said packet.

**16**. A method as in claim **1**, wherein said step of generating said access result is responsive to a plurality of said at least one matches.

**17**. A method as in claim **1**, wherein said step of matching is performed in order of constant time, whereby said step of matching is performed in time not responsive to a number of said access control patterns.

**18**. A method as in claim **1**, wherein said steps of matching and selecting are performed at a rate exceeding 1 megapacket per second.

**19**. A method as in claim **1**, including the step of making a preliminary routing decision for said packet, wherein said packet routing information includes a result of said preliminary routing decision.

**20**. A method as in claim **19**, wherein said preliminary routing decision includes determining at least one output interface for said packet.

**21**. A method as in claim **19**, wherein said packet routing information includes an output interface for said packet.

**22**. A method as in claim **1**, including the step of preprocessing said packet label to generate said matchable information.

**23**. A method as in claim **22**, wherein said step of preprocessing includes the steps of

performing an arithmetic, logical, or comparison operation on said packet label; and

generating a bit string for said matchable information in response to said arithmetic, logical, or comparison operation.

**24**. A method as in claim **22**, wherein said step of preprocessing includes the step of comparing a field of said packet label with an arithmetic range or mask value.

**25**. A method as in claim **22**, wherein said step of preprocessing includes the step of comparing a source IP port value or a destination IP port value with a selected port value.

**26**. A method as in claim **1**, including the step of postprocessing said selected match to generate said access result.

10

US 6,377,577 B1

9

**27**. A method as in claim **26**, wherein said step of postprocessing includes accessing a memory in response to a bitstring included in said selected match.

**28**. A method as in claim **1**, wherein said set of access control patterns is responsive to a sequence of access control specifiers, each one of said sequence of access control specifiers declaring whether to permit or deny access for a set of packets.

**29**. A method as in claim **28**, wherein said step of maintaining includes the steps of

  receiving said sequence of access control specifiers;

  translating said sequence of access control specifiers into said sequence of access control patterns; and

10

storing said sequence of access control patterns in said associative memory.

**30**. A method as in claim **29**, wherein said step of translating includes the step of generating a plurality of said access control patterns in response to one of said access control specifiers.

**31**. A method as in claim **29**, wherein said step of translating includes the step of generating a single one of said access control patterns in response to a plurality of said access control specifiers.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 6,377,577 B1                                    Page 1 of 1
DATED          : April 23, 2002
INVENTOR(S)    : Bechtolsheim et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 7,
Line 48, please delete "outing-decision" and insert therefore -- routing decision --.

Signed and Sealed this

Twelfth Day of August, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

12

# CERTIFICATE OF SERVICE

I certify that on September 6, 2017, I electronically filed the foregoing Principal Brief of Appellant using the Court's CM/ECF filing system. Counsel for appellee were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(a) and 25(b).

/s/ Lauren A. Degnan
Lauren A. Degnan

## CERTIFICATE OF COMPLIANCE

The Principal Brief of Appellant is submitted in accordance with the type-volume limitation of Federal Circuit Rule 32(a).  The Brief contains 8,834 words, excluding the parts of the brief exempted by Fed. Cir. R. 32(b).  This Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14 Point.


Dated: September 6, 2017          /s/ Lauren A. Degnan
                                  Lauren A. Degnan