Nos. 2017-2336, -2347

_____

# United States Court of Appeals for the Federal Circuit

_____

ARISTA NETWORKS, INC.,

*Appellant,*

v.

CISCO SYSTEMS, INC.,

*Cross-Appellant.*

_____

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board No. IPR2016-00303

_____

## CROSS-APPELLANT CISCO SYSTEMS, INC.'S OPENING & RESPONSE BRIEF

_____

John C. O'Quinn
Jason M. Wilcox
Craig T. Murray
Benjamin A. Herbert
C. Alex Shank
KIRKLAND & ELLIS LLP
655 15th St., N.W.
Washington, D.C. 20005
(202) 879-5000

*Counsel for Cross-Appellant Cisco Systems, Inc.*

October 10, 2017

## <u>U.S. Patent No. 6,377,577 Claims 1 and 2 (Appx48):</u>

**1.** A method, including the steps of maintaining a set of access control patterns in at least one associative memory;

> receiving a packet label responsive to a packet, said packet label being sufficient to perform access control processing for said packet;

> matching matchable information, said matchable information being responsive to said packet label, with said set of access control patterns in parallel, and generating a set of matches in response thereto, each said match having priority information associated therewith;

> selecting at least one of said matches in response to said priority information, and generating an access result in response to said at least one selected match; and

> making a routing decision in response to said access result.

**2.** A method as in claim **1**, including the step of performing at least two of said steps of receiving, matching, selecting, and making a routing decision, in parallel using a pipeline technique.

# CERTIFICATE OF INTEREST

**1.    The full name of every party represented by us is:**

Cisco Systems, Inc.

**2.    The name of any real party in interest represented by us, and not identified in response to Question 3, is:** None.

**3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by us are:** None.

**4.    The names of all law firms and the partners or associates that appeared for the parties now represented by us in the district court or are expected to appear in this Court are:**

Sterne, Kessler, Goldstein & Fox P.L.L.C.:   Robert Greene Sterne, Dan Block.

**5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal are as follows:**

*Cisco Systems, Inc. v. ITC* (Fed. Cir. No. 17-2289) and *Arista Networks, Inc. v. ITC* (Fed. Cir. No. 17-2351); *Arista Networks, Inc. v. Cisco Systems, Inc.* (Fed. Cir. No. 17-1525) and *Cisco Systems, Inc. v. Arista Networks, Inc.* (Fed. Cir. No. 17-1577); *Cisco Sys., Inc. v. Arista Networks, Inc.*, Case No. 4:14-cv-05343 (N.D. Cal., filed Dec. 5, 2014).


Dated: October 10, 2017          /s/ *John C. O'Quinn*
                                 John C. O'Quinn

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................xiii

INTRODUCTION .................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 6

STATEMENT OF THE ISSUES............................................................. 6

STATEMENT OF THE CASE ................................................................ 7

I.  Background.................................................................................... 7

   A.  Technology Overview ......................................................... 7

   B.  The '577 Patent ................................................................. 9

   C.  Cheriton and Bechtolsheim Assign The '577 Patent To Cisco ................................................................................. 13

   D.  Cheriton and Bechtolsheim Leave Cisco To Found Arista, Which Copied Extensively From Cisco ..................... 14

II.  Arista's Infringement Of The '577 Patent............................... 17

III.  Asserted Prior Art .................................................................... 18

   A.  Huey................................................................................. 18

   B.  ATM UNI Specification................................................... 20

IV.  Patent Trial And Appeal Board Proceedings ........................... 21

   A.  Barred From Challenging Validity At The ITC, Arista Petitions For *Inter Partes* Review ....................... 21

   B.  Institution Decision.......................................................... 24

   C.  Board Proceedings On The Merits ................................... 25

   D.  Final Written Decision..................................................... 26

SUMMARY OF THE ARGUMENT ....................................................... 29

STANDARD OF REVIEW...................................................................... 33

CROSS-APPEAL ARGUMENT ............................................................. 34

I.  The Board Erroneously Concluded That Assignor Estoppel Does Not Apply In *Inter Partes* Reviews. ...................... 34

A.  The Board Legally Erred In Refusing To Apply The Long-Established Doctrine Of Assignor Estoppel To Arista's Invalidity Arguments. .............................................. 36

    1.  The Doctrine of Assignor Estoppel Is A Well-Settled Principle Of Substantive Patent Law ............. 36

    2.  The Board Erred By Requiring An Express Affirmative Statement from Congress That A Longstanding Common Law Doctrine (Assignor Estoppel) Should Apply In IPRs................................... 39

    3.  The Patent Act Allows The Board To Consider Assignor Estoppel In *Inter Partes* Reviews ................. 44

    4.  Assignor Estoppel Is Not Limited To Patent Infringement Suits........................................................ 51

B.  The PTO's Practice Of Applying Other Non-Statutory Doctrines Makes The Board's Refusal To Apply Assignor Estoppel Arbitrary And Capricious...................................... 53

C.  This Court Can Review The Board's Refusal To Apply Assignor Estoppel To The Merits Of Arista's Invalidity Challenge. .............................................................................. 56

D.  This Is A Quintessential Case For Assignor Estoppel. ........ 60

II.  In Analyzing Patentability, The Board Adopted Erroneous Constructions Of Three Key Claim Terms.................................... 63

A.  The '577 Patent Requires Hardware-Based Enforcement of Access Control .............................................................. 64

B.  The "Access Control Patterns" Limitation Is Not Broad Enough To Cover "Patterns" Unrelated To "Access Control".................................................................................. 69

    1.  The Board Failed To Adequately Explain How Huey And The ATM UNI Specification Disclose "Access Control Patterns"............................................. 69

    2.  Rather Than Remand, The Court Should Hold Huey And The ATM UNI Specification Do Not Teach The "Access Control Patterns" Limitation........ 72

C.    The '577 Patent Requires "Generating An Access Result" Based On "At Least One Selected Match" Of The Packet Label To An Access Control Pattern ......................... 75

    1.    The Board Adopted An Unreasonably Broad Construction Of "In Response To" ................................ 75

    2.    Under The Proper Construction, Huey And The ATM UNI Specification Do Not Generate An Access Result In Response To A Match ....................... 80

ARGUMENT IN RESPONSE TO ARISTA'S APPEAL ......................... 82

III.    The Court Should Affirm The Board's Ruling That Arista Did Not Demonstrate That Claim 2 Is Unpatentable ......................... 82

CONCLUSION ....................................................................... 88

# TABLE OF AUTHORITIES

## Cases

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
　651 F.3d 1318 (Fed. Cir. 2011) ............................................................. 77

*Amrollah v. Napolitano*,
　710 F.3d 568 (5th Cir. 2013) ................................................................. 42

*Andersen Corp. v. Fiber Composites, LLC*,
　474 F.3d 1361 (Fed. Cir. 2007) ............................................................. 66

*Ariosa Diagnostics v. Verinata Health, Inc.*,
　805 F.3d 1359 (Fed. Cir. 2015) ............................................................. 34

*Ariosa Diagnostics, Inc. v. Illumina Inc.*,
　2015 WL 153677 (PTAB Jan. 8, 2015) ................................................. 49

*Aruze Gaming Macau, Ltd. v. MGT Gaming, Inc.*,
　2015 WL 780607 (PTAB Feb. 20, 2015) ................................................ 54

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
　501 U.S. 104 (1991) ................................................................................ 40

*Athena Automation Ltd. v. Husky Molding Sys., Ltd.*,
　2013 WL 8595976 (PTAB Oct. 25, 2013) ................................. 41, 51, 56

*Aventis Pharms., Inc. v. Amino Chems., Ltd.*,
　715 F.3d 1363 (Fed. Cir. 2013) ............................................................. 77

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
　135 S. Ct. 1293 (2015) ........................................................................... 40

*B/E Aerospace, Inc. v. MAG Aerospace Indus., LLC*,
　2015 WL 1385358 (PTAB Mar. 26, 2015) ............................................ 49

*Biodelivery Sci. Int'l Inc. v. Monosol RX, LLC*,
　2016 WL 7047970 (PTAB Sept. 26, 2016) ............................................ 54

*Biogen MA, Inc. v. Japanese Found. for Cancer Research*,
　785 F.3d 648 (Fed. Cir. 2015) ............................................................... 42

*Christ v. Blake,*
  1999 WL 33446702 (PTAB 2009) ......................................... 43

*Credit Acceptance Corp. v. Westlake Servs.,*
  859 F.3d 1044 (Fed. Cir. 2017) ............................................ 58

*Cuozzo Speed Techs., LLC v. Lee,*
  136 S. Ct. 2131 (2016) ................................................... 50, 57

*Data Gen. Corp. v. Johnson,*
  78 F.3d 1556 (Fed. Cir. 1996) .............................................. 42

*Dell Inc. v. Acceleron, LLC,*
  818 F.3d 1293 (Fed. Cir. 2016) ................................ 33, 34, 68

*Diamond Sci. Co. v. Ambico, Inc.,*
  848 F.2d 1220 (Fed. Cir. 1988) ........................ 38, 39, 43, 45, 51, 52, 61

*Earth Res. Corp. v. United States,*
  44 Fed. Cl. 274 (1999) ....................................................... 43

*Esselte Corp. v. Dymo,*
  2015 WL 5117894 (PTAB Aug. 28, 2015) ........................... 41

*Esselte Corp. v. Sanford L.P.,*
  2015 WL 5117892 (PTAB Aug. 28, 2015) ........................... 41

*Ex parte Aggarwal,*
  2011 WL 5508764 (BPAI Nov. 8, 2011) ............................. 54

*Ex parte Gerlach,*
  2017 WL 2242550 (PTAB May 18, 2017) ........................... 55

*Ex parte Janssen Biotech, Inc.,*
  2016 WL 6921121 (PTAB Nov. 14, 2016) ........................... 55

*Ex parte Kelly,*
  2010 WL 3454272 (BPAI Aug. 26, 2010) ........................... 54

*Ex parte Nedden,*
  2017 WL 2303202 (PTAB May 24, 2017) ........................... 55

*Ex Parte Northpoint Tech., Ltd.*,
  2014 WL 986346 (PTAB Mar. 13, 2014) ...............................................54

*Ex parte Riddle*,
  2011 WL 861732 (BPAI Mar. 10, 2011) ...............................................54

*Figueroa v. Sec'y of Health & Human Servs.*,
  715 F.3d 1314 (Fed. Cir. 2013) ......................................................40, 42

*Fina Tech., Inc. v. Ewen*,
  857 F. Supp. 1151 (N.D. Tex. 1994) .....................................................51

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  721 F.3d 1330 (Fed. Cir. 2013) ......................................................47, 48

*Google Inc. v. Intellectual Ventures II LLC*,
  ___ F. App'x ___, 2017 WL 2924132 (Fed. Cir. July 10, 2017) .............71

*Graybill v. U.S.P.S.*,
  782 F.2d 1567 (Fed. Cir. 1986) ............................................................43

*Gulf Power Co. v. Fed. Energy Regulatory Corp.*,
  983 F.2d 1095 (D.C. Cir. 1993) ...........................................................56

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
  452 F.3d 1312 (Fed. Cir. 2006) ............................................................67

*Husky Injection Molding Sys. Ltd. v. Athena Automation Ltd.*,
  838 F.3d 1236 (Fed. Cir. 2016) ......................................................56, 57

*Husky Injection Molding Sys. Ltd. v. Athena Automation Ltd.*,
  2014 WL 5454543 (PTAB Oct. 23, 2014) .............................................57

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
  849 F.3d 1034 (Fed. Cir. 2017) ............................................................71

*Impression Prods., Inc. v. Lexmark Int'l Inc.*,
  137 S. Ct. 1523 (2017)..........................................................................40

*In re Abbott Diabetes Care Inc.*,
  696 F.3d 1142 (Fed. Cir. 2012) ............................................................64

*In re Bogese*,
   303 F.3d 1362 (Fed. Cir. 2002) ............................................. 42, 53, 54, 55

*In re Longi*,
   759 F.2d 887 (Fed. Cir. 1985) ...................................................... 43, 55

*In re Man Mach. Interface Techs. LLC*,
   822 F.3d 1282 (Fed. Cir. 2016) ..................................................... 74, 80

*In re Marriage of Cheriton*,
   92 Cal. App. 4th 269 (Cal. Dist. Ct. App. 2001) ................................... 14

*In re NuVasive, Inc.*,
   842 F.3d 1376 (Fed. Cir. 2016) ........................................................ 71

*In re O'Keefe*,
   202 F.2d 767 (C.C.P.A. 1953) .......................................................... 53

*In re Smith Int'l, Inc.*,
   ___ F.3d ___,
   2017 WL 4247407 (Fed. Cir. Sept. 26, 2017) ............... 34, 65, 75, 79, 88

*Intel Corp. v. ITC*,
   946 F.2d 821 (Fed. Cir. 1991) ....................................... 37, 38, 39, 41, 43

*Interactive Gift, Express, Inc. v. Compuserve Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ........................................................ 79

*Intervet Inc. v. Merial Ltd.*,
   617 F.3d 1282 (Fed. Cir. 2010) ........................................................ 64

*Kairys v. I.N.S.*,
   981 F.2d 937 (7th Cir. 1992) ............................................................ 42

*Kirkendall v. Dep't of Army*,
   573 F.3d 1318 (Fed. Cir. 2009) ........................................................ 55

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   133 S. Ct. 1351 (2013) .................................................................... 40

*Kyocera Wireless Corp. v. ITC*,
   545 F.3d 1340 (Fed. Cir. 2008) ........................................................ 73

*McCrary v. Office of Pers. Mgmt.,*
  459 F.3d 1344 (Fed. Cir. 2006) ............................................. 55

*MCM Portfolio LLC v. Hewlett-Packard Co.,*
  812 F.3d 1284 (Fed. Cir. 2015) ............................................. 35

*Medina v. I.N.S.,*
  993 F.2d 499 (5th Cir. 1993) ................................................ 42

*Mentor Graphics Corp. v. EVE-USA, Inc.,*
  851 F.3d 1275 (Fed. Cir. 2017) ............................................. 37

*Mentor Graphics Corp. v. Quickturn Design Sys., Inc.,*
  150 F.3d 1374 (Fed. Cir. 1998) ............................... 37, 38, 39, 48, 61, 62

*Metro Traffic Control, Inc. v. Shadow Network Inc.,*
  104 F.3d 336 (Fed. Cir. 1997) .......................................... 43, 52

*Microsoft Corp. v. Proxyconn, Inc.,*
  789 F.3d 1292 (Fed. Cir. 2013) ............................................. 66

*Moshea v. Nat'l Transp. Safety Bd.,*
  570 F.3d 349 (D.C. Cir. 2009) ............................................. 55

*Nike, Inc. v. Adidas AG,*
  812 F.3d 1326 (Fed. Cir. 2016) ........................................ 71, 82

*Oil States Energy Servs. v. Greene's Energy Grp.,*
  No. 16-712, 2017 WL 2507340 (June 12, 2017) .................................. 35

*Options Exch., Inc. v. Chicago Bd. Int'l Secs. Exch., LLC,*
  677 F.3d 1361 (Fed. Cir. 2012) ............................................. 68

*Palo Alto Networks, Inc. v. Juniper Networks, Inc.,*
  2013 WL 8595314 (PTAB Dec. 19, 2013) ...................................... 49

*Personal Web Techs., LLC v. Apple, Inc.,*
  848 F.3d 987 (Fed. Cir. 2017) ......................................... 71, 72

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................... 76

*Phonometrics, Inc. v. N. Telecom Inc.*,
    133 F.3d 1459 (Fed. Cir. 1998) ............................................. 78

*Power Integrations, Inc. v. Lee*,
    797 F.3d 1318 (Fed. Cir. 2015) ............................................. 72

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
    815 F.3d 747 (Fed. Cir. 2016) ............................................... 88

*Pride Mobility Prods. Corp. v. Permobil, Inc.*,
    818 F.3d 1307 (Fed. Cir. 2016) ................................... 72, 80, 82

*Q.G. Prods., Inc. v. Shorty, Inc.*,
    992 F.2d 1211 (Fed. Cir. 1993) ............................................. 38

*Redline Detection, LLC v. Star Envirotech, Inc.*,
    2013 WL 5970197 (PTAB Aug. 27, 2013) ................................. 41, 49, 51

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
    717 F.3d 929 (Fed. Cir. 2013) ............................................... 66

*Respironics, Inc. v. Zoll Med. Corp.*,
    656 F. App'x 531 (Fed. Cir. 2016) .......................................... 63

*Rios v. Nicholson*,
    490 F.3d 928 (Fed. Cir. 2007) ................................... 40, 42, 44

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ........................................ 66, 67

*Scott Paper Co. v. Marcalus Mfg. Co.*,
    326 U.S. 249 (1945) .......................................................... 37

*Securus Techs., Inc. v. Global Tel*Link Corp.*,
    685 F. App'x 979 (Fed. Cir. 2017) .......................................... 71

*Semiconductor Energy Lab. Co. v. Nagata*,
    706 F.3d 1365 (Fed. Cir. 2013) ........................................ 51, 52

*Shamrock Techs., Inc. v. Med. Sterilization, Inc.*,
    903 F.2d 789 (Fed. Cir. 1990) ....................................... 37, 38, 39

*Symbol Techs., Inc. v. Lemelson Med. Educ. & Research Found.*,
   422 F.3d 1378 (Fed. Cir. 2005) ............................................................. 55

*Synopsys, Inc. v. Mentor Graphics Corp.*,
   2014 WL 722009 (PTAB Feb. 19, 2014),
   *aff'd*, 814 F.3d 1309 (Fed. Cir. 2016) .................................................... 49

*Tandon Corp. v. ITC*,
   831 F.2d 1017 (Fed. Cir. 1987) ............................................................. 47

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015) ............................................................................ 34

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
   90 F.3d 1558 (Fed. Cir. 1996) ............................................................... 47

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
   595 F.3d 1340 (Fed. Cir. 2010) ............................................................. 66

*Trustees of Columbia Univ. v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016) ............................................................. 65

*United States v. Texas*,
   507 U.S. 529 (1993) .............................................................................. 44

*Univ. of W. Va. Bd. of Trs. v. VanVoorhies*,
   84 F. Supp. 2d. 759 (N.D.W. Va. 2000),
   *aff'd*, 278 F.3d 1288 (Fed. Cir. 2002) .................................................... 51

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007) ............................................................. 66

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
   793 F.3d 1306, (Fed. Cir. 2015) ............................................................ 59

*Vicor Corp. v. SynQor, Inc.*,
   869 F.3d 1309 (Fed. Cir. 2017) ............................................................. 72

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) ................................................... 65, 66, 79

*Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.,*
520 U.S. 17 (1997) ................................................................. 40

*Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.,*
266 U.S. 342 (1924) ......................................... 36, 37, 45, 51

*White v. Dunbar,*
119 U.S. 47 (1886) ................................................................ 77

## Statutes

15 U.S.C. § 1114 ................................................................... 52

28 U.S.C. § 1338 ................................................................... 52

28 U.S.C. § 1498 ................................................................... 43

28 U.S.C. §1491 .................................................................... 43

35 U.S.C. § 103 ............................................................... 71, 82

35 U.S.C. § 313 ............................................................... 44, 58

35 U.S.C. § 314 ..................................................................... 56

35 U.S.C. § 316 ............................................... 44, 45, 46, 50, 58

35 U.S.C. § 318 ............................................................... 47, 48

5 U.S.C. § 706(1)(A) ............................................................. 34

## Regulations

37 C.F.R. § 41.1 .................................................................... 46

37 C.F.R. § 42.120 ........................................................... 45, 58

37 C.F.R. § 42.23 .................................................................. 26

37 C.F.R. §42.4(a) ................................................................ 25

80 Fed. Reg. 4313 (Jan. 27, 2015) ........................................ 17

**Other Authorities**

157 Cong. Rec. 3429 (2011) ...................................................... 46

H.R. Rep. No. 112–98 (2011) ............................................... 46, 47

Jeremiah Frueauf, *IPR: A Key to District Court's Assignor Estoppel Lock*, Law360 (May 1, 2015), http://bit.ly/2uzAB4y ............. 47

Latham & Watkins, *No Assignor Estoppel in AIA Inter Partes Review Proceedings*, Latham & Watkins Client Alert: Commentary (Nov. 6, 2013), http://bit.ly/2uzyMVv ............................ 47

Manual of Patent Examining Procedure (9th ed. 2015) ................... 55, 58

Reed Smith, *Assignor Estoppel Remains Unavailable as an IPR Defense*, Lexology (Jun. 6, 2017), http://bit.ly/2sVYfq9 ............. 47

## STATEMENT OF RELATED CASES

No appeal has previously been taken from the proceedings below.

The Court's decision in these consolidated appeals could affect two appeals before this Court: *Cisco Systems, Inc. v. ITC* (Fed. Cir. No. 17-2289) and *Arista Networks, Inc. v. ITC* (Fed. Cir. No. 17-2351). Those appeals stem from a complaint Cisco filed against Arista at the International Trade Commission in December 2014, Investigation No. 337-TA-945. In its complaint, Cisco asserted that Arista's switches and necessary components imported from abroad infringed numerous claims of several Cisco patents, including U.S. Patent No. 6,377,577. On May 4, 2017, the Commission determined that Arista's products infringe two Arista patents, including the '577 patent, but not others. This Court docketed Cisco's appeal of the Commission's decision on July 11, 2017, and Arista's appeal of that same decision on July 27, 2017. The Court consolidated the two appeals on August 3, 2017.

Cisco is also asserting the '577 patent in a district court action pending in the Northern District of California, *Cisco Sys., Inc. v. Arista Networks, Inc.*, Case No. 4:14-cv-05343 (N.D. Cal., filed Dec. 5, 2014). That case is stayed pending final judgment in the 945 investigation and

another ITC investigation discussed below.

In addition, Cisco asserted different patents in a separate proceeding at the ITC against Arista, Investigation No. 337-TA-944.  The accused products in both investigations are the same.  The Commission ultimately found that Arista's products infringe three of Cisco's patents but not others.  Cisco and Arista both appealed certain aspects of the Commission's decision.  *Cisco Systems, Inc. v. ITC* (Fed. Cir. No. 16-2539); *Arista Networks, Inc. v. ITC* (Fed. Cir. No. 16-2563).  This Court affirmed the Commission's decision on September 27, 2017.

Arista filed petitions for *inter partes* review of certain claims of five other Cisco patents at issue in the ITC investigations.  The Patent Trial and Appeal Board instituted review on certain claims of U.S. Patent 7,224,668, and, on June 1, 2017, entered a decision finding the challenged claims unpatentable.  This Court docketed Cisco's appeal on August 3, 2017.  *See Arista Networks, Inc. v. Cisco Systems, Inc.*, No. 17-2384.  This Court consolidated these appeals and the '668 patent appeal as companion cases.

The Patent Trial and Appeal Board instituted review on certain claims of U.S. Patent No. 7,340,597, and, on September 28, 2016, entered

a decision finding some of the claims patentable and other claims unpatentable. This Court consolidated Arista's and Cisco's appeals of the Board's decision. Arista filed its opening brief on May 8, 2017. Cisco filed its opening and response brief on July 19, 2017, and Arista filed its response and reply brief on August 30, 2017. *See Arista Networks, Inc. v. Cisco Systems, Inc.*, No. 17-1525; *Cisco Systems, Inc. v. Arista Networks, Inc.*, No. 17-1577. Like this appeal, those consolidated appeals involve the issue of assignor estoppel.

The Patent Trial and Appeal Board instituted review on certain claims of U.S. Patent No. 8,051,211, and, on October 5, 2016, entered a decision finding some of the claims patentable and others unpatentable. This Court consolidated Arista's and Cisco's appeals of the Board's decision. Briefing is now complete in those consolidated appeals. *See Arista Networks, Inc. v. Cisco Systems, Inc.*, Nos. 17-1313, 1380.

The Patent Trial and Appeal Board instituted review on some of the claims of U.S. Patent No. 7,162,537, and, on May 25, 2017, entered a decision finding those claims patentable. This Court docketed Arista's appeal of the PTAB's decision on July 27, 2017. *See Arista Networks, Inc. v. Cisco Systems, Inc.*, No. 17-2349.

The Patent Trial and Appeal Board instituted review on a single claim of U.S. Patent No. 7,023,853, and, on May 25, 2017, entered a decision finding that claim patentable. This Court docketed Arista's appeal of the PTAB's decision on August 3, 2017. *See Arista Networks, Inc. v. Cisco Systems, Inc.*, No. 17-2348. That appeal has been consolidated with Arista's '537 patent appeal.

## INTRODUCTION

At Arista's urging, the PTAB categorically refused to apply the well-established doctrine of assignor estoppel to the facts of this case in its final written decision on the merits.  Arista's founders, and two of its major shareholders, developed the '577 patent's technology while at Cisco, assigned it to Cisco for consideration, left Cisco, and built Arista's business by copying the very technology they assigned to Cisco.  Indeed, the ITC found in related proceedings that Arista was built on a "corporate culture of copying" Cisco and that Arista *knew* that its products infringed" when developing them.  When Cisco challenged Arista's blatant copying, Arista argued that the '577 patent was invalid all along.  This is the quintessential assignor estoppel case.  The PTAB's refusal to apply assignor estoppel is unsupported by precedent, legally wrong, and threatens to undermine the principle that a party cannot claim the very thing he assigned (and implicitly represented was valuable) is in fact worthless.

Patents have never been uniquely exempt from this basic principle of fair dealing and clean hands—a principle that has been part of the fabric of our law for generations.  If an inventor can at first reap value

from assigning his patent based on the implicit representation that it is valid, then later found a company and ultimately invalidate that patent through IPR proceedings when his commercial interests change, he can unfairly profit from repudiating his previous representations. Courts and the ITC have long applied assignor estoppel to prevent such conduct. The PTAB should be no different. A party (or his privy) that walks away from his previous contractual representations seeks relief with unclean hands regardless of the forum in which he files his invalidity challenge.

Cisco's cross-appeal of the Board's decision that certain claims are unpatentable raises an important legal issue of first impression in which the PTAB's approach conflicts with that of the federal courts and the International Trade Commission. Indeed, in a related proceeding, *the ITC reviewed the same conduct and found Arista's conduct was egregious and estopped its invalidity arguments*. So it should be here. This Court should hold—consistent with a century of precedent—that regardless of the forum, an assignor cannot game the system, retract his word, and challenge the validity of the patent he swore was valuable simply because his own private commercial interests have changed. That should be the beginning and end of this appeal.

If the Court nonetheless holds that assignor estoppel does not apply in PTAB proceedings, it should still overturn the Board's decision concerning the claims the PTAB found unpatentable. The Board's obviousness determination depends entirely on erroneous claim constructions. According to the Board, the challenged claims cover *both* hardware *and* software implementations of the claimed access control list processing invention. But the inventors clearly told the public—without contradiction—that the "invention provides for *hardware processing* of ACLs and thus *hardware enforcement* of access control." The very *title* of the patent is "Access Control List Processing in *Hardware*." Moreover, every figure, every embodiment, and every discussion of the invention in the specification takes a hardware-based approach. Indeed, the specification disparages software-based access control as too slow for modern networks. The Board cannot adopt a construction that departs from this clear and unequivocal description of the invention in the specification. That error alone requires a remand.

The Board further erred by holding that the "access control patterns" limitation in each of the disputed claims is broad enough to cover patterns that have nothing to do with access control. Divorcing the

adjective "access control" from the noun it modifies in this manner violates basic rules of English grammar.  It is also inconsistent with the language of the claims, which reinforces that the access control patterns must be used *to perform access control* and to *generate an access result*. The abstract and summary of the invention are equally clear that, "in the invention," the match generated by comparing the claimed access control patterns to the claimed packet label "*is used* to permit or deny" transmission of a packet.  The Board's decision thus requires ignoring not only the English language and how the claim terms relate to one another, but also how the specification describes the invention.  That is exactly what this Court's precedents prohibit.

Along the way, the Board determined that the limitations requiring "generating an access result *in response to* said at least one selected match," is satisfied whenever the match "precedes" the access result— regardless of causation.  This construction again ignores how the claim terms relate to one another and allowed the Board to invalidate the challenged claims based on prior art disclosures unrelated to access control.  As Arista acknowledged before the Board and again in its opening brief, each of the steps in the challenged claims "requires the

output of the prior step," and the "specified result of the selected match is used to permit or deny access for the packet." Arista Br. 33. This cause-and-effect relationship is consistent with the ordinary meaning of "in response to," the language of the claims, and the description of the invention in the specification. The Board's construction, in contrast, finds no support in the record, and the Board offered no defense of its construction beyond its own *ipse dixit*.

That leaves Arista's appeal of the Board's finding that its asserted art did not invalidate claim 2. That claim requires performing two or more of the claimed steps "in parallel using a pipeline technique." Arista contends that a single prior art reference, Huey, discloses this limitation. Substantial evidence supports the Board's finding that nothing in Huey teaches or suggests using parallel pipelined processing to perform the switching process it discloses. Nor was the Board required to find it would have been obvious to modify Huey to use pipelined processing just because pipelining was a known technique in other contexts. Arista's contrary arguments largely challenge a different decision than the one the Board actually issued, contesting a construction the Board specifically disclaimed and statements the Board never made.

For the foregoing reasons, this Court should reverse the Board's decision that claims 1, 7-10, 12-16, 18-22, 25, and 28-31 are unpatentable and affirm its decision that claim 2 is patentable.

## JURISDICTIONAL STATEMENT

Cisco adopts Arista's jurisdictional statement, which addresses Cisco's cross-appeal.

## STATEMENT OF THE ISSUES

**1.** Whether the Board's refusal to apply assignor estoppel to Arista's invalidity arguments is contrary to law.

**2.** Whether the Board erred in construing the '577 patent's claims by (a) reading them to permit performing the claimed invention in software; (b) adopting an unreasonably broad construction of "access control patterns"; and (c) applying an unreasonably broad construction of "generating an access result *in response to* said at least one selected match."

**3.** Whether the Board correctly determined that Arista did not show claim 2 is unpatentable, where substantial evidence supports the Board's finding that Huey does not disclose performing two or more of the claimed steps "in parallel using a pipeline technique."

## STATEMENT OF THE CASE

The patent at issue—U.S. Patent No. 6,377,577 (Appx39-50)—discloses a novel method for performing access control in hardware using an associative memory.  Both of Arista's founders developed the invention while still at Cisco.  The Board instituted *inter partes* review of several claims of the '577 patent.  Although Cisco asserted assignor estoppel after institution, the Board refused to consider that argument on the merits.  Instead, the Board concluded in its final written decision that one claim was patentable, but others were obvious.

## I.    Background

### A.    Technology Overview

Switches and routers link computers, smartphones, and other electronics into a network of interconnected devices.  The principal function of a switch or router is to facilitate the transmission of data across the network from its source to its ultimate destination.  Appx1619(¶48).  As data traverses an Internet Protocol (IP) network, it hops from one switch to the next, each switch moving the data one step closer to its destination.  Appx1619-1620(¶¶48-50); Appx1622-1623(¶55).  Modern networks connect a growing number of devices, and accordingly, data traversing a network can take many different paths, some of which

7

are better than others.  Appx1623-1624(¶¶56-58).  Switches attempt to minimize delays in transmitting data by identifying and forwarding data along the best path between devices.  *Id.*; Appx1627-1628(¶64).

In addition to making these forwarding decisions, switches can decide whether to permit or deny the transmission of data from a particular source to its intended destination.  Appx45(1:3-5); Appx1625-1626(¶¶61-62); Appx1627-1628(¶64).  For instance, the switch could drop all packets sent from devices known to be associated with suspicious or malicious activity, restrict file transfers from a company's R&D division to destinations outside the company's network, or block access to sports websites during business hours.  This is known as "access control." Appx45(1:6-7).

Access control lists (ACLs) are a technique for configuring and enforcing access control rules.  Appx45(1:9-14); Appx1625-1626(¶¶61-62).  An access control list consists of a set of rules that identify whether a particular transmission is permitted or forbidden based on several criteria, called access control patterns, such as the source and destination addresses of the network packet.  Appx45(1:15-22); Appx47(5:11-23); Appx1626(¶62).  A switch compares packets it receives against access

control patterns in its access control list, and may decide to drop the packet rather than forward it in response. Appx1627-1628(¶64); Appx42(Fig. 1); Appx47(5:24-31).

The '577 patent explains that the prior art performed access control in software. Appx45(1:27-34); Appx45(2:14-17); Appx1628(¶65). These software-based approaches suffered a fundamental shortcoming: Processing access control rules in software takes considerably more time than making the forwarding decision, which is usually performed in hardware. Appx45(1:31-34); Appx45(2:14-17); Appx1628(¶65). The switch hardware can make forwarding decisions at "the wirespeed rate of incoming packets," *i.e.* with little delay, whereas enforcing access control rules in software was 100 to 1000 times slower at the time of the invention. Appx45(2:18-26). The performance was even worse for lengthy access control lists implementing many complex access control rules. Appx45(2:8-14).

## B. The '577 Patent

The '577 patent, entitled "Access Control List Processing in Hardware," is a "radical design departure" from these earlier, then state-of-the-art software-based techniques. Appx1630(¶69). It describes and

9

claims technology David Cheriton and Andreas Bechtolsheim invented as highly compensated senior engineers and executives at Cisco before leaving to found Arista. Appx39. Dr. Cheriton and Mr. Bechtolsheim recognized "it would be desirable to provide a method and system for *hardware processing* of ACLs and thus *hardware enforcement* of access control." Appx45(2:27-29).[1]

Specifically, the '577 patent describes and claims ways to process and enforce access control in hardware using an associative memory, such as a content-addressable memory (CAM). Appx39(Abstract); Appx45(2:29-35); Appx45(2:37-49); Appx48(7:34-47). CAMs, unlike conventional memory, are addressable by a memory cell's content rather than its physical location. Appx1629(¶66). This allows the CAM to compare every cell against a desired value simultaneously, making CAM searches considerably faster than the traditional, sequential searching of each memory location. *Id.* For example, a CAM could simultaneously search for all cells matching a particular IP address. Although associative memories existed before the '577 patent's invention, adapting conventional ACL rules and processing techniques to use an associative

---

[1] All emphasis added unless otherwise specified.

memory proved challenging. Appx1629-1630(¶67). The performance benefits from doing so, however, have been tremendous. Appx1630(¶68).

The '577 patent's specification consistently reaffirms the importance of performing the claimed invention in hardware. Both the Abstract and the Summary of the Invention describe "*the invention*" as "hardware processing of ACLs and thus hardware enforcement of access control." Appx39(Abstract); Appx45(2:38-40). The specification further discloses that practicing the claimed invention allows a switch or router "to permit or deny access for [a] packet *without need for software processing*." Appx39(Abstract); Appx45(2:47-50). Consistent with the specification's characterization of "the invention," every embodiment uses one or more hardware-based "access control elements" to perform access control. Appx46(4:1-60); *see also* Appx46(3:28-39) (first embodiment), Appx46(3:40-43) (second embodiment); Appx46(3:44-54) (third embodiment); Appx46(3:55-64) (fourth embodiment).

Figure 2 of the specification shows an illustrative embodiment of the access control elements central to the invention:



Appx3574 (annotated version of Appx43); Appx1635-1637(¶¶76-79). When a packet arrives at this access control element, a packet label is created based on information derived from the packet's contents, such as its source or destination addresses. Appx46(4:1-12); Appx47(6:30-36). After additional preprocessing, the access control element then simultaneously compares this packet label against each access control pattern stored in the content-addressable memory. Appx46(4:13-22); Appx46(4:34-47); Appx47(6:42-50). Because a packet label may match multiple access control patterns, each match is sent to a priority encoder. Appx46(4:48-51); Appx47(6:47-53).

12

The priority encoder next makes an access control decision based on the access control rules associated with the matched access control patterns. Appx46(4:48-56); Appx45(2:33-35) ("[M]atching (or lack of matching) of information from the packet header to specifiers recorded in the CAM are used to enforce access control."). Specifically, the priority encoder identifies the matched access control pattern with the highest priority and enforces the associated access control rule by permitting or denying transmission of the packet. Appx46(4:48-56); Appx47(6:47-53); Appx47(6:60-64). This process is, by its terms, a hardware-based solution.

## C. Cheriton and Bechtolsheim Assign The '577 Patent To Cisco

Dr. Cheriton and Mr. Bechtolsheim invented the '577 patent's subject matter while working as a Chief Product Architect and a Vice President of Engineering, respectively, for Cisco's switching products. *See In re Certain Network Devices, Related Software and Components Thereof(II)*, Inv. No. 337-TA-945, USITC Pub. No. 597395 at 121 (Dec. 9, 2016) (Initial Determination) ("*945 Investigation*"). The '577 patent itself reflects their inventorship and assignment to Cisco. Appx39. With the application that became the '577 patent, Dr. Cheriton and Mr.

13

Bechtolsheim both signed an inventor's oath, each affirming his belief that they were the first inventors of novel subject matter. *See 945 Investigation* at 122. For "valuable consideration," Dr. Cheriton and Mr. Bechtolsheim thereafter assigned "the full and exclusive right, title and interest in and to [the '577 patent's] invention" to Cisco and requested that the Patent Office issue all patents granted on their application (including the '577 patent) to Cisco. Appx921.

Cisco compensated Dr. Cheriton and Mr. Bechtolsheim for their employment and, separately, for the assignment of inventions they developed while at Cisco. The two inventors joined Cisco when it brought their company, Granite Systems, for $220 million. *See 945 Investigation* at 121. After two years at Cisco, Dr. Cheriton alone received vested options of nearly 590,000 shares of Cisco stock, valued at over $45 million. *In re Marriage of Cheriton*, 92 Cal. App. 4th 269, 280 & n.2 (Cal. Dist. Ct. App. 2001).

### D. Cheriton and Bechtolsheim Leave Cisco To Found Arista, Which Copied Extensively From Cisco

Dr. Cheriton left Cisco with Mr. Bechtolsheim and at least thirteen other former Cisco employees to found Arista. *945 Investigation* at 121-22; *see* Appx922-924; Appx926-929; Appx931-933. He and Mr.

Bectholsheim took an ownership stake in Arista at the outset, and their shares have since increased significantly in value.

After founding Arista, Dr. Cheriton remained a high-level and influential company leader. *945 Investigation* at 124. From October 2004 to March 2014, he had a seat on its Board and was Arista's largest shareholder. Appx937(¶8); *see also* Appx983. He served as "Chief Scientist," *945 Investigation* at 124, and "was deeply involved in knowing and setting the direction of Arista's software development and had intimate knowledge of its software efforts over the years," Appx937(¶8). Dr. Cheriton also attended weekly meetings with senior engineers to discuss software architecture issues, often including discussion of Arista's EOS software. *945 Investigation* at 124-25. Although no longer at Arista, Dr. Cheriton's family trust remains one of Arista's largest shareholders. Appx978-979 (10,107,313 shares, or 15.21%).

Mr. Bechtolsheim has been even more influential at Arista. Today, he serves as Chair of the Board and Chief Development Officer. *945 Investigation* at 123-24. In those roles, Mr. Bechtolsheim exercises significant decision-making authority and control over Arista's product development efforts; indeed, he "is responsible for the overall product

development and technical direction of Arista's hardware." *Id.* at 123-124. Since 2006, he has held weekly meetings with senior design teams to discuss design goals and the architecture of Arista's products, involving himself significantly in the development of Arista's infringing products. *Id.* at 124. And, even today, the Bechtolsheim Family Trust remains a major Arista shareholder. Appx981.

Dr. Cheriton, Mr. Bechtolsheim, and their colleagues built Arista largely by copying Cisco's technology. In its ruling that Arista infringed yet another Cisco patent, the ITC found Arista was built on a "corporate culture of copying" Cisco. *In re Certain Network Devices, Related Software and Components Thereof(I)*, Inv. No. 337-TA-944, USITC Pub. No. 609119 at 20 (Apr. 19, 2017) (Commission Op.) ("Arista's behavior evinces a corporate culture of copying")[hereinafter, "*944 Commission Opinion*"], *available at* Fed. Cir. Appeal No. 16-2563, ECF# 133 (Corrected Appendix) (A566.020). This strategy of copying rather than innovating extended to launching products despite knowing that they infringed the '577 patent. *945 Investigation* at 109.

## II.    Arista's Infringement Of The '577 Patent

Cisco filed a complaint against Arista at the International Trade Commission in December 2014, alleging that Arista violated 19 U.S.C. §1337 by importing switches that infringe numerous claims of several Cisco patents.  80 Fed. Reg. 4313-14 (Jan. 27, 2015).  After a lengthy evidentiary hearing, an Administrative Law Judge ("ALJ") found that Arista infringed claims 1, 7, 9-10, and 15 of the '577 patent.  *945 Investigation* at 90.  In so doing, the ALJ found that "Arista *knew* that its products infringed certain of Cisco's assigned patents" and that it "did not and could not have a good-faith belief that it did not infringe the '577 patent."  *Id*. at 109.  The ALJ further found that Arista was estopped from challenging the validity of the '577 patent as it "clearly availed itself of Mr. Bechtolshiem's [sic] and Dr. Cheriton's 'knowledge and assistance' to conduct engineering research, and develop products that directly infringe Cisco's asserted patents."  *Id*. at 125; *see id*. at 124 (Mr. Bechtolsheim and Dr. Cheriton "significantly guided the development of Arista's infringing products.")  The Commission affirmed the ALJ's finding of infringement and assignor estoppel.  *In re Certain Network*

*Devices, Related Software and Components Thereof (I)*, Comm'n Op., Inv. No. 337-TA-945, 2017 WL 3614521, *30-31, 60-61 (June 1, 2017).

## III.  Asserted Prior Art

Two prior-art systems for performing access control are relevant here:  (1) U.S. Patent No. 5,467,349 to Huey; and (2) the ATM User-Network Interface Specification (ATM UNI specification).

### A.    Huey

Huey concerns an improved address handling circuit for processing network traffic in an asynchronous transfer mode (ATM) switch. Appx407(Abstract); Appx420(1:8-10).  Unlike a traditional IP network, an ATM network must establish a dedicated path between two devices before data can be transmitted between them across the network. Appx1654-1657(¶¶112-114); Appx2165-2166.  To establish these paths, an ATM network divides the bandwidth of the physical link between devices into multiple virtual paths (VPs), and then divides those virtual paths into multiple virtual circuits (VCs).    Appx420(2:33-36); Appx420(2:42-45); Appx2195; Appx1673(¶140).  Huey discloses a more efficient way to manage and store information about the active virtual paths and virtual circuits in an ATM switch.  Appx421-422(4:58-5:16); Appx422(6:22-26).

18

The figure below illustrates the basic components of Huey's ATM switch:



Fig-4
PRIOR ART

Appx409(Fig. 4) (annotated). Each of Huey's physical interfaces includes an address handler, cell router, and cell policer. Appx421(3:38-40). The address handler evaluates the virtual path and virtual channel identifiers in each incoming ATM cell's header (the ATM equivalent of an IP packet) against the stored virtual path and virtual channel addresses. Appx421-422(4:58-5:16); Appx1645-1646(¶98). These stored addresses are maintained in multiple content addressable memories. Appx424(9:18-21). If the information in the header matches one of the stored addresses, the cell is passed to the cell router. Appx421(3:40-42). Otherwise, the address handler drops the cell as unrouteable and invalid. *Id.* Although similar in principle to the forwarding decisions made in a

packet-based IP switch, the mechanics of the forwarding decision for ATM cells are significantly different. Appx1649-1657(¶¶105-115).

Valid cells are further processed by the cell router and cell policer. The router performs address translation and other services necessary to properly forward the cell toward its ultimate destination. Appx421(3:42-45). Huey says little about the cell policer's function, other than that it "monitors input data streams including a plurality of cells [] on a VP and/or VC basis at entry points to an ATM switching network." Appx421(3:46-48).

## B.    ATM UNI Specification

The ATM UNI specification describes software-based traffic policing and congestion-control operations in an exemplary ATM system via usage parameter control (UPC). Appx523; Appx1647(¶100); Appx1668-1669(¶130). These operations are based on a virtual path or virtual channel not "meet[ing] the negotiated Network Performance objectives for the already established connections," as defined in a traffic contract. Appx522; Appx1668-1669(¶130); Appx1674-1675(¶142). Examples could include a virtual channel violating the agreed upon peak cell rate, sustainable cell rate, and burst tolerance for traffic it sends to

a switch.  Appx527; Appx1668-1669(¶130).  An exemplary switch would discard traffic that violates the pre-negotiated traffic contract's terms. Appx1669(¶131).

The ATM UNI specification nowhere describes monitoring or discarding ATM cells based on a single cell's specific characteristics. Appx1669(¶131).  Nor does it describe discarding cells based on virtual path or virtual channel information, or any information, of the type that Huey would store in its associative memory.  *Id.*  The ATM UNI specification instead monitors the transmission rate over time on a given path to enforce the quality-of-service parameters in its traffic contract. Appx527; Appx1668-1669(¶¶130-131).

## IV.    Patent Trial And Appeal Board Proceedings

Although Arista knew it was practicing Cisco's patented technology, *945 Investigation* at 109, Arista challenged the validity of Cisco's '577 patent (and others) only after Cisco asserted it against Arista in district court and the ITC.  Appx66.

### A.    Barred From Challenging Validity At The ITC, Arista Petitions For *Inter Partes* Review

Arista petitioned for *inter partes* review of several of the '577 patent's claims, challenging their patentability over Huey and the ATM

UNI specification.[2]    The inside cover of this brief reproduces representative claims.  Arista primarily argued that Huey combined with the ATM UNI specification rendered the relevant claims obvious.  In its petition, Arista contended that the virtual path and channel addresses stored in Huey's address handler are "access control patterns," while Huey's one-sentence disclosure of a cell policer combined with the ATM UNI specification's disclosure of an ATM switch that drops cells based on unrelated traffic contracts disclosed the "access result" and "making a routing decision in response to said access result" limitations.  Arista further argued that Huey's figures taught performing two of the claimed steps in parallel using a pipeline technique, as dependent claim 2 requires.

Cisco's preliminary response countered that assignor estoppel barred Arista's challenge, providing grounds not to institute.  Appx897-912.  Cisco argued that Arista's challenge to the '577 patent is paradigmatic of arguments barred by assignor estoppel:  Dr. Cheriton

---

[2] Relying on different references, Arista unsuccessfully petitioned for *inter partes* review of the '577 patent three times before.  *Arista Networks, Inc. v. Cisco Systems, Inc.*, IPR2015-00973 (PTAB); *Arista Networks, Inc. v. Cisco Systems, Inc.*, IPR2015-01049 (PTAB); *Arista Networks, Inc. v. Cisco Systems, Inc.*, IPR2016-00301 (PTAB).

and Mr. Bechtolsheim, inventors of the '577 patent, and Arista's founders, longtime leaders, and major shareholders, validly assigned their rights in the '577 patent to Cisco and were richly compensated for their efforts. Their privy, Arista—the company they founded that now stands accused of infringing that patent—should not be permitted to contend that the patent was invalid all along. Appx907-910. Cisco acknowledged that other Board panels had concluded that assignor estoppel cannot apply to *inter partes* reviews, but contended those non-binding decisions were wrong. Appx901-907.

Cisco also disputed Arista's invalidity arguments. Cisco explained that neither Huey nor the ATM UNI specification, alone or together, disclosed "access control" or the numerous claim limitations that require "access control." Appx887-893. Cisco observed that the virtual path and channel addresses Huey stores in the address handler's associative memory are irrelevant to access control, and therefore cannot be "access control patterns," as Arista contends. And Cisco asserted that the instituted combination does not disclose generating an access result in response to a selected match. Arista's combination discards traffic by monitoring traffic flow rates, Cisco explained, not based on the virtual

path or channel information in a cell matching one of the address handler's stored addresses.

## B.    Institution Decision

The Board instituted review.  Appx1504.  It did not dispute that assignor estoppel would bar Arista from challenging the '577 patent's validity in any other forum, and it acknowledged "the specter of forum shopping" created by the PTAB's refusal to consider that well-established doctrine.  Appx1511.

The Board then construed various terms, including "access control" as "restriction on the transmission of a packet or alteration of a selected output interface for the packet." Appx1514.  While the Board did not expressly construe "access control patterns," it held that the '577 patent's specification does not "suggest that Huey's VPI and VCI addresses are not encompassed by the term 'access control patterns.'" Appx1522-1523.  The Board further held that an access result is generated "in response to" a match if the match "necessarily *precedes* the termination by cell traffic policer 70 to discard a non-conforming cell." Appx1523.  Based on this reading of the claims and prior art, the Board found a reasonable likelihood that the petitioned claims were obvious.  *Id.*

24

## C.    Board Proceedings On The Merits

After institution, Cisco filed its patent owner response on the merits.  Now that the proceeding was before the Board in its adjudicative capacity—rather than as the Director's delegate on institution, *see* 37 C.F.R. §42.4(a)—Cisco argued that the Board should apply assignor estoppel to Arista's invalidity arguments.  Appx1588-1595.

Cisco also argued that the instituted combination did not render obvious the '577 patent's claims because those references used software, not hardware, to perform the alleged "access control."  Cisco further disputed that the instituted combination disclosed "access control patterns" or "generating an access result *in response to* said at least one selected match"—limitations appearing in each challenged claim.  As to claim 2, Cisco contended that Huey failed to teach "performing at least two of said steps of receiving, matching, selecting, and making a routing decision, in parallel using a pipeline technique."

In its reply, *see* 37 C.F.R. § 42.23, Arista did not dispute Dr. Cheriton's and Mr. Bechtolsheim's assignment of the '577 patent's invention to Cisco or their founding and leading Arista.  Appx2411 n.6. Instead, Arista contended only that assignor estoppel cannot bar its

validity challenge in an *inter partes* review.  *Id.*  Arista also attempted to rebut Cisco's technical obviousness arguments with arguments laying bare its unreasonably broad reading of the claims.

### D.    Final Written Decision

The Board's final written decision addressed assignor estoppel and the parties' technical invalidity arguments, ultimately ruling that nineteen of the instituted claims were obvious and one was patentable.

Without addressing the substance of Cisco's argument, the Board declined to apply assignor estoppel.  It held assignor estoppel is categorically unavailable in *inter partes* reviews because Congress has not expressly said that it is available (even though the Board applies other equitable doctrines in IPRs without express direction from Congress to do so).  Appx8 ("'Congress has demonstrated that it will provide expressly for the application of equitable defenses when it so desires.'" (citing other Board decisions)).  In so doing, the Board saw no reason "to deviate from our continued policy of rejecting assignor estoppel as [a] doctrine applicable to *inter partes* review."  Appx7.  Other than earlier Board decisions, the Board cited no authority prohibiting it from considering assignor estoppel.  Appx7-8.

On the technical merits, the Board construed "access control" to include "restriction on the transmission of a packet," and held that it need not determine whether "access control" also includes altering a packet's transmission.    Appx12.    The Board, in its patentability analysis, nevertheless construed additional terms for the first time in its final written decision, broadly construing those limitations to read Huey's "VP and VC addresses stored in CAM arrays" as "access control patterns" (Appx22), and the "cell policer [as] perform[ing] 'access control.'" Appx25.

*First*, the Board rejected Cisco's argument that the virtual path and channel addresses stored in the address handler are not "access control patterns" because they are not "used by the cell policer/UPC" to enforce a traffic contract.    Appx26. *Second*, the Board rejected Cisco's argument that Huey and the ATM UNI specification lack the "generating an access result in response to said at least one selected match" limitation.    In so doing, the Board construed "in response to" to require only that the match "precede[]" the access result, and *not* to require that the access control patterns "used to make a match . . . also generate the access result." Appx26-27; *see* Appx30.    The Board further acknowledged this construction was crucial, finding that the "discard instruction, which

27

Petitioner contends is the recited 'access result,' is based on whether a cell passed to the policer exceeds the Traffic Contract," not the matching performed in Huey's address handler.  Appx26; *see* Appx30.

The Board also determined that, contrary to the '577 patent's title, the specification's description of "the invention," and every embodiment, the claims do not require that *hardware* implement "access control." Appx24.  In so doing, the Board noted that claim 1 "is otherwise silent as to what structure—whether software or hardware—generates the 'access result; or performs any of its other steps," without addressing the specification's consistent description of the invention.  Appx24–25.  The Board thus concluded that Huey and the ATM UNI specification rendered obvious claims 1, 7–10, 12–16, 18–22, 25, 28–31.  Appx36-37.

However, the Board concluded that Arista had failed to establish claim 2's obviousness over the same combination.  Arista had identified several disclosures in Huey that purportedly performed two or more of the claimed steps "in parallel using a pipeline technique."  The Board explained why each one failed to teach that limitation.  Appx31-33.

In its reply, Arista for the first time contended that a third reference—Kogge, *The Architecture of Pipelined Computers* (Appx3284-

3300)—demonstrated the benefits of parallel pipeline processing and therefore rendered claim 2 obvious. The Board disagreed for two separate and independent reasons. *First*, Arista offered no reason to combine Kogge with Huey and the ATM UNI specification. Appx33-34. *Second*, to the extent Arista relied on Kogge merely to show the general knowledge in the art, the Board found Arista had not demonstrated that this background knowledge would have motivated an ordinarily skilled artisan to modify Huey to satisfy the parallel pipeline processing limitation. Appx34.

## SUMMARY OF THE ARGUMENT

I.    *Cisco's Cross-Appeal—Assignor Estoppel*: This is a textbook case for applying assignor estoppel, and the Board legally erred in cancelling claims 1, 7-10, 12-16, 18-22, 25, and 28-31 of the '577 patent by holding that assignor estoppel is categorically unavailable in *inter partes* reviews. Dr. Cheriton and Mr. Bechtolsheim assigned the '577 patent's invention to Cisco while working there. They then left to found Arista, a company the ITC found had a "corporate culture of copying" Cisco's technology. When Cisco accused Arista of infringement, Arista responded that the '577 patent was invalid all along. Notwithstanding

this quintessential conduct justifying assignor estoppel, the Board reasoned it could not consider assignor estoppel because Congress had not explicitly stated it applies in *inter partes* reviews. That has the law exactly backwards. As with other well-established judge-made doctrines, because the Supreme Court and this Court have for decades endorsed assignor estoppel as part of the "fabric of our law through the life of this nation," the doctrine *presumably does* apply in agency proceedings. That includes in *inter partes* reviews. Nothing in the Patent Act or judicial precedent disturbs that presumption. Indeed, the Board's refusal to consider assignor estoppel arbitrarily and capriciously departs from the Patent Office's consideration of other equitable or non-statutory doctrines, including collateral estoppel, prosecution laches, and obviousness-type double patenting. Because assignor estoppel applies in *inter partes* reviews, this Court should hold that the doctrine defeats the textbook case Arista's challenge presents. If the Court instead remands for further consideration of assignor estoppel's application here, that would likely moot the remaining issues in this appeal.

**II.** <u>*Cisco's Cross-Appeal—The Board Erroneously Construed Critical Claim Terms*</u>: The Board's adoption of legally erroneous claim

constructions for three key terms provides separate grounds for reversing its unpatentability findings concerning claims 1, 7-10, 12-16, 18-22, 25, and 28-31. *First*, the Board erroneously concluded that the claims permit access control processing in software. That is flatly incorrect and unfaithful to the invention described in the '577 patent. The patent is titled "Access Control List Processing in *Hardware*." The specification repeatedly describes "the invention" as providing "*hardware* processing of ACLs" and "*hardware* enforcement of access control." Every disclosed embodiment uses hardware to generate an "access result." And the patent criticizes prior-art software-based approaches, while distinguishing its hardware-based invention from them. The Board's erroneous assumption that the claims permit software-based enforcement of access control requires at least a remand.

*Second*, the Board further erred by holding that "access control patterns" encompasses "patterns" unrelated to "access control," and by ignoring that "access control patterns" must be stored in "associative memory." As the Board found, Huey makes access control decisions based *solely* on a traffic contract, which is *not* stored in Huey's associative memory. In contrast, Huey does *not* use virtual channel and path

31

addresses—the *only* information stored in Huey's associative memory— to make any access control decisions. The Board nonetheless concluded that those virtual addresses were "access control patterns." The Board's failure to articulate its basis for that finding requires at least a remand. But because no evidence shows any prior-art use of information stored in an associative memory to perform access control, this Court can reverse.

*Third*, the Board unreasonably concluded that an access result is generated "in response to" a match whenever that result is generated *after* the match. That ignores the ordinary meaning of "in response to"— which requires a cause-and-effect relationship between establishing a match and generating an access result—and that each claim step requires the output from the prior step (as Arista admits). The Board's substitution of "after" for "in response to" instead makes nonsense of the claims and deviates from the described invention. Because the Board did not find obviousness under the correct construction, its decision must at least be remanded. But because Huey does not teach using a match of its virtual channel and path addresses to make an access control decision, this Court can reverse.

**III.** *Arista Did Not Show that Claim 2 Is Unpatentable*:  If this
Court finds that assignor estoppel forecloses Arista's arguments or rules
in Cisco's favor on any of the technical arguments in its cross-appeal—
each of which show the challenged claims' non-obviousness—then it need
not reach Arista's challenge to claim 2, which is meritless anyway.
Substantial evidence supports the Board's finding that Huey's Figure 4
does not even mention, much less teach, parallel pipeline processing of at
least two of claim 2's steps, as that claim requires.  And Kogge cannot fill
that gap, because it nowhere suggests using parallel pipeline processing
in ATM switches like Huey's or in any networking context.   Arista's
remaining complaints stem from the Board purportedly ignoring barely
developed arguments buried in Arista's PTAB filings, or from challenges
to a decision bearing little resemblance to the one the Board actually
issued.  Those specious arguments provide no grounds for upending the
Board's well-reasoned conclusion as to claim 2.

## STANDARD OF REVIEW

This Court reviews final agency action for compliance with the
Administrative Procedure Act.  *Dell Inc. v. Acceleron, LLC*, 818 F.3d
1293, 1298 (Fed. Cir. 2016).  Under the APA, this Court must "hold

unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1)(A).

The Board's claim constructions are reviewed *de novo* where, as here, they turn on intrinsic evidence. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840-41 (2015); *Dell*, 818 F.3d at 1298. As this Court has recently needed to remind the PTAB, "[t]he correct inquiry in giving a claim term its broadest reasonable interpretation in light of the specification is not whether the specification proscribes or precludes some broad reading of the claim term" and "it is not simply an interpretation that is not inconsistent with the specification." *In re Smith Int'l, Inc.*, ___ F.3d ___, 2017 WL 4247407, at *5 (Fed. Cir. Sept. 26, 2017). This Court reviews the Board's legal conclusion of obviousness *de novo* and any underlying factual findings for substantial evidence. *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015).

## CROSS-APPEAL ARGUMENT

## I. The Board Erroneously Concluded That Assignor Estoppel Does Not Apply In *Inter Partes* Reviews.

The Board legally erred by holding in its final written decision that assignor estoppel is categorically unavailable in *inter partes* reviews, and

34

thus erroneously cancelled claims 1, 7–10, 12–16, 18–22, 25, and 28–31 of the '577 patent. Appx7-8. If ever there were a case for assignor estoppel, this is it. The conduct of Arista and its founders is exactly what assignor estoppel should prevent, as the ITC found in a related proceeding. The Board's rationale for categorically refusing to apply the well-settled doctrine conflicts with the AIA, precedent, and the Patent Office's approach to other non-statutory doctrines. This Court should therefore reverse, or at minimum remand for consideration of assignor estoppel. The Court also need not reach Arista's appeal—assignor estoppel should moot Arista's contention that claim 2 is unpatentable.[3]

---

[3] In *Oil States Energy Services v. Greene's Energy Group*, No. 16-712, 2017 WL 2507340 (June 12, 2017), the Supreme Court granted certiorari to decide "whether *inter partes* review … violates the Constitution by extinguishing private property rights through a non-Article III forum without a jury." *See* Pet. for Writ of Certiorari at i, *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, No. 16-712 (filed Nov. 23, 2016), *available at* 2016 WL 6995217. Cisco's patent was invalidated under the same *inter partes* review procedures challenged in *Oil States*. However, circuit precedent binds panels of this Court, foreclosing such a challenge here. *See MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1290-93 (Fed. Cir. 2015). Although Cisco supports the IPR process and believes it constitutional, Cisco reserves its rights to advance arguments, at an appropriate point in this proceeding, based on the Supreme Court's decision.

A.    **The Board Legally Erred In Refusing To Apply The Long-Established Doctrine Of Assignor Estoppel To Arista's Invalidity Arguments.**

1.    **The Doctrine of Assignor Estoppel Is A Well-Settled Principle Of Substantive Patent Law**

The doctrine of assignor estoppel is indisputably a longstanding principle of substantive patent law. The Supreme Court has endorsed it for nearly a century. Chief Justice Taft's seminal decision in *Westinghouse* in 1924 described assignor estoppel as establishing "a rule well settled by 45 years of judicial consideration and conclusion." *Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 349 (1924). Under that doctrine, "an assignor of a patent right is estopped to attack the utility, novelty or validity of a patented invention which he has assigned or granted as against any one claiming the right under his assignment or grant." *Id.*

The underlying principle is one of "fair dealing," based on an "analogy" with "conveyances in land": "If one lawfully conveys [a patent], fair dealing should prevent him from derogating from the title he has assigned, just as it estops a grantor of a deed of land from impeaching the effect of his solemn act as against his grantee." *Id.* at 350. The assignor

36

may present non-infringement arguments, but cannot dispute the assigned patent's validity. *Id.* at 351.

This Court and the Supreme Court have repeatedly affirmed assignor estoppel's vitality. In *Scott Paper Co. v. Marcalus Manufacturing Co.*, the Supreme Court specifically reaffirmed the doctrine. 326 U.S. 249, 251-52 (1945). Though disagreeing with the majority about the doctrine's application to the facts of the cases before it, Justice Frankfurter's dissent confirmed that "[t]he principle of fair dealing as between assignor and assignee of a patent whereby the assignor will not be allowed to say that what he sold as a patent was not a patent had been *part of the fabric of our law through the life of this nation.*" *Id.* at 260 (Frankfurter, J., dissenting). This Court's subsequent precedents have reaffirmed that assignor estoppel remains "part of the fabric of our law." *See Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1282-83 (Fed. Cir. 2017); *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 150 F.3d 1374, 1377-78 (Fed. Cir. 1998); *Intel Corp. v. ITC*, 946 F.2d 821, 836-39 (Fed. Cir. 1991); *Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990); *Diamond Sci. Co.*

*v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988) (concluding that assignor estoppel survived *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969)).

This Court has also recognized assignor estoppel's applicability in a range of circumstances. After more than a century, it is now well-established that the doctrine applies in courts *and* agencies. *Intel*, 946 F.2d at 837 (establishing assignor estoppel's applicability in ITC investigations). Assignor estoppel can bar "equitable" attacks on a patent's enforceability; it is not limited to statutory "validity" challenges. *Shamrock*, 903 F.2d at 794 ("We reject the contention that mere classification of a defense [inequitable conduct] as equitable bars consideration of assignor estoppel."). The doctrine is important enough that it applies even where the assignment is later undone. *Q.G. Products, Inc. v. Shorty, Inc.*, 992 F.2d 1211, 1212 (Fed. Cir. 1993). And this Court requires the equivalent of a clear statement before reading a contract to disclaim assignor estoppel's consequences—something Dr. Cheriton and Mr. Bechtolsheim did not negotiate here. *Mentor Graphics*, 150 F.3d at 1378. Likewise, it is well-established that assignor estoppel bars invalidity challenges by the assignor's privies, "such as a corporation

founded by the assignor." *Diamond*, 848 F.2d at 1224; *see Mentor*, 150 F.3d at 1379; *Intel*, 946 F.2d at 836-37; *Shamrock*, 903 F.2d at 793.

Against this backdrop, this Court cannot sustain the Board's categorical refusal to apply assignor estoppel in its final written decision.

### 2. The Board Erred By Requiring An Express Affirmative Statement from Congress That A Longstanding Common Law Doctrine (Assignor Estoppel) Should Apply In IPRs

The Board gave one reason here for refusing to apply assignor estoppel to Arista's invalidity argument:  Congress purportedly did not provide expressly for "equitable defenses" in *inter partes* reviews.  Appx8; Appx1509-1510.  That reasoning has the law entirely backwards.[4]

Assignor estoppel is the sort of well-established non-statutory doctrine *presumed* to apply unless a strong statutory reason indicates otherwise.   As the Supreme Court reiterated recently, "'[w]here a common-law principle is well-established, courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.'"

---

[4] If the Board's sole reason for not applying assignor estoppel is inadequate, that at least requires a remand—neither Arista nor the Court may rely on rationales that the Board did not adopt. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

*Impression Prods., Inc. v. Lexmark Int'l Inc.*, 137 S. Ct. 1523, 1536 (2017) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (ellipsis omitted)).    Thus, for longstanding doctrines like exhaustion (whose operative principle resembles assignor estoppel) and collateral estoppel, the Supreme Court has presumed their continued applicability against the backdrop of subsequent legislation—even in administrative proceedings—unless strong evidence shows Congress intended otherwise.  *See id.* (patent exhaustion); *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1303, 1305 (2015) (preclusive effect of TTAB rulings); *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013) (copyright exhaustion); *cf. Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 25-26 (1997) (rejecting arguments that the doctrine of equivalents died with the 1952 revision of the Patent Act); *Figueroa v. Sec'y of Health & Human Servs.*, 715 F.3d 1314, 1318-21 (Fed. Cir. 2013) (presumption of survivorship); *Rios v. Nicholson*, 490 F.3d 928, 930-31 (Fed. Cir. 2007) (mailbox rule in VA proceedings).   So it is here.

Despite various Board panels incorrectly citing this Court's *Intel* decision for the proposition that, unless Congress clearly provides otherwise, agencies cannot rely on non-statutory doctrines, *Intel* does not

40

deviate from this unbroken line of cases. *See Esselte Corp. v. Sanford L.P.*, 2015 WL 5117892, at *11 (PTAB Aug. 28, 2015); *Esselte Corp. v. Dymo*, 2015 WL 5117894, at *3 (PTAB Aug. 28, 2015); *Athena Automation Ltd. v. Husky Molding Sys., Ltd.*, 2013 WL 8595976, at *7 (PTAB Oct. 25, 2013); *Redline Detection, LLC v. Star Envirotech, Inc.*, 2013 WL 5970197, at *2 (PTAB Aug. 27, 2013). The Board's approach is nonsensical and inconsistent with the Patent Office's general treatment of court-made doctrines—ranging from obviousness-type double patenting to inequitable conduct. *See infra* Part I.B. Regardless, *Intel* did not establish a novel rule departing from Supreme Court precedent. Quite the opposite.

In *Intel*, the ALJ concluded that assignor estoppel did not apply in the ITC. 946 F.2d at 837. The Commission reversed, citing 19 U.S.C. §1337(c), which provides that "[a]ll legal and equitable defenses may be presented in all [section 337] cases." *Id.* This Court affirmed. *Id.* To be sure, the Court and Commission agreed that §1337(c) *supported* the Commission's decision that assignor estoppel was available in the ITC, even though assignor estoppel is technically not a "*defense*" to a claimed §337 violation based on patent infringement. But it does not follow—and

*Intel* did not suggest—that that statutory language was *necessary* to the result. Rather, *Intel* simply aligns with longstanding precedent, presuming applicability of "common law provision[s]," including in Article I tribunals, *unless evidence shows Congress intended otherwise*. *Rios*, 490 F.3d at 931; *see Figueroa*, 715 F.3d at 1318-21; *cf. Amrollah v. Napolitano*, 710 F.3d 568, 571-73 (5th Cir. 2013) (holding United States Citizenship and Immigration Services was collaterally estopped from concluding that Amrollah was ineligible for permanent-resident status, based on an earlier USCIS decision); *Medina v. I.N.S.*, 993 F.2d 499, 502-04 (5th Cir. 1993) (holding res judicata applied in a Board of Immigration Appeals proceeding); *Kairys v. I.N.S.*, 981 F.2d 937, 938-40 (7th Cir. 1992) (same, for collateral estoppel).

That presumption extends to judge-made doctrines, which this Court has held agency adjudicators and other non-Article III tribunals should apply where appropriate. These doctrines include: interference estoppel, *Biogen MA, Inc. v. Japanese Found. for Cancer Research*, 785 F.3d 648, 657-60 (Fed. Cir. 2015); prosecution laches, *In re Bogese*, 303 F.3d 1362, 1365-69 (Fed. Cir. 2002); judicial estoppel, *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996); assignor estoppel in TTAB

proceedings, *Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 340 (Fed. Cir. 1997) (remanding for the TTAB to consider assignor estoppel arguments (citing *Intel*, 946 F.2d at 836-39; *Diamond*, 848 F.2d at 1224-45)); collateral estoppel, *Graybill v. U.S.P.S.*, 782 F.2d 1567, 1571 (Fed. Cir. 1986); and obviousness-type double patenting, *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985). *See also Earth Res. Corp. v. United States*, 44 Fed. Cl. 274 (1999) (Court of Federal Claims applying assignor estoppel);[5] *Christ v. Blake*, 1999 WL 33446702, at *9-10 (PTAB 2009) (Board considering inequitable conduct in an interference). Assignor estoppel is no different: It is a well-established non-statutory legal principle presumed to apply *unless* strong evidence shows Congress intended otherwise.

The Board reached the wrong answer here because it flipped the normal presumption on its head. Congress need not have reiterated in the AIA its desire that an important part of the fabric of our law apply in *inter partes* reviews; rather, the Board should have presumed that intent absent contrary evidence. Nothing suggests Congress intended to

---

[5] The Court of Federal Claims' governing statutes do not expressly authorize application of "equitable" doctrines. *See* 28 U.S.C. §§1491, 1498.

exempt IPRs uniquely from application of this basic patent-law doctrine implementing the universal principle that a party cannot sell a patent or other property for value and later claim what it sold was worthless— rather, the relevant indicia of congressional intent show otherwise.

### 3. The Patent Act Allows The Board To Consider Assignor Estoppel In *Inter Partes* Reviews

Nothing in the Patent Act, as amended by the AIA, rebuts assignor estoppel's presumed applicability in *all* proceedings where patentability is challenged. The Act does not "'speak[] directly'" to assignor estoppel; it does not mention it at all. *Rios*, 490 F.3d at 931 (citing *United States v. Texas*, 507 U.S. 529, 534 (1993)). And nothing in the Act's text or structure reflects any intent to preclude the Board from applying assignor estoppel in IPRs.

Instead, assignor estoppel fully comports with the system Congress established. After an IPR is instituted, the petitioner has "the burden of proving a proposition of unpatentability by a preponderance of the evidence." 35 U.S.C. §316(e). As of right, a patent owner can file a post-institution response showing why the petitioner fails to meet that burden. *Id.* §316(a)(8); *id.* §313; 37 C.F.R. §42.120(a). And assignor estoppel is one of many reasons why a petitioner may fail to meet its

44

burden on unpatentability. Nothing in §316, nor elsewhere in the statute, suggests assignor estoppel does not apply in *inter partes* reviews—much less that *no equitable doctrines* do, as the Board's rationale incorrectly implies. Appx8 ("'Congress has demonstrated that it will provide expressly for the application of equitable defenses when it so desires.'… Accordingly, we decline to apply assignor estoppel to this *inter partes* review proceeding.").

Instead, applying assignor estoppel aligns with many of the goals Congress articulated in the AIA, including: assisting "the economy," "the integrity of the patent system," "the efficient administration of the Office," and "the ability of the Office to timely complete proceedings instituted under" chapter 31. 35 U.S.C. §316(b). The doctrine benefits both the economy and integrity of the patent system by promoting "fair dealing." *Westinghouse*, 266 U.S. at 250. It further contributes to the patent system's integrity by preventing the "injustice" of assignors "benefit[ting] from [their] own wrong[s]." *Diamond*, 848 F.2d at 1224. And it facilitates efficient administration and timely completion of Board proceedings by allowing expeditious resolution of a proceeding based on issues that the Board has experience adjudicating, like privity (when

determining real parties in interest), without requiring technical experts.[6] It is absurd to suggest that, *unlike every other adversarial proceeding* in which a patent's validity can be challenged—including Article III district courts, the Article I Court of Federal Claims, and the ITC—Congress intended that in IPRs alone assignor estoppel would not apply *without saying so* when making PTAB proceedings resemble even more closely these other adjudicative proceedings. *Cf.* H.R. Rep. No. 112–98, pt. 1, pp. 46–47 (2011) ("The Act converts inter partes reexamination from an examinational to an adjudicative proceeding"); 157 Cong. Rec. 3429–3430 (2011) (remarks of Sen. Kyl) ("Among the reforms that are expected to expedite these proceedings [is] the shift from an examinational to an adjudicative model").

If anything, singling out the Board would frustrate Congress's vision for *inter partes* review as an efficient alternative to district-court patentability disputes. *See* 35 U.S.C. §316(b); H.R. Rep. No. 112-98 at 78. And it would encourage gamesmanship and forum shopping, as the Board and commentators have recognized. Appx8 ("We are cognizant of

---

[6] Assignor estoppel likewise would further the Director's aim "to secure the just, speedy, and inexpensive resolution of every proceeding before the Board." 37 C.F.R. §41.1(b).

the specter of forum shopping."); Reed Smith, *Assignor Estoppel Remains Unavailable as an IPR Defense*, LEXOLOGY (Jun. 6, 2017), http://bit.ly/2sVYfq9 ("[A]t least for now, petitioners may also invalidate a patent in an IPR when they would be estopped [by assignor estoppel] from doing so in litigation."); Jeremiah Frueauf, *IPR: A Key to District Court's Assignor Estoppel Lock*, LAW360 (May 1, 2015), http://bit.ly/2uzAB4y; Latham & Watkins, *No Assignor Estoppel in AIA Inter Partes Review Proceedings*, LATHAM & WATKINS CLIENT ALERT: COMMENTARY (Nov. 6, 2013), http://bit.ly/2uzyMVv ("The popularity of IPR[s] will likely increase as assignor estoppel does not apply to IPRs.").

The risk of gamesmanship is especially problematic given the collateral consequences of the Board's final patentability determinations. 35 U.S.C. §318(b); *cf. Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1338-47 (Fed. Cir. 2013).[7] Although courts have long decided whether assignor estoppel should bar an assignor's invalidity arguments, *see supra* Part I.A.1., the Board's categorical refusal to consider assignor

---

[7] In contrast, the ITC's invalidity determinations are non-binding outside of the ITC. *See Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1568-70 (Fed. Cir. 1996); *Tandon Corp. v. ITC*, 831 F.2d 1017, 1019 (Fed. Cir. 1987).

estoppel can short-circuit that equitable inquiry. No matter how egregious an assignor's conduct, if he convinces the Board that the relevant patent's claims are not patentable and the PTO consequently cancels them after any appeals are exhausted, then the patent owner will have no opportunity in an Article III court to prove the inequity of the assignor's conduct. Because his patent has been finally canceled, any such suit would be dismissed. 35 U.S.C. §318(b); *cf. Fresenius*, 721 F.3d at 1338-47.

To be sure, parties may contract around assignor estoppel. *Mentor Graphics*, 150 F.3d at 1378. But Dr. Cheriton and Mr. Bechtolsheim chose not to, presumably because it furthered their financial self-interest not to do so. It cannot be that Congress intended to allow inventors to end-run the consequences of their valid assignments without saying so. Yet that is exactly Arista's position. Indeed, Arista has availed itself of the Board's misguided refusal to consider assignor estoppel here—the ITC correctly concluded that assignor estoppel bars Arista's challenge to the '577 patent's validity, *945 Investigation* at 120–128.

Some Board panels have suggested that 35 U.S.C. §311(a) precludes assignor estoppel in IPRs. It says no such thing. Section 311(a) relevantly states:

> Subject to the provisions of this chapter, a person who is not the owner of a patent may file with the Office a petition to institute *inter partes* review of the patent.

That just means that an IPR must start as an adversarial proceeding—patent owners cannot use IPRs as *ex parte* proceedings to seek affirmance of their claims' patentability over additional prior art—and that there is no Article III-like standing requirement. Yet, through analytical gymnastics, some Board panels have reasoned that §311(a) categorically bars the Board from rejecting an assignor's invalidity arguments based on assignor estoppel, because only a patent "owner" is barred from filing a petition. *See B/E Aerospace, Inc. v. MAG Aerospace Indus., LLC*, 2015 WL 1385358, at \*7 (PTAB Mar. 26, 2015); *Ariosa Diagnostics, Inc. v. Illumina Inc.*, 2015 WL 153677, at \*7 (PTAB Jan. 8, 2015); *Synopsys, Inc. v. Mentor Graphics Corp.*, 2014 WL 722009, at \*9 (PTAB Feb. 19, 2014), *aff'd*, 814 F.3d 1309 (Fed. Cir. 2016); *Palo Alto Networks, Inc. v. Juniper Networks, Inc.*, 2013 WL 8595314, at \*6-7 (PTAB Dec. 19, 2013); *Redline*, 2013 WL 5970197, at \*2.

That makes no sense. Just because an Article III-like standing requirement does not limit who can file a petition, that does not mean that, on the merits, the Board can disregard well-settled substantive patent-law arguments, even those personal to the petitioner. Indeed, nothing in §311(a) immunizes petitions filed by non-patent-owners from arguments arising from authority outside of chapter 31. Nor could it. *See Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2141-42 (2016) (concluding that the APA, 5 U.S.C. §§706(2)(A)-(D), enables courts to "set aside agency action" that is "contrary to constitutional right," "in excess of statutory jurisdiction," or "arbitrary and capricious"). Assignor estoppel does not prevent Arista from filing a petition under §311(a), just as it would not prevent Arista from filing an invalidity counterclaim in district-court litigation. Instead, assignor estoppel simply forecloses relief *on the merits*, preventing Arista from meeting its burden under §316(e) of "proving a proposition of unpatentability by a preponderance of the evidence." Assignor estoppel is a substantive patent-law principle, not the procedural gatekeeping requirement some Board panels imagine.

### 4.   Assignor Estoppel Is Not Limited To Patent Infringement Suits

Some Board panels have concluded that assignor estoppel applies only to patent-infringement suits.  *See Athena*, 2013 WL 8595976, at *7 (citing *Semiconductor Energy Lab. Co. v. Nagata*, 706 F.3d 1365, 1369 (Fed. Cir. 2013)); *Redline*, 2013 WL 5970197, at *2 (same, also citing *Diamond*, 848 F.2d at 1225).  Cisco knows of no authority supporting that proposition.   Indeed, courts have applied assignor estoppel in cases involving pure declaratory judgment claims of patent invalidity, absent any corresponding infringement claims.  *See Fina Tech., Inc. v. Ewen*, 857 F. Supp. 1151, 1156-58 (N.D. Tex. 1994); *Univ. of W. Va. Bd. of Trs. v. VanVoorhies*, 84 F. Supp. 2d. 759, 772 (N.D.W. Va. 2000), *aff'd*, 278 F.3d 1288 (Fed. Cir. 2002).  Rightly so.  Assignor estoppel applies to *invalidity* challenges and rests on the fundamental unfairness of allowing a party to represent that its patent is valuable, then later assert it is invalid and worthless.   *Westinghouse*, 266 U.S. at 350.   Whether there is an infringement claim is irrelevant.

Neither *Semiconductor* nor *Diamond* say otherwise.    In *Semiconductor*, co-inventor Nagata assigned his rights in the '463 patent to SEL.  706 F.3d at 1367.  SEL then sued Samsung for infringement.  *Id.*

51

In that suit, Nagata *testified* for Samsung, which contended the '463 patent was invalid for inequitable conduct. *Id.* After settling with Samsung, SEL attempted to sue Nagata for violation of "Federal Patent Law," *i.e.*, for testifying so as to allegedly violate assignor estoppel. *Id.* at 1367-68. This Court affirmed the district court's dismissal of that portion of SEL's complaint, merely concluding that assignor estoppel provides no federal cause of action. *Id.* at 1368-70. *Diamond* is also inapposite. There, this Court confirmed assignor estoppel's vitality, holding the doctrine barred an accused infringer-assignor from challenging the validity of the patent-owner-assignee's patent. 848 F.2d at 1222-24. The issue arose in an infringement suit, but *Diamond* in no way limited assignor estoppel's applicability *only* to such suits. If anything, this Court's decision in *Metro Traffic* confirms that assignor estoppel applies *regardless* of whether infringement is disputed—that case involved a TTAB proceeding where the agency could only consider invalidity and not infringement. 104 F.3d at 340; *see* 15 U.S.C. §1114(1); 28 U.S.C. §1338(a).

Regardless, there is no basis for assignor estoppel to apply in infringement suits but not Board proceedings. This Court addressed an

analogous issue, also involving a non-statutory doctrine, in *Bogese*, 303 F.3d at 1365-67. There, the Board applied the "equitable doctrine" of prosecution laches, which "may be applied to bar enforcement of a patent that issued after unreasonable and unexplained delay in prosecution." This Court affirmed, expressly confirming the Board's authority to apply equitable prosecution laches. *Id.* at 1366-69. The Court "[saw] no basis for denying the power to the PTO itself that we have recognized exists in the district courts in infringement actions." *Id.* at 1367. Similarly here, there is no daylight between the Board and the courts (and ITC) concerning assignor estoppel. The Board legally erred in refusing to apply assignor estoppel to Arista's invalidity arguments.

### B. The PTO's Practice Of Applying Other Non-Statutory Doctrines Makes The Board's Refusal To Apply Assignor Estoppel Arbitrary And Capricious.

In addition to being contrary to law, the Board's refusal to apply assignor estoppel purportedly because the Patent Office can only "appl[y] equitable defenses when" Congress "expressly" says so, deviates from the Office's consideration of other equitable or non-statutory doctrines. *See*, *e.g.*, *In re O'Keefe*, 202 F.2d 767, 771-72 (C.C.P.A. 1953) (in reversing an obviousness determination, faulting the Board for "depart[ing] from

[Board] precedents which have controlled the decision of the Patent Office in the past"). That independently requires vacatur.

Indeed, despite its categorical reasoning here, the Board routinely considers whether common-law principles like *collateral estoppel* prevent parties from raising issues or arguments in particular cases. Although the Patent Act does not explicitly provide for collateral estoppel, the Board applies it. *See, e.g.*, *Aruze Gaming Macau, Ltd. v. MGT Gaming, Inc.*, 2015 WL 780607, at *5 (PTAB Feb. 20, 2015) (interpreting §315(b) with reference to preclusion principles); *Biodelivery Sci. Int'l Inc. v. Monosol RX, LLC*, 2016 WL 7047970 (PTAB Sept. 26, 2016) (considering collateral estoppel); *Ex Parte Northpoint Tech., Ltd.*, 2014 WL 986346, at *4-5 (PTAB Mar. 13, 2014) (applying collateral estoppel).

Likewise, as noted above, this Court has specifically approved the Board's consideration of prosecution laches, another "equitable" doctrine. *See Bogese*, 303 F.3d at 1367. And the Board has applied prosecution laches since *Bogese*. *See Ex parte Aggarwal*, 2011 WL 5508764, at *4 n.7 (BPAI Nov. 8, 2011) (directing examiner to consider prosecution laches); *Ex parte Riddle*, 2011 WL 861732, at *7-16 (BPAI Mar. 10, 2011); *Ex parte Kelly*, 2010 WL 3454272, at *6-14 (BPAI Aug. 26, 2010). Indeed,

the Manual of Patent Examining Procedure instructs examiners when to apply prosecution laches. MPEP §2190 (9th ed. 2015) (citing *Bogese*, 303 F.3d at 1369; *Symbol Techs., Inc. v. Lemelson Med. Educ. & Research Found.*, 422 F.3d 1378, 1385 (Fed. Cir. 2005)).

Relatedly, the Patent Office applies the non-statutory doctrine of obviousness-type double patenting. *Longi*, 759 F.2d at 892 ("a judicially created doctrine … rather than based purely on the precise terms of the statute"); *Ex parte Nedden*, 2017 WL 2303202, at *1-2 (PTAB May 24, 2017); *Ex parte Gerlach*, 2017 WL 2242550, at *2-5 (PTAB May 18, 2017); *Ex parte Janssen Biotech, Inc.*, 2016 WL 6921121 (PTAB Nov. 14, 2016).

The Board's treatment of these and other longstanding non-statutory doctrines is irreconcilable with its *categorical* refusal to consider assignor estoppel because Congress did not *expressly* authorize it. That is exactly the sort of unexplained, "inconsistent" agency approach that courts routinely reject as arbitrary and capricious. *E.g.*, *Kirkendall v. Dep't of Army*, 573 F.3d 1318, 1327 (Fed. Cir. 2009); *Moshea v. Nat'l Transp. Safety Bd.*, 570 F.3d 349, 352-53 (D.C. Cir. 2009); *McCrary v. Office of Pers. Mgmt.*, 459 F.3d 1344, 1350 (Fed. Cir. 2006);

*Gulf Power Co. v. Fed. Energy Regulatory Corp.*, 983 F.2d 1095, 1101-02 (D.C. Cir. 1993).

### C. This Court Can Review The Board's Refusal To Apply Assignor Estoppel To The Merits Of Arista's Invalidity Challenge.

Neither *Husky Injection Molding Systems Ltd. v. Athena Automation Ltd.*, 838 F.3d 1236 (Fed. Cir. 2016), nor 35 U.S.C. §314(d) foreclose review of the Board's refusal to apply assignor estoppel in its final written decision.

Section 314(d) bars appeals challenging "[t]he determination by the Director *whether to institute* an *inter partes* review." *Husky* fit that description; this appeal does not. In *Husky*, the patent owner raised assignor estoppel only in its preliminary patent owner response, arguing estoppel bars *institution*. Preliminary Patent Owner Response, 2013 WL 5402693 (Aug. 22, 2013). The Board disagreed, and instituted proceedings. *Athena*, 2013 WL 8595976, at *6–7. The patent owner then dropped the assignor estoppel issue—neither the Patent Owner Response nor the Board's Final Written Decision said anything about it.[8] 2014 WL

---

[8] The Board's post-institution scheduling order included the standard instruction: "The patent owner is cautioned that any arguments for

2864289; 2014 WL 5454543 (PTAB Oct. 23, 2014).  Thus, the only issue presented in *Husky* was the Board's failure to consider assignor estoppel *as a bar to institution*.  This Court had no difficulty concluding that §314(d) barred the patentee's appeal because it "specifically" challenged "the Board's determination during the *institution phase* that assignor estoppel cannot bar an assignor or his or her privies from *petitioning* for *inter partes* review."  838 F.3d at 1245.  *Husky* did not hold, however, that *all* appeals concerning assignor estoppel are unreviewable as challenges to institution decisions—nor could it.

Unlike in *Husky*, Cisco does not "attack the decision to *institute inter partes* review," nor does its cross-appeal implicate "questions that are closely tied to the application and interpretation of statutes related to the Patent Office's decision to *initiate inter partes* review."  *Cuozzo Speed Techs.*, 136 S. Ct. at 2141.  Instead, Cisco challenges the Board's assignor-estoppel determination *on the merits*, as reflected in the Board's final written decision.

---

patentability not raised in the response will be deemed waived."  *See* 2013 WL 8701798 (PTAB Oct. 25, 2013).

In contrast to the patentee in *Husky*, Cisco properly raised assignor estoppel on the merits *after* institution. Appx7-8; Appx1588-1595. Following institution, the petitioner must prove unpatentability. 35 U.S.C. §316(e). The patent owner is entitled to argue why that burden cannot be met. *Id.* §§316(a)(8), 313; 37 C.F.R. §42.120(a). And one way a petitioner might be unable to prove unpatentability in an adversarial adjudication is if longstanding common-law principles prevent him from doing so. *See, e.g.*, MPEP §2659 (9th ed. 2015) (discussing claim and issue preclusion in *inter partes* reexaminations). This Court recognized as much in *Credit Acceptance Corp. v. Westlake Services*, noting that the AIA's statutory estoppel provisions were "not limited to institution decisions," restricted a petitioner's ability to "request *or maintain*" post-grant review proceedings, and were thus within this Court's jurisdiction to review when the issue was properly joined below. 859 F.3d 1044, 1050-51 (Fed. Cir. 2017).

The fact that an issue was raised in opposing institution does not immunize it from judicial review when presented again at the merits phase. Were it otherwise, §314(d) would deviate from the "strong presumption" "favoring judicial review of rights-changing administrative

action," *Versata Development Group, Inc. v. SAP America, Inc.*, 793 F.3d 1306, 1320 (Fed. Cir. 2015)—a presumption the PTAB has never acknowledged, let alone overcome "by 'clear and convincing' evidence." *Id.*  For precisely that reason, *Versata* makes clear that decisions going to the merits of unpatentability, and not just whether to institute, are reviewable.  *Id.* at 1329 ("Before us then are the merits of the final written decision rendered by the PTAB in this case. To be clear, it is the merits of the final written decision that are on appeal; we are not here called upon to review the determination by the PTAB whether to institute a CBM review, and indeed the statute expressly instructs that we may not …."); *id.* ("[O]n an appeal of the PTAB's final written decision, all questions that relate to the ultimate merits of the case are before us.") Indeed, the Patent Office has itself noted the importance of this distinction:

> [I]n *Cuozzo* the validity of the USPTO's 'broadest reasonable interpretation' rule was properly before the Court: the agency had applied that rule in the institution decision, but it had also applied the rule in its final patentability decision on the merits. *The patent owner's challenge to that rule was therefore not a challenge solely to the institution decision, and the government did not dispute that this Court and the Supreme Court had jurisdiction to address it.*

*Wi-Fi One, LLC v. Broadcom Corp.*, Nos. 2015-1944, -1945, -1946, En Banc Br. for Intervenor Michelle K. Lee, Director, USPTO, Dkt. 164, at 38 (Mar. 22, 2017).

So too here. Nothing about assignor estoppel confines the Board's consideration of it to the institution stage. Where, as here, and in *Credit Acceptance* and *Versata*, the patent owner properly raised an issue as a reason not to maintain the proceeding—or to rule against the petitioner—this Court has jurisdiction to review the Board's decision.

### D.    This Is A Quintessential Case For Assignor Estoppel.

Once it is clear that assignor estoppel applies to invalidity arguments made in IPRs, as in every other proceeding, the Court should hold that it defeats Arista's arguments. Arista never contested the merits of Cisco's assignor-estoppel argument before the Board—for good reason. Dr. Cheriton's and Mr. Bechtolsheim's assignment of the '577 patent and Arista's challenge to its patentability present a textbook assignor-estoppel case. The ITC has already found as much. *945 Investigation* at 120–128.

As explained in the Statement of the Case, it is indisputable that Dr. Cheriton and Mr. Bechtolsheim assigned the '577 patent's invention

to Cisco for valuable consideration.  *See supra*, Part I.C; Appx39; Appx921; *945 Investigation* at 122.  Owing to "the intrinsic unfairness in allowing an assignor to challenge the validity of the patent it assigned," Dr. Cheriton and Mr. Bechtolsheim's "representation of validity contained in [their] assignment of [the '577] patent for value raises the presumption that an estoppel will apply."  *Mentor*, 150 F.3d at 1378. They could have negotiated a different deal, but did not.  *See id.* Subsequently, both founded Arista, which the ITC found to have a culture of copying Cisco, and which developed products it knew infringed the '577 patent's technology.  *945 Investigation* at 109.

Because it was founded by Dr. Cheriton and Mr. Bechtolsheim, Arista exemplifies the type of privity this Court has found to create assignor estoppel.  *See Diamond*, 848 F.2d at 1224 ("The estoppel also operates to bar other parties in privity with the assignor, *such as a corporation founded by the assignor*.").  If Dr. Cheriton and Mr. Bechtolsheim's founding of Arista were not enough to establish privity, their substantial ownership and leadership of Arista would be.  "Even a party that owns less than a majority of a company's stock can still exercise effective control over the company's operations," *Mentor*, 150

F.3d at 1380 (finding privity), and Dr. Cheriton and Mr. Bechtolsheim were and continue to be some of Arista's largest stockholders. Appx978-979; Appx981; Appx983; Appx937(¶8). More than that, Mr. Bechtolsheim is Arista's Chairman and Chief Development Officer. *945 Investigation* at 123-124. And Dr. Cheriton led Arista for years as a chief technologist, giving him "deep[] involve[ment] in knowing and setting the direction of Arista's software development and . . . software efforts over the years." *See id.* at 124-125; Appx937(¶8). On this record, the ITC correctly concluded that Arista "clearly availed itself of Mr. Bechtolshiem's [sic] and Dr. Cheriton's 'knowledge and assistance' to conduct engineering research, and develop products that directly infringe Cisco's asserted patents." *945 Investigation* at 125.

Based on the public and Board records, Arista is indisputably in privity with Dr. Cheriton and Mr. Bechtolsheim, who assigned the '577 patent's invention to Cisco. Under decades of this Court's precedents, assignor estoppel bars Arista from challenging the '577 patent's validity.

*        *        *

The Board's failure to apply assignor estoppel is both contrary to settled law and, even on its own terms, arbitrary and capricious. The

Court should hold that the doctrine applies in *inter partes* reviews to prevent the gamesmanship of parties like Arista. Based on the undisputed facts, the Court can find that the doctrine bars Arista's invalidity arguments, or remand for the PTAB to consider its application, which would likely moot the remaining issues in these consolidated appeals.

## II.  In Analyzing Patentability, The Board Adopted Erroneous Constructions Of Three Key Claim Terms

Separate and apart from its failure to apply assignor estoppel, the Board adopted legally erroneous claim constructions in its patentability analysis. The Board's application of the claims to the prior art improperly (1) reads the claims to permit performing the claimed invention in software; (2) adopts an unreasonably broad construction of "access control patterns"; and (3) applies an unreasonably broad construction of "generating an access result in response to said at least one selected match."

Like any other claim construction issue, this Court reviews the Court's application of the claims in its patentability analysis *de novo* applying well-established claim construction principles. *See Respironics, Inc. v. Zoll Med. Corp.*, 656 F. App'x 531, 535 (Fed. Cir. 2016); *In re Abbott*

*Diabetes Care Inc.*, 696 F.3d 1142, 1150–51 (Fed. Cir. 2012); *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1289–90 (Fed. Cir. 2010). Here, those principles make clear the inconsistency between the Board's constructions and the invention described and claimed in the '577 patent. For that reason alone, this Court should set aside the Board's finding that claims 1, 7-10, 12-16, 18-22, 25, and 28-31 are unpatentable.

## A. The '577 Patent Requires Hardware-Based Enforcement of Access Control

Each of the challenged claims requires (i) maintaining a set of access control patterns in an associative memory; (ii) receiving a packet label; (iii) matching information from the packet label against the access control patterns in parallel; (iv) in response to those matches, generating an access result; and (v) making a routing decision in response to the access result. Appx48(7:34-48). By reading the claims to permit performing some of these steps in software, the Board's application of the claims to the prior art is unfaithful to the '577 patent's invention. Appx24-25. That alone requires a remand.

The claims expressly require associative memory, which is a hardware component. Appx48(7:34-35). And the specification further makes clear that the invention must be performed in hardware. Dr.

64

Cheriton and Mr. Bechtolsheim regarded their invention as requiring "access control list processing *in hardware.*" Appx39(Title); *see also Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) (the specification is "'the single best guide to the meaning of a disputed term'"); *Smith*, 2017 WL 4247407, at *5 (holding the "broadest reasonable interpretation" is "an interpretation that corresponds with what and how the inventor describes his invention in the specification"). That is their patent's title and what the specification repeatedly says. The abstract, for example, states that "[t]he invention provides for *hardware* processing of ACLs and thus *hardware* enforcement of access control." Appx39(Abstract). The summary of the invention reiterates that "[t]he invention" provides "*hardware* enforcement of access control" and eliminates the "need for software processing." Appx45(2:38-40, 2:47-50); *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1318 (Fed. Cir. 2014) ("The fact that the Summary of the Invention gives primacy to these attributes strongly indicates that [is what] the invention requires."). Those statements defining *the invention* are inherently "expressions of manifest exclusion or restriction," as this Court has repeatedly held. *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340,

1352 (Fed. Cir. 2010); *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013); *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1367-68 (Fed. Cir. 2007); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).

The embodiments described in the '577 patent confirm that the specification means what it says when it limits the invention to hardware-based access control. *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1299 (Fed. Cir. 2013); *VirnetX*, 767 F.3d at 1317. The specification discloses no embodiment using software to generate the claimed access result. "Quite the opposite." *Univ. of Minn.*, 717 F.3d at 936; *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001). Every embodiment and figure uses an access control element implemented in hardware to process and enforce access control rules. Appx43(Fig. 2); Appx44(Fig. 3); Appx46(3:66-4:60); Appx47-48(6:10-7:26); *see also* Appx46(3:28-40) (first embodiment), Appx46(3:41-44) (second embodiment); Appx46(3:45-55) (third embodiment); Appx46(3:55-64) (fourth embodiment). Confirming the invention's hardware-based focus, the specification further explains that "embodiments of the invention can be implemented using *circuits*

66

adapted to" the processes and data structures "described herein," Appx46(3:18-24)—language, again, inconsistent with a software implementation of the claimed invention.

The specification not only defines the invention as the hardware enforcement of access control, it expressly distinguishes the invention's hardware processing from the prior art that the specification disparages. For example, "[o]ne known solution" described in the specification reduces the number of packets that require comparison against the access control patterns, but "still has the drawback that comparing at least some of the incoming packets against the ACL *must be performed using software*." Appx45(1:35-46); Appx45(2:3-6). The specification identifies a significant problem with this approach: Processing access control rules in software is slow and could adversely affect device performance. Appx45(1:32-35); Appx45(2:14-26). Indeed, avoiding the performance delays from enforcing access control in software is the claimed invention's major "advantage." Appx45(2:27-35). These remarks disparaging software-based solutions confirm the claims must be performed in hardware. *See, e.g.*, *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319 (Fed. Cir. 2006); *SciMed*, 242 F.3d at 1343.

To be sure, the specification clarifies elsewhere that requesting "higher-level" software-based access control processing is one possible access result the claimed method may generate. Appx46(4:57-65). But this unclaimed higher-level processing occurs *after* the hardware enforcement of access control recited in the claims. Appx46(4:57-65); Appx47(6:53-59) (disclosing that the result of higher-level processing "substitute[s]" for the result previously generated by the access control element). Moreover, the specification contrasts the higher-level processor's use of "software (rather than hardware)" for "further treatment" with the hardware-based solution Dr. Cheriton and Mr. Bechtolsheim invented and claimed. Appx46-47(4:57–5:5).

The specification thus "goes well beyond expressing [a] preference" for a system employing hardware enforcement of access control and instead "disavows" other approaches. *Options Exch., Inc. v. Chicago Bd. Int'l Secs. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012). Because the Board assumed otherwise, this Court should remand for consideration in the first instance whether Huey and the ATM UNI specification teach hardware-only performance of the challenged claims. *See Dell*, 818 F.3d at 1300.

68

As Cisco's expert explained, they do not because software implements Huey's cell policer and the ATM UNI specification's traffic-control operations.   Appx1667-1668(¶129); Appx1669-1670(¶¶132-133) (citing Appx530).  Huey at best relies on hardware in its address handler to make forwarding decisions, while Huey and the ATM UNI specification discard cells based on software-implemented traffic-policing algorithms.  Appx1667-1668(¶129); Appx1669-1670(¶¶132-133)—exactly the prior-art solutions the '577 patent disparages, which relied on "hardware processing of the packet for routing," but enforced "access control … using software." Appx45(1:32-35).  Cisco is confident that, once its legally erroneous claim construction is reversed, the Board will agree.

### B.    The "Access Control Patterns" Limitation Is Not Broad Enough To Cover "Patterns" Unrelated To "Access Control"

#### 1.    The Board Failed To Adequately Explain How Huey And The ATM UNI Specification Disclose "Access Control Patterns"

The Board further erred by holding that the "access control patterns" limitation encompasses "patterns" having nothing to do with "access control."  Each of the challenged claims requires "maintaining a set of *access control patterns* in at least one associative memory." Appx48(7:35-36).  Arista contends that the virtual channel and path

69

addresses that Huey stores in its address handler are "access control patterns." *See* Appx22. But neither Huey's address handler nor its cell policer ever use those addresses to make access-control decisions.

The address handler instead uses the virtual channels and paths to determine the proper transmission path for forwarding the ATM cell toward its destination—standard routing behavior. Appx421(3:40-48); Appx421(4:43-59); Appx424(9:16-21); Appx1645-1646(¶98); Appx1673(¶140); Appx1644(¶96); Apx1662(¶123); Appx1673(¶140). Huey's cell policer then discards the cell based on a separate, unrelated traffic contract, dropping cells when a transmission path exceeds its maximum throughput rate without referencing the virtual path and channel information stored in Huey's content addressable memory. Appx421(3:40-48); Appx1645-1646(¶98); Appx1647-1648(¶101); Appx1667-1669(¶¶129-131); Apppx1674-1675(¶142).

The Board never articulated how Huey's virtual path and channel addresses are "access control pattern[s]" beyond "disagree[ing]" with Cisco's argument that those addresses "cannot be the 'access control patterns' described and claimed in the '577 patent." Appx25. Instead, the Board evaluated whether the "cell policer performs 'access control'"

and "'make[s] a routing-decision in response to said access result.'" Appx25-27. This "conflat[es]" different claim limitations, Appx26, even though showing obviousness requires proof that *every limitation* was either known in or an obvious modification of the prior art. 35 U.S.C. § 103; *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1335 (Fed. Cir. 2016).

This Court frequently vacates Board decisions for just such unexplained findings. *See, e.g.*, *Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 992-93 (Fed. Cir. 2017); *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1047 (Fed. Cir. 2017); *Securus Techs., Inc. v. Global Tel*Link Corp.*, 685 F. App'x 979, 987 (Fed. Cir. 2017). "Stating a disagreement with [Cisco] … does not amount to a satisfactory explanation for its findings." *Google Inc. v. Intellectual Ventures II LLC*, ___ F. App'x ___, 2017 WL 2924132, at *4 (Fed. Cir. July 10, 2017). Rather, the Board must "explain[] why [it] accepts the prevailing argument." *In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) ("'[C]onclusory statements' alone are insufficient."). Here, the Board did not explain why Cisco's evidence and argument were unconvincing or explicitly adopt any countervailing evidence from Arista. *Google*, 2017 WL 2924132, at *5.

That silence requires at least a remand.  *See Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1323-24 (Fed. Cir. 2017); *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1323-25 (Fed. Cir. 2015).  Without findings about how Huey's virtual paths and channels stored in its address handler are "access control patterns," the Board's decision lacks the necessary findings to facilitate meaningful judicial review or to support its obviousness determination.  *Power Integrations*, 797 F.3d at 1323-25; *Personal Web*, 848 F.3d at 991-92.

> **2.    Rather Than Remand, The Court Should Hold Huey And The ATM UNI Specification Do Not Teach The "Access Control Patterns" Limitation**

Rather than remand, however, the Court should reverse.  *See Pride Mobility Prods. Corp. v. Permobil, Inc.*, 818 F.3d 1307, 1314-15 (Fed. Cir. 2016).  Huey and the ATM UNI specification do not teach "maintaining a set of *access control patterns* in at least one associative memory." Appx48(7:35-36).    The "access control patterns" limitation plainly requires patterns used for access control, *i.e.*, to restrict a packet's transmission.    This construction aligns both with the Board's construction of "access control" as "restriction on the transmission of a packet," Appx12, and the ITC's.  *945 Investigation* at 64 (construing

"access control patterns" as "patterns of bits or other elements used for access control").

The surrounding claim language confirms that "access control" is the defining feature of the claimed "access control patterns." *See Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) (this Court "does not interpret claim terms in a vacuum, devoid of the context of the claim as a whole").  In addition to maintaining access control patterns in the associative memory, the challenged claims require "receiving a packet label" that is "sufficient to perform access control processing" and "matching matchable information" from the packet label against "said set of *access control patterns* in parallel" to "generat[e] an access result." Appx48(7:35-48).  The abstract and summary of the invention are equally clear that "in the invention" the match generated by comparing the claimed access control patterns to the claimed packet label *is used* to permit or deny transmission of a packet.    Appx39(Abstract); Appx45(2:38-50).  The "access control patterns" are thus what enable access control processing of the packet.

Arista's application of the prior art to the claims, which the Board seemingly adopted without explanation, reads "access control" out of the

claims. The virtual channel and path addresses Huey stores in its content-addressable memory are *not used in any access control decisions* its cell policer supposedly performs. Appx1645-1646(¶98); Appx1647-1648(¶101); Appx1667-1669(¶¶129-131); Appx1673(¶140); Appx1674-1675(¶142). Divorcing the adjective "access control" from the noun it modifies violates basic rules of English grammar and this Court's precedent. *In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282, 1286 (Fed. Cir. 2016) (reversing a construction that "ignore[d] the term 'thumb' in 'thumb switch.'").

Once the claims are properly construed, Huey and the ATM UNI specification unquestionably fail to teach or suggest "maintaining a set of access control patterns in at least one associative memory." Huey stores *only* the virtual path and channel addresses in its associative memory. Appx421(3:40-48); Appx424(9:16-21); Appx424(9:43-59); Appx415(Fig. 10A); Appx1659-1661(¶¶120-121); Appx1667-1668(¶129). Even the Board acknowledged, however, that Huey performs access control "based on whether a cell passed to the policer exceeds the Traffic Contract." Appx30. That process simply never uses the virtual path and channel addresses in Huey's CAMs. Appx1667-1669(¶¶129-131);

Appx1674-1675(¶142). And since the stored addresses are not used for access control, they cannot be "access control patterns." Without evidence that the prior art teaches access control patterns stored in an associative memory, Arista cannot meet its burden of proving the challenged claims obvious. *See Smith*, 2017 WL 4247407, at *6.

### C. The '577 Patent Requires "Generating An Access Result" Based On "At Least One Selected Match" Of The Packet Label To An Access Control Pattern

#### 1. The Board Adopted An Unreasonably Broad Construction Of "In Response To"

Compounding its erroneous application of "access control patterns," the Board determined an access result is generated "in response to" a match whenever the result is generated after the match occurs. Appx30 ("in response to" satisfied if the match "precedes" the access result); *see also* Appx26-27 ("in response to" does "not require[]" that the match "generate the access result"). This again unreasonably expanded the claims' scope and allowed the Board to find the challenged claims obvious based on disclosures having no relevance to access control, let alone by using access control patterns stored in an associative memory.

Tellingly, the Board cited *nothing* supporting its view that "in response to" is satisfied if the match simply "precedes" the access result.

Appx26-27; Appx30. The '577 patent's claims, read alongside the specification, require that the access decision (*e.g.*, permit or deny) associated with the selected match *is used to determine* the access result.

Claim construction begins with the language of the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). Here, each challenged claim requires *first* "generating a set of matches" by matching "matchable information" from the "packet label" with the "set of access control patterns," then "generating an access result *in response to* [] at least one selected match." Appx48(7:40-47). The Board's erroneous construction of "in response to" stemmed from its failure to appreciate the cause-and-effect relationship between identifying a match and generating an access result. Even Arista acknowledges that each of the steps in the challenged claims "requires the output of the prior step," and the "*specified result of the selected match is used to permit or deny access for the packet*." Arista Br. 33; *see also* Appx93 n.9 (Arista contending that "each step's output serv[es] as a required input for the next step").

This cause-and-effect relationship is evident from the claim language itself. "There is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharms., Inc.*

*v. Amino Chems., Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013); *see also White v. Dunbar*, 119 U.S. 47, 51-52 (1886). The ordinary meaning of "in response to" "require[s] a cause-and-effect relationship," *American Calcar, Inc. v. American Honda Motor Co.*, 651 F.3d 1318, 1340 (Fed. Cir. 2011), in which a subsequent action depends on the results of an earlier action. Arista admitted as much in its petition, acknowledging that "'responsive' should be construed broadly enough to include 'based on' and 'derived from,'" Appx74—which the Board seemingly agreed reflected the ordinary meaning, as it did not give an explicit construction in its institution decision, Appx1512-1516; *see also* Appx883 n.4 (Cisco adopting Arista's proposed construction).

The disputed limitation, "generating an access result *in response to* said at least one selected match," uses "in response to" in precisely this ordinary manner. Indeed, the access result is generated in response to an *object*, the "selected match," not an *event*. Thus, it would not make grammatical sense to construe "in response to" as referring to the temporal sequence of events.

The Board's construction likewise makes nonsense out of the remaining claim limitations. In addition to the disputed limitation, the

challenged claims use "in response to" or "responsive to" five other times. Those claims require "receiving a packet label *responsive* to a packet" that is "sufficient to perform access control processing for said packet." Appx48(7:37-39). The "matchable information" must further "be[] *responsive to* said packet label," and the "set of matches" must be generated "*in response []to*" matching this matchable information with the access control patterns. Appx48(7:40-44). The claimed method then "select[s] at least one of said matches *in response to*" the "priority information associated" with each match. Appx48(7:45-47). Finally, each of the challenged claims makes a routing decision "*in response to* [the] access result." Appx48(7:48).

"A word or phrase used consistently throughout a claim should be interpreted consistently." *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998). But adopting the Board's construction of "in response to"—which merely requires one action to occur after an earlier action—would make the challenged claims gibberish:

> matching matchable information, said matchable information being *after* ~~responsive to~~ said packet label, with said set of access control patterns in parallel …

> selecting at least one of said matches *after* ~~in response to~~ said priority information, and generating an access result *after* ~~in response to~~ said at least one selected match; and
>
> making a routing-decision *after* ~~in response to~~ said access result.

Even under the broadest-reasonable-interpretation standard, the Board and this Court should strive to make sense rather than nonsense out of the claim language. *See Interactive Gift, Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1336 (Fed. Cir. 2001) (rejecting construction that was "illogical and does not accord with the plain import of the claim language"). The Board's construction thus cannot be correct.

The summary of the invention reinforces how, in "the invention," the "specified result *of the selected match* is used to permit or deny access for the packet." Appx45(2:47-49); Appx39(Abstract). This description "strongly indicates that [is what] the invention requires." *VirnetX*, 767 F.3d at 1318; *see Smith*, 2017 WL 4247407, at *5. So do other portions of the specification, including its statement that the "matching (or lack of matching) of information from the packet header to specifiers recorded in the CAM *are used to enforce access control*." Appx45(2:33-35). The specification also discloses that the "indicator" associated with the highest priority access-control pattern matching a given packet "specifies

whether or not the packet [] has permission to be forwarded." Appx46(4:51-60).

Each of these disclosures describes an invention that requires using the match to generate an access result. None support the Board's conclusion that "in response to" here merely requires a before-and-after relationship. The specification thus confirms what the claims already make clear. *See Pride Mobility*, 818 F.3d at 1314; *Man Mach. Interface Techs.*, 822 F.3d at 1287. By interpreting "in response to" contrary to the claims' language and the specification's description of the invention, the Board legally erred.

### 2. Under The Proper Construction, Huey And The ATM UNI Specification Do Not Generate An Access Result In Response To A Match

Each of the Board's obviousness determinations depended on its decision that Huey and the ATM UNI specification disclosed "generating an access result *in response to* said at least one selected match" under its erroneous construction. The Board, at Arista's urging, found that the "discard" instruction issued by Huey's cell policer is the claimed "access result." Appx23; Appx26. It then determined that this "discard instruction is generated 'in response to' a match by the address handling

80

circuit because a match necessarily *precedes* the determination by cell traffic policer 70 to discard a non-conforming cell." Appx26; Appx30 (citing Appx424(9:39-41)). The Board never addressed whether Huey and the ATM UNI specification teach the disputed limitation under Cisco's proposed construction, and Arista never asked it to. *See* Appx3656-3658(29:17-31:2).

Because the Board did not consider the issue, the Court should at minimum vacate all of the Board's obviousness findings and remand. But the Court should instead reverse because the cell policer indisputably never uses the match of virtual path or channel information in the address handler to make access control decisions. Rather, as the Board found, the cell policer issues discard instructions "based on whether a cell passed to the policer *exceeds the Traffic Contract*," Appx26; Appx30.

In attempting to address this shortcoming of the instituted combination, Arista merely pointed to the cell's virtual path or channel address being used "to provide the feed [of cells] to that usage parameter control, UPC," while admitting that cells are only discarded when the traffic "rate is being exceeded." Appx3654(27:13-20); Appx3666(39:4-7) (citing Appx564-565). That rate evaluation is not based on the virtual

81

path or channel address match in the address handler, and therefore does not generate a "discard" instruction in response to a selected match in the associative memory.  Appx1664-1666(¶126); Appx1667-1669(¶¶129-131), Appx1674-1675 (¶142).  Arista thus cannot meet its burden to establish obviousness. *See Pride Mobility Prods.*, 818 F.3d at 1314-15.

## ARGUMENT IN RESPONSE TO ARISTA'S APPEAL

### III. The Court Should Affirm The Board's Ruling That Arista Did Not Demonstrate That Claim 2 Is Unpatentable

The Board correctly found that claim 2 is patentable.  If this Court determines that assignor estoppel does not foreclose Arista's arguments, it should affirm claim 2's patentability on the merits.   To prove obviousness, a challenger must show each claim element in the prior art or a persuasive explanation for modifying that art to include those elements.  *See* 35 U.S.C. §103; *Nike*, 812 F.3d at 1335.  Because Huey does not teach performing "at least two" of the claimed steps "in parallel using a pipeline technique," the Board correctly found Arista failed to make this showing.  Appx31-34.[9]

---

[9] The Court also need not reach this issue if it rules for Cisco on any of the technical arguments raised in its appeal, each of which explain why claim 2, like the other challenged claims, is non-obvious.

Parallel pipeline processing improves system performance by dividing a task into a pipeline of independent steps, with the output of one step serving as the input to the next. Appx3298. This allows each step in the pipeline to execute simultaneously on different pieces of data, much like an auto assembly line allows a manufacturer to assemble multiple cars at once. Appx3298-3299. When one piece of data moves from the first step in the pipeline to the second, the first step can start performing its small part of the overall process on the next piece of data. *Id.* A switch could thus use a pipeline to make a forwarding decision for one packet while simultaneously performing access control on a second packet for which a forwarding decision has already been made. Appx47(6:40-53).

Substantial evidence supports the Board's finding that Huey does not implement parallel pipeline processing. According to Arista, Huey's Figure 4 demonstrates that its address handler, cell router, and cell policer operate in parallel "such that each stage is always operating on a cell." Arista Br. 36. But calling Huey's components "pipelined stages" does not make them so. *Id.* 35. Huey describes Figure 4 in one

paragraph, which never mentions parallel processing or a processing pipeline. Appx421(3:34-48); *see also* Appx421(5:54-56).

Kogge cannot fill this gap. *See* Arista Br. 37. Kogge certainly describes parallel pipeline processing as a "well-recognized" technique in computer architecture. Appx3297-3298. But Kogge does not suggest using it in an ATM switch similar to Huey's or in any networking device, let alone describe parallel pipeline processing as a well-recognized or universal technique in the networking context. The Board thus did not err by declining to find, based on Kogge, that every multi-step process a switch or other networking device performs necessarily involves parallel pipeline processing.

To the extent Arista complains that the Board misunderstood its Kogge-based arguments, Arista can only blame itself. Arista Br. 38-39. Arista cited Kogge only once, *belatedly in its reply*, to support the assertion that an ordinarily skilled artisan would "understand the speed benefits and efficiency from operating the address handler and cell policer at the same time." Appx2404-2405. Beyond that citation, Arista never explained Kogge's relevance or teachings. And Arista never directed the Board to specific passages or quoted any language from

Kogge as it does here. Appx2404-2405. The Board need not make Arista's arguments for it or determine for itself why "Kogge shows that putting packets through the pipeline without waiting for the previous packet would be considered operating in parallel given that this reference distinguishes parallel operation from pipeline operation" when Arista provided no answer. Appx34; *see also* Appx3293 (describing "parallelism and pipelining" as "complementary design philosophies" that are "discernably different in their general approach").

Despite challenging the Board's explicit findings about Kogge's teachings, Arista oddly argues that the Board "refused to consider Kogge because Arista did not offer it as part of a[n] [obviousness] combination." Arista Br. 37. Not so. The Board's decision addressed Kogge and explained why its teachings do not render claim 2 obvious even if offered only to show artisans' general knowledge at the relevant time. Appx34. The Board also *separately* determined Arista "ha[d] not shown a reason to combine Kogge with Huey and the ATM UNI Specification." Appx33-34. Arista cannot fault the Board for addressing either potential use of Kogge given Arista's opaque, undeveloped arguments concerning that reference.

85

Nor can Arista fault the Board for not specifically addressing the expert testimony cited in its opening brief. Arista Br. 36. Arista buried that testimony within a five-page block of deposition testimony unaccompanied by further explanation in its PTAB reply. Appx2404. The Board, again, need not unearth arguments Arista could have made based on evidence buried in a lengthy citation. As with Arista's Kogge-based arguments, remanding for the Board to consider this testimony would grant Arista an undeserved mulligan to raise arguments it chose not to adequately develop the first time.

Regardless, the Board rejected the factual underpinnings for Arista's expert's opinion. That expert, Dr. Chao, testified that an ordinarily skilled artisan would understand Huey's Figure 4 "will allow you to do parallel and pipeline," Appx1788(92:17-19), *based on the separate disclosures in "Column 8" and also "Figure 10a and 10b,"* Appx1789(93:12-21); *see generally* Appx1789-1793(93:12-97:20). The Board explained that Huey's column 8 disclosure that its switch processes cells "in real time" and that its address handler can simultaneously load multiple subfields *of the same ATM header* into memory does not teach parallel pipeline processing. Appx32-33. Arista's

appeal does not challenge those findings.  With good reason: "real time" and "parallel" are not synonymous, and loading multiple subfields into memory simultaneously may perform the claimed matching efficiently, but does not suggest that Huey's matching occurs in parallel with any other step.  Nor does Arista challenge the Board's finding that Figures 10a and 10b show "only that the CAMs are physically connected in parallel, not that they operate in parallel to each other."  Appx33.  The Board's rejection of every factual predicate for Dr. Chao's opinion renders it irrelevant.

Arista's remaining arguments purport to challenge a decision bearing no resemblance to the one the Board actually issued.  Arista contends that the Board read claim 2 "as requiring the steps to be performed in parallel *for the same packet*."  Arista Br. 27.  But the Board said the opposite, explaining it assumed the claims require performing the steps in parallel *for different packets* because neither party argued otherwise.  Appx31-32.  The Board likewise did not "discuss limitations of" a related patent "instead of analyzing … claim 2."  Arista Br. 31.  The portion of the Board's decision Arista latches onto discusses the sole reference to parallelism in the *'577 patent's* specification.  *See* Appx31

(citing Appx47(6:40-53)).    Considering how the specification uses "parallel," far from being legally erroneous, that is precisely what this Court requires.  *See Smith*, 2017 WL 4247407, at *5; *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 751, 755 (Fed. Cir. 2016) (claim terms must be understood "in light of the claims and specification").  Arista simply did not meet its burden of proof, and the Board properly concluded as much.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Board's decision that claims 1, 7-10, 12-16, 18-22, 25, and 28-31 are unpatentable and affirm its decision that claim 2 is patentable.

October 10, 2017                            Respectfully submitted,

                                             */s/ John C. O'Quinn*
                                             John C. O'Quinn
                                             Jason M. Wilcox
                                             Craig T. Murray
                                             Benjamin A. Herbert
                                             C. Alex Shank
                                             KIRKLAND & ELLIS LLP
                                             655 15th St., N.W.
                                             Washington, D.C. 20005
                                             (202) 879-5000

*Counsel for Cross-Appellant Cisco Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of October, 2017, a true and correct copy of the foregoing document was filed with the clerk of court using the CM/ECF system, which will send notice of electronic filing to all CM/ECF participants, resulting in service upon all counsel of record.

*/s/ Jason M. Wilcox*
Jason M. Wilcox

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. Cir. R. 28.1(b)(2)(A).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B)(iii), the brief contains 16,478 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Century Schoolbook font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  October 10, 2017              */s/ John C. O'Quinn*
                                      John C. O'Quinn